## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| HAMBURG SÜDAMERIKANISCHE DAMPFSCHIFFFAHRTS-GESELLSCHAFT A/S & CO. KG ; HAMBURG SUD NORTH AMERICA, INC. ; MAERSK A/S, *as successor in interest to Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG* ; and MAERSK AGENCY USA, INC., *as successor in interest to Hamburg Sud North America, Inc.*<br><br>    *Petitioners,*<br><br>    v.<br><br>FEDERAL MARITIME COMMISSION,<br><br>    *Respondent.* | Case No. 25-1156 |

## PETITION FOR REVIEW

Petitioners (1) Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG; (2) Hamburg Sud North America, Inc.; (3) Mærsk A/S, *as successor in interest to Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG* ; and (4) Maersk Agency USA, Inc., *as successor in interest to Hamburg Sud North America, Inc.* seek this Court's review under the Hobbs Administrative Orders

Review Act, 28 U.S.C. §§ 2342(3)(B) and 2344, of the Federal Maritime

Commission's *Order Denying Petition for Reconsideration*, FMC Dkt. 21-

11 (served June 27, 2025), *Order Affirming Initial Decision*, FMC Dkt.

21-11 (served August 27, 2024), and all orders or rulings encompassed in

or made reviewable by those Orders. Copies of the June 27, 2025 Order

and August 27, 2024 Order are attached to this Petition.

July 18, 2025                    Respectfully submitted,

                                 */s/ Bryan Killian*

                                 Bryan Killian
                                 Brendan J. Anderson
                                 MORGAN, LEWIS & BOCKIUS LLP
                                 1111 Pennsylvania Avenue, NW
                                 Washington, DC 20004
                                 (202) 739-3000
                                 bryan.killian@morganlewis.com
                                 brendan.anderson@morganlewis.com

                                 *Counsel for Petitioners*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| HAMBURG SÜDAMERIKANISCHE DAMPFSCHIFFFAHRTS-GESELLSCHAFT A/S & CO. KG ; HAMBURG SUD NORTH AMERICA, INC. ; MAERSK A/S, *as successor in interest to Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG* ; and MAERSK AGENCY USA, INC., *as successor in interest to Hamburg Sud North America, Inc.*<br><br>    *Petitioners,*<br><br>    v.<br><br>FEDERAL MARITIME COMMISSION,<br><br>    *Respondent.* | Case No. 25-1156 |

## PETITIONERS' CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, and District of Columbia Circuit Rule 26.1, Petitioner Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG states that it was formerly a corporation organized under the laws of Germany with a principal place of business in Hamburg, Germany, until it merged with Mærsk A/S in November 2021.

3

Petitioner Hamburg Sud North America, Inc. states that it was formerly a corporation organized under the laws of New Jersey, with a principal place of business in Morristown, New Jersey, until it merged with Maersk Agency USA, Inc. in January 2022.

Petitioner Mærsk A/S is a direct subsidiary of A.P. Møller – Mærsk A/S. A.P. Møller – Mærsk A/S is a publicly traded company organized under the laws of Denmark, with a principal place of business in Copenhagen, Denmark. A.P. Møller Holding A/S controls 51% of its voting shares. No other publicly traded company owns 10% or more of its stock.

Petitioner Maersk Agency USA, Inc. states that it is a corporation organized under the laws of Delaware, with a principal place of business in Florham Park, New Jersey. Maersk Agency USA, Inc. is a direct U.S. subsidiary and agent of Mærsk A/S.

Pursuant to the requirement of Circuit Rule 26.1(b) that they provide a statement of their general nature and purpose as relevant to the litigation, Petitioners state that they provide or have provided ocean shipping services worldwide, including to and from the United States.

July 18, 2025                    Respectfully submitted,

                                 */s/ Bryan Killian*

                                 Bryan Killian
                                 Brendan J. Anderson
                                 MORGAN, LEWIS & BOCKIUS LLP
                                 1111 Pennsylvania Avenue, NW
                                 Washington, DC 20004
                                 (202) 739-3000
                                 bryan.killian@morganlewis.com
                                 brendan.anderson@morganlewis.com

                                 *Counsel for Petitioners*

## CERTIFICATE OF SERVICE

Pursuant to Rule 15(c) of the Federal Rules of Appellate Procedure, I hereby certify that I have on this 18th day of July, 2025, caused to be served copies of the foregoing Petition for Review by first class mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to:

David Eng, Secretary
Federal Maritime Commission
800 North Capitol Street, N.W.
Washington, DC 20573

Shlomo Y. Hecht
Shlomo Y. Hecht, P.A.
4538 NW 85th Ave.
Coral Springs, FL 33065
(954) 861-0025

Aaron W. Davis
Valhalla Legal, PLLC
204 W. 7 St., PMB 222
Northfield, MN 55057
(763) 957-2397

Jacob Weiss
OJ Commerce, LLC
3076 N Commerce Parkway
Miramar, FL 33025

and by email on all parties on the Commission's service list in the

underlying proceeding, Commission Docket No. 21-11, as set forth

below.

Shlomo Y. Hecht
sam@hechtlawpa.com

Aaron W. Davis
davis@valhallalegal.com

Jacob Weiss
jacob@ojcommerce.com

*/s/ Bryan M. Killian*
Bryan M. Killian

# Exhibit A

# FEDERAL MARITIME COMMISSION

OJ COMMERCE, LLC,

    *Complainant*,

      v.

HAMBURG SÜDAMERIKANISCHE
DAMPFSCHIFFFAHRTS-GESELLSCHAFT
A/S & CO. KG AND HAMBURG SUD
NORTH AMERICA, INC.,

    *Respondents.*

Docket No. 21-11

Served: June 27, 2025

---

**BY THE COMMISSION:** Louis E. SOLA, *Chairman*; Rebecca F. DYE, Daniel B. MAFFEI, and Max S. VEKICH, *Commissioners.*

---

### <u>Order Denying Petition for Reconsideration</u>

This case is before the Commission on a Petition for Reconsideration ("Petition") from the Commission's Order Affirming Initial Decision ("Final Decision" or "F.D.") dated August 27, 2024. The Final Decision ordered Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG ("HSDG") to pay OJ Commerce, LLC ("OJC") a total of $17,563,806.14 in reparations, including interest running from

April 29, 2021, due to HSDG's knowing and willful violations of the Shipping Act's prohibitions on refusing to deal and retaliation.

OJC now petitions the Commission to reverse part of Section C.3.ii of the Final Decision, which described how the Commission calculated OJC's profits per container. The Commission disagrees with the Petition that the Commission erred in finding that HSDG would not have renewed OJC's service contract for the prior year's shipping rates. OJC's interpretation of an email from Ms. Casanova is misleading and does not identify a substantive error in the Commission's Final Decision. The Commission summarily rejects and, in the alternative, denies the Petition on the merits.

## I.    **BACKGROUND**

### A.    **Procedural History**

As a limited liability company organized with a principal place of business in Miramar, Florida selling "dropship products" from domestic inventory of hundreds of brands, OJC initiated this case with a Complaint served December 13, 2021. F.D. at 2-3. The Complaint alleged that HSDG is a vessel-operating common carrier and that it violated 46 U.S.C. § 41104(a)(3) and (10) (2021) in connection with service contract AECC0000291 and with unsuccessful negotiations towards a renewal covering June 2021 to June 2022. Verified Complaint. On June 7, 2023, the Administrative Law Judge ("ALJ") issued the Initial Decision ("I.D.") which found HSDG violated both 46 U.S.C. § 41104(a)(3) and (10), concluded double reparations were appropriate, and ordered HSDG to pay OJC $9,843,766.40 with interest. I.D. at 64. Both HSDG and OJC filed exceptions on June 29, 2023, and responses on July 21, 2023. The Commission issued the Final Decision on August 27, 2024, which affirmed the Initial Decision's finding as to liability but modified the award of damages. F.D. at 63-64. The Commission concluded that profits should be calculated based on the shipping costs OJC actually paid

across the 2021-2022 service contract period and that the parties would have agreed on a 400 forty-foot-equivalent ("FFE") minimum quantity commitment ("MQC"). *Id*.

## B.    Reparations

The ALJ accepted OJC's calculations of average revenue per container, $60,250.30, and average profit per container, $22,892.48. I.D. at 48. The ALJ noted that OJC calculated those numbers using costs for actual shipments made from June 1, 2020, to July 16, 2022. For revenue per container, OJC used actual products shipped and the selling price of those products. *Id*. The ALJ found OJC calculated profits-per-container by using the same information about actual products shipped and selling price and deducting "all the costs" such as the purchase cost of the good, sales commissions, marketing, fulfillment center costs, and shipping costs. *Id*. However, contrary to the ALJ's conclusion, OJC did not use actual shipping costs it paid during the June 1, 2021, to July 16, 2022, period. OJC's data instead uses an estimated rate OJC calls "HS Est Rate" that OJC seems to have created. This rate is based on the 2020-2021 service contract rates OJC paid even though OJC's data reflects actual shipment costs for shipments made in the 2021-2022 service contract year. OJC Exhibit 101. OJC used this rate because OJC believed HSDG would have renewed the service contract with the same rates. Petition at 7.

The Commission identified the ALJ's mistake in the Initial Decision and corrected the calculations in the Final Decision. F.D. at 50-54. The Commission explained that it was unreasonable to assume that HSDG would have agreed to renew OJC's service contract at prior year rates based on the record and the market conditions at that time. Negotiations never reached a point where the parties exchanged proposed rates and it is not clear from the record what rate the parties would have negotiated, so there is no indisputable rate the Commission could simply substitute. Instead of remanding the case for the ALJ to correct the calculations based on the same record before the Commission, the Commission chose

to adjust the calculations. F.D. at 52. The Commission analyzed the record and concluded that the most just and reasonable hypothetical shipping rates for the 2021-2022 Service Contract were the rates OJC actually paid during this period. *Id*. at 52-54. The Commission calculated OJC's lost profits per container for the 2021-2022 service contract at $18,983.01 instead of the ALJ's $22,892.48. F.D. at 63.

OJC's Petition focuses on an internal HSDG email exchange and language in the Final Decision. The Commission concluded that there "is no evidence that HSDG was willing to renew for the 2020-2021 shipping rates . . . ." F.D. at 51. However, Ms. Casanova sent an internal email to HSDG employees stating, "I created the new [contract] . . . The new contract contains the same lanes, rates, and conditions of the current contract . . . ." Complainant's Appendix ("CX") at 214. Ms. Casanova sent a follow-up email 22 minutes later that more fully describes OJC's history as an HSDG customer, recites OJC's actions due to HSDG's purported breach of the existing contract, and asks if HSDG can increase the MQC to 400 FFE to make up for the previous contract shortfall. CX at 215. Ms. Casanova does not mention maintaining the lanes, rates, or conditions of the previous contract. The record includes no evidence the parties exchanged proposed shipping rates for the renewed contract.

## II.    **DISCUSSION**

### A.    **Standard of Review**

The Commission's rules for reconsideration of a final decision or order of the Commission are found at 46 C.F.R. § 502.261. A petition for reconsideration will be summarily rejected "unless it . . . (2) [i]dentifies a substantive error in material fact contained in the decision or order". 46 C.F.R. § 502.261(a). A petition cannot simply elaborate on or repeat arguments made prior to the decision or order. *Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, Docket No. 08-03, 2014 WL 5316353, at *3 (FMC Feb. 11, 2014).

OJC v. HSDG and HSNA                                                         5

## B.    Count I

### 1.    Summary Rejection

As a threshold matter, the Commission's regulations require that the Commission summarily reject any petition that does not meet one of three criteria. The relevant criterion for this Petition requires that OJC allege an error that is a substantive error of material fact. 46 C.F.R. § 502.261(a)(2). Few Commission decisions delve into what constitutes a "substantive error" or what qualifies as a "material fact". Generally, a "substantive error" is understood to be one that affects a party's substantive rights or the outcome of a case. *Substantive Error*, Black's Law Dictionary (10th ed. 2014); *Hutchins v. Champion Int'l Corp*., 110 F.3d 1341, 1344 (8th Cir. 1997); *see also Skyview Cabinet USA, Inc. v. U.S.*, 2024 WL 4904673, at *4 (Ct. Int'l Trade Nov. 27, 2024) (defining a "substantive error" as an error that affects a party's substantive rights or the outcome of the case).

For reasons further elaborated on below, the Petition does not identify a "substantive error." Even if the Commission accepted that it erred by failing to consider part of Ms. Casanova's statement, the error would not affect the outcome of this case or OJC's substantive rights. Thus, the first count of the Petition does not identify a substantive error of material fact and the Commission summarily rejects the Petition.

### 2.    Petition Denial

Alternatively, and in addition to summarily rejecting the Petition on Count I, the Commission denies Count I of the Petition on the merits. *See China Ocean Shipping Company v. DMV Ridgeview, Inc.*, 1992 WL 231211, at *2 (FMC Mar. 19, 1992). As relevant here, OJC asserts that the Commission made a substantive

error in material fact by using the significantly higher spot market shipping rates to calculate profits for the 2021-2022 service contract period instead of the same rates OJC paid for the 2020-2021 Service Contract. OJC extrapolates from an internal HSDG email that HSDG would have offered OJC the same rates as the prior year. Petition at 4. The Commission disagrees.

The ALJ explained in the Initial Decision why it was not reasonable for OJC to assume HSDG would agree to renew the 2020-2021 Service Contract rates for the 2021-2022 service contract year. I.D. at 55. The parties did not reach the point of exchanging contract rates before HSDG disengaged, Ms. Casanova's "same rates" comment was not presented to OJC as an offer, and it is clear from the context of Ms. Casanova's email that she was merely providing the information internally to begin the contract renewal process. *Id*. The ALJ explained that HSDG's violations of the Shipping Act are the reasons the parties did not agree on shipping rates for a hypothetical 2021-2022 service contract. The ALJ believed[1] OJC had calculated profits for the 2021-2022 service contract period by using actual shipping rates it paid on the spot market and concluded such a measure of profits was "sufficiently supported to use in calculating 2021-2022 injuries." *Id*. at 56.

The Commission, like the ALJ, concluded that it was not reasonable for OJC to assume HSDG would renew for the previous year's shipping rates and found that OJC's actual shipping rates were the appropriate measure for calculating OJC's damages. F.D. at 52. Generally, the Commission may order reparations for the actual injury caused by violations. 46 U.S.C. § 41305(b); F.D. at 51. "Actual injury" means compensation for the actual loss or injuries sustained by reason of the wrongdoing. *MAVL Capital Inc. v. Marine Transport Logistics, Inc.*, Docket No. 16-16, 2022 WL 2209421, at *3 (FMC June 10, 2022). Absolute precision is not

---

[1] OJC actually used the "HS Est Rate" mentioned above that was based on the rates it paid HSDG the prior year.

necessary, but the evidence must be sufficient to infer actual loss. F.D. at 39.

The Commission explained in the Final Decision that OJC's spreadsheet contains unsupported assumptions and the ALJ was correct to conclude that HSDG would not have renewed the 2021-2022 Service Contract for the prior year's shipping rates. F.D. at 50-51. The Commission pointed out that HSDG stated it would have never renewed for the rates in the 2020-2021 Service Contract, there is no evidence that HSDG was willing to renew for the 2020-2021 Service Contract rates, the contract did not contain an automatic renewal provision, HSDG's expert described marketplace dynamics at the beginning of 2021 that would have dictated higher rates, and spot rates at least doubled over the course of 2020-2021. *Id*. at 51.

OJC places great weight on the Final Decision's use of the phrase "no evidence" and the email from Ms. Casanova where she discusses a renewal contract with the "same rates." The Final Decision states there "is no evidence that HSDG was willing to renew for the 2020-2021 shipping rates . . . ." F.D. at 51. Ms. Casanova sent an internal email to HSDG employees stating in relevant part: "I created the new [contract] . . . The new contract contains the same lanes, rates, and conditions of the current contract . . . ." CX at 214. OJC argues that this statement in Ms. Casanova's email is evidence that HSDG did renew its service contract with OJC at the same rates and conditions as the prior contract. Petition at 7.[2]

The Commission disagrees with OJC's interpretation. Ms. Casanova sent her email to members of the trade team at HSDG, Mr. Li and Mr. Cheung. Respondent's Appendix ("RX") at 955. Ms. Casanova explained in her declaration that the trade team was the team within HSDG that would provide new rates for any contract. RX at 1139. Her first email to the trade team on April 29, 2021, at

---

[2] It is not clear how OJC reconciles the statement that HSDG did renew OJC's service contract using the same rates with the Commission's conclusion that HSDG did not renew. HSDG does not challenge that conclusion but assumes it is wrong. Petition at 7.

10:16 AM, which OJC cites above, stated that Ms. Casanova only modified the MQC, while leaving trade lanes, rates, and conditions of the existing contract. CX at 214. Ms. Casanova then described conditions and fees that need to be updated, indicating that she did not change aspects of the contract that she knew needed to be updated. *Id.* In a follow-up email to the same recipients at 10:38 AM, Ms. Casanova more fully describes OJC's history as a customer, recites OJC's actions due to HSDG's purported breach of the existing contract, and asks if HSDG can increase the MQC to 400 FFE to make up for the previous contract shortfall. CX at 215. Ms. Casanova does not mention maintaining the lanes, rates, or conditions.

Ms. Casanova declared under oath that she was not internally proposing maintaining the same rates and OJC points to no persuasive evidence from the record to refute her sworn declaration. RX at 1139. Even if Ms. Casanova was internally proposing to maintain the same rates, HSDG would not have made that offer to OJC. Mr. Li forwarded Ms. Casanova's email to Mr. Pump and said, "they are proposing a renewal contract with 400 FFE MQC but all rates remain the same from the last year contract." CX at 220. The phrasing of Mr. Li's message shows that he found most objectionable the idea that OJC was expecting to maintain rates from the prior year. The record reinforces this interpretation, as Mr. Li was aware of OJC's projections of moving 4,200 to 4,700 FFE across 2021-2022, did not disengage from negotiations at the mention of this increased expectation of space, and continued to follow up about OJC proposing an MQC. *Id.* at 224-26. Mr. Pump testified that he did not remember any customer negotiating a service contract for 2021-2022 that maintained the same rates as the prior year. RX at 991. He testified that such an expectation would not have been reasonable given the state of the transpacific market at the time and was "completely detach [sic] from realities of the market." Opposition to Reconsideration at 5; RX at 993. Though OJC insinuates this sworn testimony should be disregarded as it is self-serving, OJC offers no persuasive evidence contradicting these statements.

Ms. Casanova also adequately explained the pertinent language from her email. She created a contract in HSDG's internal system with the same rates because those were the existing rates in the system that populated. RX at 1139. Ms. Casanova declared that new rates would have depended on the MQC and trade lanes for a proposed service contract. *Id.* at 1138. Ms. Casanova sent her internal email to "gauge interest" in a renewed contract and "determine" contract rates. *Id*. at 1139. She reiterated an interest in increasing the MQC but made no mention of maintaining the same rates. *Id.* Finally, she was not part of the trade team that sets rates for service contract renewals and she sent the email to that team to get them to provide her new rates. *Id*. at 955, 1139.

Thus, the Final Decision is correct that the record reflects no evidence that HSDG was willing to offer OJC a 2021-2022 service contract with the same rates as the 2020-2021 Service Contract. Ms. Casanova left the previous year's contract rates in the system because they auto-populated, she flagged that she had left terms of the 2020-2021 Service Contract in the system except for an increased MQC, and she reiterated a request for an increased MQC but never mentioned maintaining rates. Ms. Casanova was not part of the trade team at HSDG that set rates, and these rates would have been set after deciding on a volume commitment and trade lanes. Mr. Li's communications show a frustration specifically with the idea that OJC would expect to maintain rates from the prior year, and he would have had more authority as part of the trade team to set rates than Ms. Casanova. Mr. Pump agreed with Mr. Li and testified that he remembered no customers maintaining prior year rates and such an expectation would have been completely detached from the market reality. OJC produced no evidence that HSDG communicated a willingness to maintain the prior year's rates to OJC.

OJC argued that the Commission erred by concluding that the record reflects no evidence that OJC was willing to offer a service contract renewal with the prior year rates in light of Ms.

Casanova's internal email. But as discussed, Ms. Casanova's email was sent only internally within HSDG, it expressed no intention of offering OJC a renewal at the same rates, she was not part of the trade team that sets rates, the trade team and senior executives rejected the idea of offering OJC a renewal at the same rates, and the evidence of the shipping market at the time of renewal discussions is inconsistent with OJC's argument. The weight of the evidence is contrary to OJC's interpretation and OJC's petition for reconsideration on this count is denied.

### 3.    Collateral Estoppel

The Commission also denies the Petition on Count I due to collateral estoppel, because OJC failed to disagree with the Initial Decision's conclusion. The Commission's regulations governing petitions for reconsideration and exceptions do not explicitly address whether a petition for reconsideration is precluded when a party does not first raise an issue in exceptions. 46 C.F.R. §§ 502.227, 502.261. But the principles of collateral estoppel may properly be applied in administrative cases. *Pac. Seafarers, Inc. v. Pac. Far E. Line, Inc.*, 404 F.2d 804, 809 (D.C. Cir. 1968). "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated . . . to enforce repose." *Martyn Merritt, et. al. - Possible Violations of Sections 10(a)(1) and (10)(b)(1) of the Shipping Act of 1984*, No. 89-27, 1991 WL 382879, at *5 (FMC May 20, 1991) (discussing the closely related cannon of res judicata).

Here, the ALJ conclusively determined that OJC's actual shipping rates were the appropriate means to calculate OJC's profits. I.D. at 55-56. The ALJ stated that the profit calculation "based on 2020-21 and 2021-2022 actuals is sufficiently supported to utilize in calculating 2021-22 injuries, especially as the profit per container includes the spot rates OJC utilized in 2021-22." I.D. at 56. OJC had the opportunity to fully litigate this issue, the ALJ evaluated OJC's and HSDG's arguments, and the ALJ decided to use spot rates to

calculate damages. OJC did not appeal this conclusion in OJC's exceptions. *See* Complainant's Exceptions to the Initial Decision. As such, OJC has had a chance to fully litigate this issue and it did not disagree with the ALJ's decision on this point. Even if the Petition were not summarily rejected and denied on the merits, the Commission would not entertain the Petition due to collateral estoppel.

### C.    Count II

#### 1.    Summary Rejection

For the second count in the Petition, OJC argues that even if there is uncertainty about whether HSDG was willing to renew the service contract for prior year shipping rates, that uncertainty must be borne by HSDG. Petition at 8. HSDG refused to comply with ALJ orders to produce information about service contract rates and the ALJ and the Commission erred by concluding additional evidence would not have materially impacted the outcome of this case states OJC. *Id*. As noted above, the purpose of a reconsideration petition is not to simply elaborate on or repeat arguments made prior to the decision or order. *Maher Terminals,* 2014 WL 5316353, at *3. OJC has repeatedly argued that HSDG should bear any uncertainty about damages calculations due to HSDG's willful violations of the Shipping Act and additional evidence would have materially impacted the outcome of the case. Complainant's Exceptions to the Initial Decision at 14, 27; Complainant's Reply to HSDG's Exceptions to the Initial Decision at 26; Complainant's Brief at 26-7. The argument that the HSDG refused to comply with ALJ discovery orders and should be sanctioned was addressed by the Initial Decision and the Final Decision. F.D. at 62; I.D. at 64. OJC reiterates prior arguments about the "standard[s]" for adverse inferences, "the law," and "authority," but does not point out material facts to support the conclusion that the Commission made a substantive error in the Final Decision by ignoring, misrepresenting, or misunderstanding them. Petition at 8-9.  As

OJC v. HSDG and HSNA                                           12

such, the Commission summarily rejects the Petition because it does not meet the criteria for reconsideration. 46 C.F.R. § 502.261.

### 2.    Petition Denial

Were the Commission to reach the merits of the Petition's second argument, the Commission would deny the Petition. OJC argues that "evidence of what service contract rates HSDG charged others in 2021-2022 was the exact information OJC sought in discovery[.]" Petition at 8. But the ALJ chose not to require HSDG to produce this information and specifically did not require HSDG to "review or provide documents regarding pricing for individual shippers." Order on Motion to Compel and Revise Schedule, June 29, 2022; CX at 300. OJC argues that HSDG refused multiple court orders to produce this information, but that is not accurate. Petition at 8. OJC argues that the evidence HSDG refused to produce would have provided all the missing evidence the Commission desires. *Id.* But the evidence is not missing because HSDG refused to produce it; rather, it is missing because it does not exist. OJC and HSDG never reached the point of negotiating shipping rates for the service contract renewal and never exchanged even proposals for rates. The information the ALJ did ask HSDG to produce, namely "any policies, procedures, guidance, training, or instructions regarding pricing for shipping or determining prices charged for shipment," does not support OJC's argument that the missing information is precisely what the Commission felt was so important. CX at 300. The Commission does not agree that the arguments OJC asserts identify substantive error in the Final Decision, and finds that certainly none of the arguments asserted identify a material fact that the Commission missed, misinterpreted, or otherwise got wrong. As such, the Commission denies the second count of the Petition.

### D.    Attorney Conduct

The Commission appreciates zealous advocacy. However, we have serious concerns about an argument OJC's attorney used in the Petition. On page seven of the Petition, OJC's attorney inserts a

block quote that purports to quote from the Commission's Final Decision but includes brackets around key words. Brackets are generally used for changing letters or the tense of words, omitting letters, or indicating grammatical mistakes. OJC's attorney instead modifies the Commission's Final Decision by replacing one concept (pricing), with another wholly different concept (space availability). OJC's attorney provides no clear explanation for this switch, which gives the reader the mistaken impression that the Commission's Final Decision directly supports OJC's arguments. The closest OJC comes to explaining the use of brackets is stating, "[w]hat was true for space was also true for pricing." Petition at 7. But that statement is not consistent with the record and is not a statement made in either the Final Decision or Initial Decision.

The Commission recently took action against an attorney practicing before the agency who was alleged to have "repeatedly misquoted the record to support his client's claims," among other things. *Order Directing Marcus Nussbaum to Show Cause*, Docket No. 24-03 (FMC Jan. 10, 2024). Attorneys who misrepresent the record or make false statements are of grave concern to the Commission. This is especially true with misrepresenting prior Commission statements given the volume of Commission precedent available only in difficult-to-access databases. The conduct of OJC's attorney does not yet merit further process, but the Commission takes this opportunity to warn OJC's attorney Mr. Hecht and any other attorneys practicing before the Commission against similar conduct.

## III.    **CONCLUSION**

For the reasons discussed in this order, the Commission summarily rejects both counts of the Petition. The Commission also denies both counts of the Petition in the alternative.

The Commission hereby:

OJC v. HSDG and HSNA                                              14

    (1) **SUMMARILY REJECTS** Complainant OJ Commerce, LLC's first count of the Petition for Reconsideration for failing to identify a substantive error of material fact as required by 46 C.F.R. § 502.261(a)(2);

    (2) **DENIES,** alternatively, Complainant OJ Commerce, LLC's first count of the Petition for Reconsideration because the record shows HSDG was not willing to renew OJC's service contract with the prior year's shipping rates;

    (3) **DENIES,** alternatively, Complainant OJ Commerce, LLC's first count of the Petition for Reconsideration due to collateral estoppel;

    (4) **SUMMARILY REJECTS** Complainant OJ Commerce, LLC's second count of the Petition for Reconsideration for failing to identify a substantive error of material fact as required by 46 C.F.R. § 502.261(a)(2);

    (5) **DENIES,** alternatively, Complainant OJ Commerce, LLC's second count of the Petition for Reconsideration because OJC fails to identify a substantive error of material fact.

By the Commission.


           David Eng
           Secretary

# Exhibit B

# FEDERAL MARITIME COMMISSION

OJ COMMERCE, LLC,

    *Complainant*,

      v.

HAMBURG SÜDAMERIKANISCHE
DAMPFSCHIFFFAHRTS-GESELLSCHAFT
A/S & CO. KG AND HAMBURG SUD
NORTH AMERICA, INC.,

    *Respondents.*

Docket No. 21-11

Served: August 27, 2024

---

**BY THE COMMISSION:** Daniel B. MAFFEI, Chairman; Rebecca F. DYE, Louis E. SOLA, Carl W. BENTZEL, and Max M. VEKICH, Commissioners.

---

### <u>Order Affirming Initial Decision</u>

This case is before the Commission ("FMC") on Exceptions to an Initial Decision (Initial Decision") of the Administrative Law Judge ("ALJ") dated June 7, 2023. The Initial Decision ordered Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft ("HSDG") to pay OJ Commerce, LLC ("OJC") a total of $9,843,766.40 in reparations due to HSDG's knowing and willful violations of the Shipping Act's prohibitions on refusing to deal and

retaliation. The Initial Decision dismissed any pending motions and ordered the proceeding discontinued.

As to liability, we deny the Exceptions and affirm the ALJ's Decision. The ALJ correctly found that HSDG refused to deal with OJC and retaliated against OJC. As to damages, we modify the ALJ's damages calculations to reflect more accurately the harm suffered by OJC, but we affirm the ALJ's decision to double the damages award given the knowing and willful nature of HSDG's violations.

# I. **BACKGROUND**

## A.     **Factual Background**

### 1.     Parties

OJC is a limited liability company organized with a principal place of business in Miramar, Florida that sells "dropship products" from domestic inventory of hundreds of brands. Initial Decision (I.D.) at 5.[1] OJC also has a direct import program where OJC buys household goods, including a wide variety of furniture and office products globally for sale in the United States. OJC's imports come from Asia and Brazil and are delivered to California or Kentucky.

HSDG was previously a corporation operating as a Vessel Operating Common Carrier ("VOCC") with a principal place of business in Hamburg, Germany until it merged with its former parent company, Maersk A/S on November 1, 2021. I.D. at 5. Hamburg Sud North America, INC ("HSNA") is a corporation with a principal place of business in Morristown, New Jersey. HSNA was a wholly-owned subsidiary of HSDG that acted as the United States general agent of HSDG until November 1, 2021, when it became a

---

[1] The Commission adopts the ALJ's findings of fact, except as specifically described below, and supplements them as noted herein with additional evidence from the record or evidence pursuant to 46 C.F.R. § 502.226(a). I.D. at 5-22.

wholly-owned, indirect subsidiary of Maersk A/S. On January 1, 2022, HSNA was merged into Maersk Agencies USA, Inc., the United States subsidiary and general agent of Maersk A/S.[2]

### 2.    Relationship

OJC and HSDG entered into a service contract in June 2020 for the carriage of goods by sea from foreign countries to the United States and for delivery to warehouse facilities within the United States. I.D. at 6. The service contract signed between OJC and HSDG "c/o" HSNA was numbered AECC0000291 and was effective June 23, 2020, to May 31, 2021. I.D. at 6 ("2020-2021 Service Contract"). In the 2020-2021 Service Contract, OJC agreed to tender, and HSDG agreed to transport, a minimum volume/quantity commitment of 400 twenty-foot equivalent units ("TEUs"), equal to 200 forty-foot equivalent units ("FFEs"), from Asia to California at specified rates. The 2020-2021 Service Contract included a liquidated damages clause that only provided liquidated damages if the carrier failed to provide space to meet 90 percent of the minimum quantity commitment ("MQC") and capped those damages at $250 per TEU.

HSDG initially internally allocated OJC 8 TEU per week, but on August 3, 2020, OJC was informed by email that "Space Protection" was increased to 10 TEU per week. I.D. at 7. The record suggests that OJC received insufficient space based on HSDG emails. I.D. at 7. But HSDG emails indicate that there was no formal documentation of an obligation to carry additional cargo per week. I.D. at 8. Throughout the 2020-2021 service contract, OJC and OJC President Jacob Weiss repeatedly asked for more space per week. *See, e.g.*, I.D. at 9.

---

[2] The ALJ denied all claims against HSNA because it found HSNA not to be a common carrier, instead HSNA was acting as a disclosed agent on behalf of HSDG. I.D. at 37. Neither side challenged this conclusion, and no evidence suggests it should be reviewed. As such, the ALJ and this memorandum impute HSNA and HSNA employee actions to HSDG. Given this, references to HSDG sometimes encompass HSNA or HSNA employee conduct.

OJC v. HSDG and HSNA                                                                    4

On October 16, 2020, OJC sent a demand letter to HSDG notifying it of breach of the 2020-2021 Service Contract and demanding that HSDG honor the terms of the agreement, including minimum TEU quantities. I.D. at 7; Complainant's Appendix ("CX") at 159-160 ("October 16 Demand Letter"). The October 16 Demand Letter was a formal letter from a law firm representing OJC that requested HSDG maintain all records relating to the dispute in anticipation of litigation. *Id*. HSNA Risk Management employee Michael Gast sent an email on October 21, 2020, following a conversation within HSDG in which he stated, among other things, "I understand space is limited and other customers are paying a premium for space presently but any additional profit gained from those premiums is going to quickly go out the window if this matter goes to trial… This is a very bad case for us which we will likely lose… At present based on the emails I have seen I do not have confidence in our ability to establish that we are doing our part under these terms…but again we must please take into account that our losses could easily exceed US$100,000 between our lawyer fees and any final judgment which may be awarded to them by a court." I.D. at 8.

OJC began negotiations towards a 2021-2022 service contract ("2021-2022 Service Contract") as early as January 2021. I.D. at 10. HSNA Cargo Flow Specialist Kevin Li testified that the majority of contracts would be negotiated and entered in the first quarter of the year, through April, or possibly May. I.D. at 10. HSNA Senior Vice President Juergen Pump stated that customers in 2021 started to negotiate contracts as early as January and February in light of market conditions and OJC's renewal not being concluded by April was "very very late in the game." Respondent's Appendix ("RX") at 992. Negotiations on a renewal continued through March and April of 2021. I.D. at 11. The record also shows that OJC continued to struggle with booking space with HSDG through March and April. I.D. at 11.

Internal HSDG emails reflect a conversation between HSNA Cargo Flow Specialist Mr. Li, HSNA Manager East Coast Sales Gonzalo Maldonado, and HSNA Account Executive Andrea Casanova about renewing OJC's contract for another year. I.D. at 13. Mr. Li requested an MQC for OJC's account and Ms. Casanova reached out to Mr. Weiss for him to commit to an MQC. Mr. Weiss declares that "OJC and Maersk [HSDG] agreed to the 4200-4700 MQC for 2021-2022, and [Ms.] Casanova worked on getting the new contract drafted." CX at 468. However, Ms. Casanova declares that this is "false" and that OJC and HSDG never agreed on key contract terms, like shipping rates, volume, and trade lanes. RX at 1138-39.

On April 28, 2021, at 10:27 AM, a law firm representing OJC emailed a second demand letter ("April 28 Demand Letter") to HSDG notifying HSDG of breach of the 2020-2021 Service Contract and asserting that failure to cure the described breach of the service agreement may result in the "filing of a petition to the Federal Maritime Commission to seek relief." I.D. at 13. This is the first time OJC notified HSDG of an intention to complain to the Commission. OJC specifically stated, "[f]ailure to cure the breach by May 3, 2021, may result in legal action against you and your affiliates, as well as the filing of a petition to the Federal Maritime Commission to seek relief." I.D. at 13-14. Soon thereafter Ms. Casanova created a contract renewal in HSDG's computer system doubling the MQC to 400 FFE as a way to potentially offset the anticipated 2020-2021 Service Contract deficit and "showing an interest in handling more of OJC's volume." I.D. at 14. Ms. Casanova used the rates of the 2020-2021 Service Contract because those were the rates in the system. *Id.* On April 29, 2021, Ms. Casanova sent an internal HSDG email, which the ALJ presumed attached OJC's April 28 Demand Letter, stating: "I have spoken with the customer and… he does not want to end the relationship with us… [h]e is open to any solution that can offset this deficit. I want to ask if it is possible to Increase MQC by 200 FFE giving a total of $400 [sic] FFE, that will not only cover the deficit by [sic] also show our interest to participate more of their volume, of course,

if we truly can satisfy this volume. This is not a short term account and the customer has been constant in his volumes and is willing to commit to much more of the current MQC." I.D. at 14-15.

Later, on April 29, 2021, at 2:04 PM, Mr. Li emailed Mr. Pump, "[s]orry to trouble you but I need your executive decision on this account… I was completing [sic] unaware of the legal action they put against us… they are threatening us on liquidated damage… Meanwhile, they are proposing a renewal contract with 400 FFE MQC but all rates remain the same from last year contract. In my opinion this is pathetic and unacceptable, it will be a risk to continue work with this account especially considering our space situation this coming year. I can work with APAROM to ensure they will get the remaining 18 FFE before end of May." I.D. at 15. Mr. Pump responded the same day, "Fully agree. We should not engage in any renewal discussions with customer in light of the potential litigation, I would also not provide them with space under the existing contract. The shortfall will be compensated as per contract terms." Mr. Li communicated this "executive decision" to other HSDG employees on April 29, 2021, stating that HSDG should not engage in renewal discussions and should reject the proposed agreement. I.D. at 15-16. Mr. Li also stated, "we should also consider not provide them space under existing contract. The shortfall will be compensated as per contract terms[.]" I.D. at 16.

Mr. Gast, the risk manager, followed up with his own email to HSDG employees internally on April 29, 2021, opining that, "The first time this occurred I stressed the financial impact such a lawsuit could carry and I have done so again. It appears our local sales colleagues had tried to address the capacity issue with origin but were advised that no additional space would be granted for this customer… Should such a lawsuit occur I can easily imagine the cost would easily wipe out any profits gained from the commercial relationship due to potential breach of contract judgments against us and the cost of our own legal representation. At this point I do not know what more could be done from my side other than to wait for May 31 to see how bad the shortfall is[.]" I.D. at 17-18.

Another HSDG employee requested authorization to grant OJC the space in May to meet the MQC. I.D. at 16. Subsequent messages between HSDG employees on May 4, 2021, indicate that employees in Asia identified 12 FFE on a specific ship, confirmed the space, and told the local booking desk to release the space to OJC. I.D. at 16. Another email states HSDG had found an additional 6 FFE and the total 18 FFE should fulfill the MQC of 200 FFE. *Id.* HSDG employees congratulated each other on their efforts to fulfill the contractual obligations and reported they had informed OJC of the space on May 5, 2021. *Id.* Two screenshots of the OJC customer dashboard tell a conflicting story. On April 29, Ms. Casanova attached a screenshot of OJC's customer dashboard that reflected 11 FFE being carried by HSDG in April 2021 and projected 18 FFE would be carried in May 2021. CX at 215-16. But on May 7, 2021, an email from Ms. Casanova included a screenshot of the same OJC customer dashboard reflecting HSDG transporting only 9 FFE for OJC in April, and May is no longer listed. RX at 726. June 2021 is listed but shows 0 FFE scheduled to move. Ms. Casanova appears to have informed Mr. Weiss by phone that HSDG would not renew the service contract, as she followed up with an email stating, "[a]s per our conversation, we are not able to renew the contract at this time." She then blamed this on "the lack of space and equipment in Asia and the shortage of truck power in the US that we and the entire industry are facing." I.D. at 17. OJC tried to negotiate a contract with a more limited scope, but HSDG refused. *Id.*

The 2020-2021 Service Contract expired on May 31, 2021, with HSDG shipping 185 FFE for OJC, and no renewal contract was concluded because it was "not approved by Upper Management." I.D. at 18. Ms. Casanova noted that OJC was "claiming" the 15 FFE deficit. I.D. at 19. The ALJ concluded that the 15 FFE shortfall was not a result of space being unavailable, rather the containers were not shipped "due to potential litigation." I.D. at 19.

Finding of Fact 76, which HSDG challenges, reads, "After April 29, 2021, Hamburg entered into service contracts with other

shippers for a significantly higher amount of space than OJC was requesting." I.D. at 19. The ALJ cited to a declaration of Mr. Weiss stating Maersk entered into service contracts with the prefix NOAC for 25,402 TEUs after April 29, 2021. CX at 469. The ALJ also cited to a list of agreements and MQCs produced by HSDG, but that list does not include the dates the agreements were signed or identify the trade lane or lanes that are covered by each agreement. CX at 259-84. However, Mr. Weiss's declaration does state that OJC demanded HSDG identify, "for each Service Contract, the date it was entered into, total FFEs or TEUs, the shipping lines included, and the shipping prices." CX at 469. HSDG refused to produce the requested information, instead producing only the limited information the ALJ cited. CX at 469.

### 3.    Reparations

#### i.    Expert Reports

Both parties submitted expert reports. OJC submitted the first expert report by Mr. Berning on September 2, 2022, after the ALJ's scheduled deadline for disclosure of initial expert reports on August 5, 2022. Mr. Berning then submitted a supplemental report on October 17, 2022. HSDG submitted one expert report by the August 5, 2022, deadline. Respondent HSDG's Exceptions to Initial Decision ("HSDG Exceptions") at 23. Mr. Zayas's report was submitted on August 5, 2022, but he also submitted a supplemental declaration on December 8, 2022. I.D. at 45. The ALJ decided that it was preferable to resolve the case on the merits and declined to exclude any of the expert reports because they were late. I.D. at 45.

HSDG's expert, Mr. Zayas, concluded that OJC had provided insufficient information to conclude it sustained any loss due to HSDG's conduct. RX at 1183. Mr. Zayas did not have access to Mr. Berning's first report, but he evaluated OJC's damages based on a version of OJC's final spreadsheet. RX at 1183. Mr. Zayas identified issues with OJC's damages claims and challenged assumptions that he stated undermine OJC's data. RX at 1184.

Mr. Zayas supplemented his initial report on December 8, 2022, the day HSDG filed its final brief, with a "declaration" that is longer than his expert report. RX at 1144-73. Mr. Zayas reviewed both of Mr. Berning's reports and the updated spreadsheet OJC provided on September 2, 2022. Mr. Zayas declared that these documents did not change his opinions and he continued to assert that OJC had not provided enough information to evaluate or sustain the damages claims. RX at 1149.

Mr. Berning's initial expert report assumed that HSDG was liable to OJC on one or more legal claims and that OJC's damages were proximately caused by HSDG. CX at 418. Mr. Berning used the data provided to him to calculate three different valuations of damages, namely lost profits, shipping rate differentials, and market value of lost revenue. CX at 418. When evaluating OJC's lost profit damages claim, Mr. Berning noted that OJC captured all of its costs and all of the costs of third parties used to sell the product. CX at 423. Mr. Berning acknowledged Mr. Zayas's statement that OJC's gross profit calculation does not capture all the costs associated with the sale of a product but then concluded, based on an understanding of how OJC operated, that OJC had captured the vast majority, if not all, of the costs relating to the sale of products. CX at 423. Mr. Berning supplemented his report but the additions are not relevant to this decision as they dealt with damages measured by shipping rate differentials and neither party advocates for the usage of this measure. CX at 462.

ii.      Profits Per Container

The ALJ accepted OJC's calculations of average revenue per container, $60,250.30, and average profit per container, $22,892.48. I.D. at 48. The ALJ noted that OJC calculated those numbers for the period from June 1, 2020, to July 16, 2022. For revenue per container, OJC used actual products shipped and the selling price of those products. I.D. at 48. OJC calculated profits per container by using the same information about actual products shipped and

OJC v. HSDG and HSNA                                                          10

selling price and deducting "all the costs" such as the purchase cost of the good, sales commissions, marketing, fulfillment center costs, and shipping costs.[3] I.D. at 48. Mr. Berning evaluated OJC's costs in light of OJC's organizational structure and noted, "the way they operated is almost as... a virtual company. So their costs, overhead and stuff are very limited because they outsource pretty much everything." I.D. at 48. OJC also provided a spreadsheet identifying spot market shipping rates from 2020 through 2022. OJC Exhibit 104 – CONFIDENTIAL WCI Data for OJcommerce ("OJC Ex. 104"). Mr. Pump testified that service contract rates doubled from 2019 to 2021 and spot rates tripled if not more. I.D. at 19.

### iii.    Container Volume

Mr. Pump testified that HSDG's biggest challenge for 2021-2022 was capacity, as almost all customers asked for more capacity and HSDG could not "get a firm handle" on capacity for 2021-2022. I.D. at 19-20. Further, he stated, there was the challenge of figuring out which customers should get more capacity and where that capacity comes from. I.D. at 20. After HSDG cut off contract renewal negotiations, OJC could not obtain a shipping contract from any other carrier. I.D. at 20. Mr. Weiss declared that he "tried to do so with no avail" and OJC was forced to obtain what limited space it could on the spot market at elevated rates. I.D. at 59. The ALJ concluded that OJC was often unable to secure shipments and in most cases was forced to forgo making shipments because spot rates became too expensive to justify the cost of container freight. I.D. at 20. OJC shipped 143 containers in 2021-2022 on the spot market or through freight forwarders. I.D. at 20.

The evidence shows that OJC told HSDG it planned to move 70 percent of its projected 2021-2022 volume of 4,200 to 4,700 FFE to Kentucky, with the remaining 30 percent going to California. I.D. at 12. Mr. Weiss declared that Ms. Casanova agreed to finalize an

---

[3] As will be discussed later, it appears that OJC's data does not base these calculations on actual shipping costs, but instead on an estimated rate.

agreement to transport 4,200 to 4,700 FFE for 2021-2022. CX at 468. Mr. Weiss also stated that OJC had a contract with Maersk for shipments from Brazil. CX at 469. But Ms. Casanova declared that OJC had no such contract and OJC had previously tried to secure a service contract with HSDG delivery to Kentucky multiple times without success. RX at 1141. It appears OJC tried to include the Kentucky business in the service contract prior to signing the 2020-2021 Service Contract. I.D. at 20. Then during the contract, Ms. Casanova or Mr. Weiss asked to revisit the Kentucky business in July 2020, October 2020, January 2021, and April 2021. I.D. at 10, 12, 21. HSDG came closest to considering a service contract with delivery to Kentucky in April 2021, but Ms. Casanova ultimately indicated on April 28, 2021, that HSDG was unwilling to bid on the Kentucky route. RX at 812 (Ms. Casanova stating to Mr. Weiss, "Please consider this a commitment for the place of delivery City of Industry CA only."); RX at 1137. HSDG did transport cargo to Kentucky for OJC, but only through the spot market. RX at 1142 (Ms. Casanova stating it is false that OJC had a service contract for Brazil to United States shipments and those were instead shipped on a case-by-case basis pursuant to short-term rate quotations).

### iv.     Double Damages

The ALJ awarded double damages based on the knowing and willful violation of the Commission's prohibition on retaliation, the maximum allowable amount. I.D. at 64; *see also* 46 U.S.C. § 41305(c). Mr. Pump testified that he did not receive or review copies of OJC's notice of intention to file a case with the Commission, but emails indicate OJC was mentioned in a call with Mr. Pump, Mr. Li referenced OJC's "legal action" against HSDG, and Mr. Pump emailed Mr. Li that OJC should be cut off from renewal negotiations and space under the existing service contract due to "potential litigation." I.D. at 15. Mr. Pump testified he made his "executive decision" to cut off OJC based on the emails he received from Mr. Li and his conversation with Mr. Li. I.D. at 22. Further, Mr. Pump testified that he knew a customer complaining to the Commission could not be a reason not to negotiate and that this was part of

HSDG's compliance training. *Id.* Mr. Pump also testified that it was clearly understood in the organization a customer threat to complain to the Commission is not to factor into a decision of whether or not to negotiate a service contract. *Id.*

When considering the knowledge of HSDG, the ALJ also highlighted Mr. Gast's multiple emails explaining to HSDG employees how HSDG was failing to meet its contractual commitments. I.D. at 62. The ALJ noted that Mr. Gast's emails do not suggest that OJC's claims were not well-founded and noted that Mr. Gast hoped the lure of a contract renewal would dissuade OJC from filing suit. *Id.* Based on this, the ALJ concluded that OJC clearly explained why HSDG violated the service contract and Shipping Act, but instead of resolving this dispute, HSDG committed additional violations. I.D. at 63. HSDG knew OJC would seek compensation, but still decided to "disengage." Though HSDG employees suggested how HSDG could meet the minimum requirements of the 2020-2021 Service Contract and offered to give the space to OJC, HSDG still did not provide the space to OJC and refused to engage in renewal discussions. I.D. at 63. From this record, the ALJ concluded double damages are appropriate because of HSDG's knowing and willful violation of the Shipping Act. I.D. at 64.

### B.    Procedural History

OJC initiated this case with a Complaint dated December 13, 2021, alleging that HSDG and HSNA are vessel-operating common carriers and that they violated 46 U.S.C. §§ 41104(a)(3) and (10) in connection with service contract AECC0000291 and unsuccessful negotiations towards a renewal for a service contract covering June 2021 to May 2022. Verified Complaint; I.D. at 6; 46 U.S.C. § 41104(a)(3), 41104(a)(10) (2021). On February 8, 2022, the ALJ issued an Order granting OJC's request to amend the Complaint and denying HSDG's Motions to Dismiss and for Summary Judgment as moot because OJC amended the Complaint. Order on Motion to Amend Complaint and Motion to Dismiss, February 18, 2022 ("First

MTD Order"). The ALJ included in that order dicta advising that the Commission has a duty to determine whether an entity has violated the Shipping Act, even when allegations may also constitute breach of contract claims. First MTD Order at 4.

In a June 29, 2022, Order, the ALJ approved the parties' request for a modification to the scheduling order but shortened their requested extension of time. Order on Respondents' Motion to Compel and Revised Schedule, June 29, 2022 ("MTC Order"). The new schedule called for disclosure of initial export reports on August 5, 2022, the last day for serving discovery requests on August 30, 2022, the last day to disclose rebuttal expert reports on September 2, 2021, and the close of all discovery on September 16, 2022. MTC Order at 4. The ALJ did not compel HSDG to respond to OJC's request for production about which shippers were offered service contracts and which were not, as the burden outweighed the potential benefit, but did compel HSDG to produce other information about service contracts, such as sailings from the cities at issue, total cargo capacity and unbooked cargo capacity, and documents showing pricing for shipping or determining prices for service contracts and the spot market. MTC Order at 2-4.

On August 31, 2022, the ALJ issued an Order addressing multiple motions. Order on Respondents' Motion to Partially Dismiss and for a Protective Order and Complainant's Motion for Expedited Relief, August 31, 2022 ("Second MTD Order"). The ALJ dismissed OJC's claims under 46 U.S.C. §§ 41102(a)(5), 41102(b), and 41104(a)(9), but denied the rest of HSDG's motion to dismiss. Second MTD at 12. The ALJ also ordered HSDG to comply with the previous Order on Respondents' Motion to Compel and threatened sanctions for HSDG's continued unwillingness to produce information. Second MTD at 9. The ALJ also removed some of HSDG's confidential designations and rejected HSDG's labeling of certain documents "Attorney Work Product." Second MTD at 8-10. Finally, the ALJ directed HSDG to produce management level employees who would have knowledge of HSDG pricing decisions for deposition. Second MTD at 12.

On September 30, 2022, the ALJ denied all of HSDG's motions to compel, but granted OJC's motion to extend the close of discovery so any depositions agreed to, but not conducted, could be completed. Order on Respondents' Motion to Compel and Complainant's Motions for Extension of Time and for Clarification, September 30, 2022 ("Second MTC") at 5-6. The ALJ chose not to strike OJC's expert report even though it was not timely submitted. Second MTC at 5.

On June 7, 2023, the ALJ issued the Initial Decision. Both HSDG and OJC filed exceptions on June 29, 2023, and responses on July 21, 2023.

## II. <u>DISCUSSION</u>

### A.      **Standard of Review**

Normally, when the Commission reviews exceptions to an ALJ's Initial Decision, it has "all the powers which it would have in making the initial decision." 46 C.F.R. § 502.227(a)(6). The Commission therefore generally reviews the ALJ's findings de novo. *Id*.; *see also Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, FMC Docket No. 12-02, 2015 WL 94261, at *5 (FMC Dec. 18, 2015). Under the Administrative Procedure Act, the complainant has the burden of proving its allegations by a preponderance of the evidence, meaning that it must persuade the Commission that the allegations are more probable than not. 5 U.S.C. § 556(d); 46 C.F.R. § 502.203; *Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, FMC Docket No. 08-03, 2014 WL 9966245, at *14 (FMC Dec. 17, 2014). However, the Commission reviews discovery orders, including orders imposing sanctions, under an abuse of discretion standard. *See Rana v. Franklin*, FMC Docket No. 19-03, 2022 WL 1744905, at *4 (FMC May 25, 2022).

### B.      **Liability**

1.    Jurisdiction

The Commission affirms the ALJ's determination that it has jurisdiction over OJC's Shipping Act claims. HSDG argues that treating OJC's claims as Shipping Act claims instead of breach of contract claims renders 46 U.S.C. § 40502(f) a nullity since "virtually every breach now becomes actionable under the Shipping Act[.]" HSDG Exceptions at 12. But the Commission's test is "whether a complainant's allegations are inherently a breach of contract claim, or whether they also involve elements peculiar to the Shipping Act." *Cargo One, Inc. v. COSCO Container Lines Co., Ltd.*, 28 S.R.R. 1635, 1645 (2000).[4] The Commission has a duty to consider Shipping Act claims because they are distinct from breach of contract claims and entail a different analysis. *MCS Industries, Inc., v. MSC Mediterranean Shipping Company S.A.*, Docket No. 21-05, 2024 WL 95383, at *7 (FMC Jan. 3, 2024). Here, OJC sought remedies for HSDG's violations of Shipping Act prohibitions against retaliation and refusing to deal, so the Commission has jurisdiction.

The ALJ found that OJC sent HSDG a notice of intention to file a case with the Commission, which led HSDG to refuse any further requests for space under the MQC and abruptly break off negotiations towards an expanded service contract for the next year. I.D. at 19. The remedies OJC seeks are not for HSDG's failure to meet its contractual commitments; it seeks redress for Shipping Act violations, namely HSDG's actions after OJC notified HSDG of an

---

[4] Though HSDG relies on *Cargo One* to support its argument that the Commission should narrowly interpret its power to review service contracts given the language of 46 U.S.C. § 40502(f), that decision actually revised the Commission's interpretation in the other direction. *Cargo One* "articulat[ed] a more precise and less expansive view of which causes of action seeking reparations are precluded by [§ 40502(f)]" than previously articulated in the *Vinmar* case. *Cargo One*, 28 S.R.R. at 1644.

intention to bring a complaint to the Commission. I.D. at 27.[5] OJC provided concrete evidence of HSDG refusing to provide available space and terminating ongoing discussions about a contract renewal and expansion due to OJC's notice of intention to file a case with the Commission. There is clear evidence of violations of the Shipping Act and the presence of a service contract does not alter the Commission's duty to resolve OJC's claims.

HSDG's argument that the ALJ erred by not making OJC rebut the presumption that its claims are simply breach of contract claims is not persuasive. First, OJC brought no contract law claims to the Commission. Though any contract law claims OJC brought would share facts with OJC's Shipping Act claims, OJC does not seek breach of contract remedies and seeks only remedies for Shipping Act violations. Moreover, OJC did unearth evidence of Shipping Act violations by HSDG that are distinct from HSDG's failure to meet its contractual commitments.

Second, HSDG's claim that the Commission has articulated a presumption that a claim is no more than a breach of contract claim when it involves an underlying service contract is inaccurate. HSDG does not cite to case law supporting the existence of this presumption. The Commission did state in the *Cargo One* decision that allegations essentially comprising contract law claims should be dismissed unless the complainant successfully rebuts "the presumption" that the claims are no more than simple breach of contract claims. *Cargo One*, 28 S.R.R. at 1645. But in the next sentence, the Commission stated that the Commission would likely presume a case is correctly before the Commission where the alleged violation raises issues beyond contractual obligations.[6]

[5] The Commission notes that some of HSDG's Shipping Act violations appear to have predated April 29, 2021, and continued after that date, as HSDG refunded OJC for demurrage charges as early as February 5, 2021 and as late as July 14, 2021. *See* Verified Amended Complaint at 10-12; I.D. at 1.
[6] "We find that as a general matter, allegations essentially comprising contract law claims should be dismissed unless the party alleging the violation successfully

Here, OJC did not allege breach of contract claims and instead alleged violations of the Shipping Act. Accordingly, HSDG's argument that the ALJ failed to address a presumption that does not exist and in any case would have been easily overcome by the evidence OJC proffered is not persuasive.

Based on this record, the Commission has jurisdiction to consider OJC's claims.

### 2.      Refusal to Deal

The ALJ correctly determined that HSDG had refused to deal with OJC in violation of 46 U.S.C. § 41104(a)(10) because the evidence established that after OJC sent HSDG notice of an intention to file a case with the Commission, HSDG refused to provide OJC any more space pursuant to the 2020-2021 Service Contract and refused to negotiate a renewal. 46 U.S.C. § 41104(a)(10) (2021). HSDG's argument that it did not engage in a refusal to deal is unpersuasive. There are two parts to the Commission's analysis of a refusal to deal claim. *See Orolugbagbe v. A.T.I., U.S.A., Inc.*, Informal Docket No. 1943(I), at *31 (FMC Oct. 22, 2015). The Commission first considers whether the entity has refused to deal or negotiate, also described as "shutting out" a counterparty. *New Orleans Stevedoring Co. v. Bd. of Commissioners of the Port of New Orleans*, Docket No. 00-11, 29 S.R.R. 1066, 1070, 2002 WL 33836158 (FMC June 28, 2002), *aff'd sub nom. New Orleans Stevedoring Co. v. FMC*, 80 Fed. Appx. 681 (D.C. Cir. 2003). Then the Commission considers whether that refusal has been unreasonable. *Canaveral Port Authority - Possible Violations of Section 10(b)(10), Unreasonable Refusal to Deal or Negotiate,* Docket No. 02-02, 29 S.R.R. 1436, 2003 WL 723336, at *16 (FMC Feb. 24, 2003). Refusal to deal cases are factually driven and

---

rebuts the presumption that the claim is no more than a simple contract breach claim. In contrast, where the alleged violation raises issues beyond contractual obligations, the Commission will likely presume, unless the facts as proven do not support such a claim, that the matter is appropriately before the agency." *Cargo One,* 28 S.R.R. at 1645.

determined on a case-by-case basis. *Canaveral Port Authority*, 2003 WL 723336, at *18.

i.        Whether HSDG "Refused"

a.        2020-2021 Service Contract

The ALJ correctly concluded that HSDG refused to provide the required space under the 2020-2021 Service Contract because of OJC's notice of intention to file a case with the Commission and not because space was unavailable. I.D. at 28-30. The record shows HSDG employees offering to find space to fulfill the MQC and finding that space, but HSDG undisputedly not meeting the MQC. I.D. at 30. HSDG argues that it did not "shut out" OJC as required for a claim of refusal to deal. HSDG first argues that internal emails show that HSDG was attempting to find space for OJC after OJC's April 28 Demand Letter and after the "executive decision" to cut off OJC. HSDG Exceptions at 13. But the internal emails are more complicated. The emails show HSDG employees securing space for OJC that would meet the MQC and celebrating meeting the MQC, but ultimately HSDG shipped only 185 of the 200 required containers after Mr. Pump's "executive decision." I.D. at 16, 19.

HSDG argues that it shipped containers for OJC after the April 28 Demand Letter, so it did not "refuse" to deal, but OJC's CEO explained that a few of the 66 containers shipped by Maersk after April 29, 2021, were already scheduled prior to that date and the rest were shipped by freight forwarder or using spot quotes. Complainant's Appendix - Supplement ("SCX") at 509-10. This is consistent with contemporaneous internal HSDG evidence that it had shipped 182 FFE for OJC by April 29, 2021, and only 185 FFE by May 31, 2021. I.D. at 15, 19. Neither side disputes the fact that

HSDG shipped only 185 FFE during the 2020-2021 Service Contract. [7]

The Commission affirms the ALJ's conclusion that the shortfall of 15 FFE was not a result of space being unavailable but was because of "potential litigation." I.D. at 19. Emails from HSDG employees indicate that sufficient space was available during this period to meet the MQC and that space was saved for OJC. I.D. at 16. Emails from Mr. Pump and Mr. Li reflect an "executive decision" that OJC was to be cut off from space on the existing service contract. I.D. at 15-16. An internal HSDG dashboard showing its relationship with OJC reflects no previous months where OJC was completely cut off. RX at 726. This evidence shows that HSDG had not previously completely failed to ship any of OJC's cargo during a month, space was available during the April 29, 2021, to May 31, 2021, period, and HSDG executives directed that OJC be cut off from using the service contract on April 29, 2021. HSDG's argument that it did not "cut off" OJC is unpersuasive.

      b.    Service Contract for 2021-2022

The Commission affirms the ALJ's conclusion that HSDG shut out OJC by refusing to finalize negotiations towards a 2021-2022 Service Contract. The record shows HSDG proceeding towards a renewal of OJC's service contract, and then abruptly ceasing all renewal efforts and refusing to enter even a pared-down service contract with OJC. HSDG argues that it did not shut out OJC by refusing to enter into a service contract for 2021-2022 primarily because the ALJ erred in finding HSDG "shut out" OJC when there

_____

[7] Neither side provides a convincing explanation for 16 Bills of Lading ("BOLs") dated after April 28, 2021, that include the OJC-HSDG service contract number or exactly how they relate to the MQC, though this question is ultimately inconsequential to the outcome. RX at 2-56. Though neither side, nor the ALJ, provided adequate explanation, no one disputed that HSDG missed the MQC by 15 FFE.

is evidence HSDG shipped containers for OJC on the spot market. HSDG Exceptions at 12. But HSDG cites no support for the argument that spot market shipments can preclude finding a respondent refused to deal with respect to a service contract.

The Commission concurs with the ALJ that these are qualitatively different products and that finding a refusal to deal does not require finding a carrier shut out a shipper from both types of products. The ALJ rejected HSDG's evidence that it continued to work with OJC after the expiration of the 2020-2021 service contract, because "offering higher spot market rates does not ameliorate the problems caused by not having a predictable, year-long service contract." I.D. at 31.

Though the issue of whether refusing to negotiate a service contract but continuing to ship containers at spot rates qualifies as a refusal to deal is a novel issue for the Commission, the record supports the ALJ's conclusion. Because OJC worked on an as-needed basis with a 60–90-day lead time to produce products, it had to secure future transport before producing products; otherwise, its products would be stuck at ports or abroad with nowhere to store them. SCX at 510. Using the spot market does not allow this planning, as prices may fluctuate to an extent that products are not profitable to ship, and space may simply not be available. OJC Ex. 104; I.D. at 59. Given the supply chain dislocation that spanned 2020 to 2022, OJC's fears it could not find a carrier to ship a container were well-founded. *See* I.D. at 20 (Mr. Pump stating, "who do we give more capacity to where, where does it come from" when discussing the space allocation challenges during the April 2021 service contract renewal period); Peter Tirschwell, *Container Capacity Shortfall Drives Contract Fulfillment Conflict,* Journal of Commerce (Aug. 5, 2021) https://www.joc.com/article/container-capacity-shortfall-drives-contract-fulfillment-conflict_20210805.html ("sailings have been canceled because the ships are anchored off North American ports awaiting berth, making then unavailable for scheduled weekly departures from Asia ports"). Spot rates on a route from Shanghai to Los Angeles grew from

around $2,000 at the start of the 2020-2021 Service Contract, to $5,742 by its end, and within four months spiked to over $12,400. OJC Ex. 104. Over the course of 2020-2021, OJC shipped 542 containers pursuant to three service contracts with three different carriers, but without a service contract, it shipped only 143 FFE in 2021-2022 despite projecting significantly higher volume during this period. Complainant's Exceptions to the Initial Decision ("OJC Exceptions") at 24; I.D. at 20.

The Commission affirms the ALJ's conclusion that intermittent spot rate shipping is not equivalent to or the same as the guarantees provided by a service contract and the ALJ's determination that HSDG shut out OJC by refusing to negotiate a 2021-2022 service contract.

> ii.    Whether    the    Refusal    was Unreasonable

The Commission affirms the ALJ's conclusion that HSDG's refusal to deal with OJC was unreasonable. HSDG never gave "good faith consideration to [OJC]'s proposal or efforts at negotiation" as described in *Orolugbagbe* and *Maher*. *Orolugbagbe* Docket 1943(I), at *32*, citing Maher,* 2014 WL 9966245, at *6. Nor are HSDG's actions similar to those of the port in *New Orleans Stevedoring*, where there were documented concerns about the Complainant's desired use of a physical space interfering with planned construction. *New Orleans Stevedoring,* 2002 WL 33836158, at *1-2. Instead, HSDG's actions are similar to those of the Canaveral Port Authority, which offered a range of explanations after the fact, but none that justified the refusal to even hold a hearing to evaluate the Complainant's application. *Canaveral Port Authority,* 2003 WL 723336, at *16-18. Here, HSDG refused to even consider a renewal after OJC's April 28 Demand Letter when OJC tried to negotiate a pared-down service contract.

The record supports the ALJ's conclusion that HSDG's actions were unreasonable. As early as the October 16 Demand

Letter, HSDG employees knew and admitted they were not meeting their contractual commitments. I.D. at 8. Before and after the April 28 Demand Letter, HSDG employees knew they were failing to meet their contractual commitments and sought additional space guarantees for OJC in the next service contract to make up for their failures. I.D. at 11-14. OJC issued reasonable legal notices based on these failures, and HSDG responded by cutting off access to the existing service contract and refusing to renew or expand the relationship. I.D. at 13-17. HSDG seemed to know this response was unreasonable because it offered pretextual excuses for the refusal. I.D. at 30. When OJC received the refusal and attempted to salvage even a pared-down service contract, HSDG continued to refuse. I.D. at 17. HSDG Executive Mr. Pump admitted during depositions that he knew retaliating against a counterparty after a threat to file litigation or a complaint with the Commission was prohibited. I.D. at 22.

HSDG's explanations for its refusal offered after the fact are inconsistent with the evidence showing the real reason HSDG disengaged, namely Mr. Pump's executive decision after OJC's notice of intention to file a case with the Commission. HSDG argues that its failure to perform was due to legitimate transportation factors posed by supply chain congestion. The evidence supports HSDG's claim that it was impacted by supply chain congestion and, as the ALJ noted, supply chain congestion could be a transportation factor that reasonably justifies failing to perform under a service contract or refusing to negotiate a renewal. But "[*i*]*n this particular case*" the evidence does not support a conclusion that any transportation factors were the reason HSDG declined "*this particular service contract*." I.D. at 33 (emphasis in original). Prior to April 28, 2021, HSDG was actively negotiating a service contract with OJC, and after Mr. Pump's April 29, 2021, executive decision HSDG refused to negotiate further. HSDG does not point to any abrupt changes in transportation factors, such as sudden supply chain congestion around April 29, 2021, that would explain the stark shift from expanding the relationship with OJC to ending it. It was the

OJC v. HSDG and HSNA                                               23

"executive decision" by Mr. Pump communicated to Mr. Li that resulted in HSDG's refusal. *Id.*

HSDG's argument that a carrier may refuse to deal when faced with what appears to be a baseless claim by a counterparty is not persuasive because this argument is inconsistent with this record. I.D. at 34. HSDG disagrees with the ALJ's conclusion that this argument does not apply but now points to no errors in her analysis. Instead, HSDG argues that shutting out OJC was a reasonable exercise of business discretion given what it characterizes as OJC's baseless threats to sue for a breach of contract and the contract's liquidated damages clause.[8] HSDG Exceptions at 14. But this argument is not supported by these facts, as the evidence shows OJC's notice of intention to file a case with the Commission was well supported. I.D. at 34. OJC was seeking transportation it was entitled to under the service contract, it objected to demurrage fees HSDG ultimately refunded, and it raised legitimate complaints about HSDG's actions that ultimately led to a judgment against HSDG for Shipping Act violations. *Id.* HSDG's own risk manager confirmed that HSDG was not meeting its contractual commitments and would likely face substantial damages. CX at 161, 229. These facts do not lead to the conclusion that OJC was making baseless or frivolous claims or that HSDG was justified in refusing further dealings. I.D. at 34.

Further, the case HSDG relies upon to support its argument that HSDG can refuse service to counterparties that demand it meets

---

[8] HSDG may have been justified in cutting off OJC from further business if there was no basis for a claim against HSDG. I.D. at 34. But in contrast to *Cornell v. Princess Cruise Lines, Ltd.*, HSDG was indisputably failing to meet contractual commitments. Docket No. 13-02, 2014 WL 5316340, at *8 (FMC Aug. 28, 2014). Further, OJC's complaint alleged HSDG charged demurrage that violated 46 U.S.C. § 41102(c) and HSDG ultimately refunded that demurrage, suggesting OJC had non-frivolous Shipping Act claims prior to its April 28, 2021, Demand Letter. HSDG's argument that OJC's notice of intention to file a case with the Commission was frivolous because HSDG had yet to violate the Shipping Act by retaliating, meaning the Commission lacked jurisdiction, ignores the Commission's jurisdiction to resolve OJC's 46 U.S.C. § 41102(c) claims.

its contractual obligations cannot be read as expansively as HSDG desires; otherwise the Commission's prohibitions against retaliation would cease to exist. In *Cornell v. FMC*, the complainant brought not one, but two unsuccessful lawsuits stemming from carriage on the respondent's passenger vessel. *Cornell v. FMC*, 634 Fed. Appx. 795 (D.C. Cir. 2015). The Commission noted in the *Cornell* case that the nature of passenger vessel operators means they cannot be expected to resolve all customer complaints, such as high ticket prices or bad food, to the customer's satisfaction or face claims of refusal to deal. *Cornell v. Princess Cruise Lines, Ltd.*, Docket No. 13-02, 2014 WL 5316340, at *8 (FMC Aug. 28, 2014). The Commission's decision in no way suggested a carrier could cut off a shipper from contractually obligated space because that shipper intended to complain to the Commission. The Shipping Act prohibits a carrier from retaliating against a shipper for filing a complaint or for any other reason by refusing otherwise available cargo space accommodations or resorting to other discriminatory measures. *See* 46 U.S.C. § 41104(3) (2021). But HSDG's interpretation of the *Cornell* case would allow a carrier to refuse otherwise available cargo space accommodations because a shipper has sued them or a related entity, filed a complaint against the carrier, or simply notified a carrier it was failing to meet its legal obligations pursuant to a contract. The Commission declines to adopt HSDG's expansive view of the *Cornell* case and concludes that the situation facing the passenger vessel operator in that case is distinguishable from the situation of HSDG here.

For the reasons discussed above, the Commission affirms the conclusion of the ALJ that HSDG's refusal was unreasonable.

### 3.     Retaliation

The Commission affirms the ALJ's conclusion that HSDG retaliated against OJC in violation of 46 U.S.C. § 41104(a)(3) by refusing further space under the 2020-2021 Service Contract and refusing to renew the contract for the 2021-2022 term after OJC's protected notice of intention to file a case with the Commission. 46

U.S.C. § 41104(a)(3) (2021). HSDG argues that neither its non-performance of the existing service contract nor its refusal to enter into a new service contract amounts to retaliation. Even if HSDG did retaliate, HSDG argues, OJC's private notice of intention to file a case with the Commission is not a protected activity. The Commission does not find HSDG's arguments persuasive.

> i.    HSDG    Engaged    in    Prohibited
> Conduct by Shutting Out OJC

The Commission rejects HSDG's argument that it did not retaliate against OJC either during the term of the existing service contract or during negotiations towards a renewal. HSDG Exceptions at 15-18.[9] HSDG argues that the ALJ improperly conflated 46 U.S.C. § 41104(a)(3)'s reference to "cargo space accommodation" with a service contract,[10] and that it was erroneously based on an incorrect interpretation of the evidence. 46 U.S.C. § 41104(a)(3) (2021). HSDG argues that the ALJ erred by concluding that it refused to provide cargo space accommodations when available because the record clearly shows it provided OJC space through the spot market. But the ALJ's decision is well supported and HSDG's exceptions are unpersuasive.

---

[9] HSDG uses much of the same evidence to argue it did not refuse cargo space accommodations as it used to argue it did not refuse to deal. For the reasons discussed above, those arguments are not persuasive.

[10] HSDG also argues that "to the extent" that the Initial Decision relied on the Commission's Refusal to Deal NPRM to suggest a decision to decline a service contract must be based on transportation factors, it is wrong. HSDG Exceptions at 21. HSDG is correct that the ALJ overstated the Commission's consideration of transportation factors. The ALJ stated a carrier's decisions on granting or denying cargo space "must" be based on legitimate transportation factors or legitimate business decisions. I.D. at 39. The NPRM notes that the Commission has previously found reasonable decisions based on transportation factors or legitimate business decisions, but it does not say that decisions "must" be based on these factors as the ALJ suggested. NPRM at 57677. But it is not HSDG's failure to base its refusal or retaliation on transportation or business factors that underpins the ALJ's determination, so the confusion is irrelevant to the ultimate outcome.

HSDG first argues that the ALJ improperly conflated offering space with negotiating a service contract, but it offers no support for that claim.[11] HSDG does not cite precedent explaining why providing "cargo space accommodations" cannot include the signing of service contracts and why refusing a service contract does not mean refusing "cargo space accommodations" when available. HSDG Exceptions at 16-17. The Commission's definition of a "Service Contract" includes commitments to provide "a defined service level, such as assured space…" 46 U.S.C. 40102(21). The Commission concludes that refusing to sign a service contract that guarantees cargo space and rates is a form of refusing cargo space accommodations.

HSDG then argues that it cannot be forced to contract with OJC and its offer to carry cargo on a non-contract basis shows it did not refuse to provide "cargo space accommodations." HSDG Exceptions at 16-17. But OJC does not argue, and the Commission does not find, that HSDG must sign a service contract with any party that requests one. Instead, HSDG simply must refrain from refusing to negotiate or sign a service contract for one of the reasons prohibited by the Shipping Act. I.D. at 34. The contemporaneous evidence supports the conclusion that HSDG refused to sign a new service contract with OJC for prohibited reasons, not for any of the reasons now offered.

Relevant precedent considering whether refusing to sign a service contract but continuing to ship containers through the spot market qualifies as a refusal to provide cargo space accommodations is rare. 46 U.S.C. § 41104(a)(3) (2021). HSDG does not analyze this distinction in detail. Instead, HSDG points out that it does not have to sign a service contract with every counterparty, it just must avoid shutting out a customer, and that it did offer spot market space. HSDG Exceptions at 12. HSDG then leaps to the conclusion that it

---

[11] HSDG notably does not extend this argument to the final four weeks of the 2020-2021 Service Contract, essentially admitting it refused space for this period.

did not refuse space, but service contracts and non-contractual cargo space are different.

The Commission's definition makes clear that a service contract is a reciprocal commitment between shipper and carrier that ensures the carrier receives a minimum volume of cargo and the shipper receives commitments to assured space or rates. 46 U.S.C. § 40102(23). In contrast, spot market rates can, and did, fluctuate wildly over a one-year period. OJC Ex. 104. A carrier has no obligation to accept cargo pursuant to the spot market. And when a shipper may need guaranteed space the most, for instance during periods of peak demand or supply chain congestion, the spot market offers neither certainty the cargo will ship nor certainty the price will be palatable. As OJC's Mr. Weiss explained, service contracts provide certainty for a company trying to create business plans for the next year by locking in rates for shipping and regular space for containers. SCX at 510. Further, the ALJ found that providing higher spot market rates does not ameliorate the problems caused by not having a predictable, year-long service contract. I.D. at 31. HSDG offers no persuasive argument or evidence from the record rebutting that conclusion, only evidence that it did provide spot market space. HSDG Exceptions at 12-13. Finally, HSDG's choice to cut off OJC from a service contract but not spot rates shows that HSDG viewed those as different products that provide different services. Accordingly, HSDG's argument that it did not refuse to provide cargo space accommodations is not persuasive.

HSDG also takes issue with the ALJ's citations. HSDG is correct that *Ceres Marine Terminals v. Maryland Port Administration* is not a refusal to deal or retaliation case and instead involves unreasonable preference or prejudice. Docket 94-01, 29 S.R.R. 356, 370 (FMC Aug. 15, 2001); HSDG Exceptions at 21. But the ALJ only cited *Ceres* because it is cited in the Commission's Notice of Proposed Rulemaking for a rule addressing the prohibition on refusing to deal, not for any legal principle whose application here would be undermined by the specific focus of the *Ceres* case. I.D. at 39; *see also* Notice of Proposed Rulemaking, Definition of

Unreasonable Refusal to Deal or Negotiate with Respect to Vessel Space Accommodations Provided by an Ocean Common Carrier, Docket No. 22-25, 87 Fed. Reg. 57674 (Sept. 21, 2022). Given this, the citation to the *Ceres* case in no way calls into question the ALJ's decision.

Finally, HSDG's argument that the ALJ's conclusion that HSDG had space available is inconsistent with the evidence and is not persuasive. HSDG points out that Finding of Fact ("FOF") 76 is based partially on a list of HSDG service contracts that do not include the date the contract was entered into or information besides the MQC and the effective date. HSDG Exceptions at 17-18. The ALJ used the phrase "entered into" when describing the list of service contracts, even though the list does not appear to show when the parties concluded negotiations towards each contract, just the date the contract started. I.D. at 19. OJC, however, asked for information on when the contracts were entered into, the shipping lane, and the contract prices. CX at 255 (HSDG objecting to the request and stating it will only produce a list of service contracts "concluded" after April 28, 2021, and the MQC), 469. OJC complained about HSDG's refusal to produce relevant information about blank sailings, service contract rates, and pricing strategy for the spot market and service contracts. Complainant's Brief ("OJC Brief") at 26-33. The failure of the record to include what HSDG sees as key missing information, namely the date HSDG "entered into" service contracts with counterparties, is solely due to HSDG's unwillingness to provide that information. HSDG now argues that the failure of the record to include this single data point renders any conclusion HSDG had space available to offer OJC unsupportable. But if HSDG wanted that conclusion to flow naturally from the record, it had more than ample opportunity to produce the missing information.[12] It did not.

---

[12] Further evidence that might prove HSDG had insufficient space is unavailable either because HSDG withheld testimony from knowledgeable executives or because of HSDG's intervening violations of the Shipping Act, specifically refusing to conclude negotiations towards a 2021-2022 Service Contract for prohibited reasons.

Moreover, there is sufficient evidence in the record to conclude that HSDG had space available to offer OJC. The record shows that at no point prior to August 29, 2021, did HSDG suggest to OJC that it would be unable to renew the 2020-2021 Service Contract due to space constraints, no internal HSDG communications suggest it was considering rejecting a contract renewal due to space concerns, internal HSDG communications from April 29, 2021, show it had enough available space to consider renewing and even doubling OJC's MQC to appease OJC, and HSDG's spreadsheet of service contracts shows that around the time it broke off negotiations with OJC, it was allocating space in magnitudes far exceeding the 400 FFE it was considered granting OJC. I.D. at 39. After HSDG cut off negotiations, OJC calculated that HSDG entered into service contracts with MQCs for 25,402 TEUs on one specific trade lane.[13] CX at 283, 469.

This evidence shows HSDG dealing in quantities of space vastly exceeding the 400 FFE Ms. Casanova provisionally allocated to OJC. *See also* RX at 985 (Mr. Pump testifying that 500 FFE would be a small customer for the transpacific trade).[14]

---

[13] OJC cites the NOAC trade lane. CX at 469. As HSDG points out, it is not clear which trade lanes are represented by which abbreviations. But, again, the reason this information is not available is because HSDG refused to provide it.

[14] Mr. Pump's testimony proves difficult to parse. Mr. Pump testified that generally carriers schedule year-long service contracts to all begin on May 1. RX at 988. He testified that carriers will enter "out of season" contracts during the year, but will end "out of season" contracts on April 30 so that the carrier can evaluate demand for the following year. Next Mr. Pump testified that most carriers sell all their space by April or May at the latest, meaning they have no contract space to sell throughout the rest of the year. RX at 988. But OJC's 2020-2021 Service Contract started in June of 2020, indicating HSDG had not sold all

OJC v. HSDG and HSNA                                                    30

HSDG's argument that it did not have enough cargo space available to support a finding that it had retaliated by refusing "cargo space accommodations" is not persuasive for all the reasons listed above. HSDG may be right that technically the ALJ erred by stating the evidence shows HSDG "entered into" contracts after April 28, 2021, instead of more clearly articulating that those contracts had an effective date after April 28, 2021. But this is only a technicality that is outweighed by the evidence showing HSDG had cargo space accommodations available. The Commission affirms the ALJ's well-supported findings that HSDG retaliated against OJC by denying cargo space accommodation when available.

ii.     OJC Engaged in Protected Activity

The Commission affirms the ALJ's finding that OJC's notice of intention to file a case with the Commission is protected by the Commission's prohibition on retaliation "for any other reason." *See* 46 U.S.C. § 41104(a)(3) (2021). It is a novel legal issue whether the Commission's prohibition on retaliation extends to a notice of intention to file a case with the Commission, but such a protection is consistent with statutory language and the Commission's guidance. HSDG argues that the ALJ erred in finding a notice of intention to file a case with the Commission constitutes retaliation. First, HSDG argues that the Commission's Statement on Retaliation does not state that a "mere threat of legal action constitutes, 'for any other reason.'" HSDG Exceptions at 19; *see also* Federal Maritime Commission: Statement on Retaliation, Docket 21-15 (Dec. 2021)

---

of its contract space by May of 2020, and ended at the end of May 2021, indicating HSDG did not require OJC's contract to end when Mr. Pump testified it should have ended. None of the discussions between OJC and HSDG during April 2021 indicated an expectation that OJC's contract end early, or that any new contract begin before the end of the previous contract. Further, the list of contracts provided by HSDG includes many contracts, representing thousands of FFE, that either do not start May 1 or do not end April 30. *See* CX at 259-84. Because it is contradicted by substantial evidence, the Commission does not place great weight on Mr. Pump's testimony that carriers had no service contract space to sell by the end of April or at the latest May.

("Statement on Retaliation"). Then HSDG argues that the implications of including notification of intention to complain to the Commission within the definition for this phrase would be sweeping and unworkable. Finally, HSDG disagrees with the ALJ's conclusion that protecting the ability of consumers to share notification of an intent to complain to the Commission would avoid Shipping Act violations. The Commission finds HSDG's arguments that the ALJ erred unpersuasive.

> a. The ALJ Correctly Interpreted the Commission's Guidance on Retaliation

The Commission affirms the ALJ's interpretation of the Commission's guidance. The central focus of the ALJ's analysis and HSDG's exceptions is on whether the statutory phrase, "for any other reason," includes the claimed conduct in this case. Subsection 41104(a)(3) of Title 46 prohibited a common carrier from retaliating against a shipper "because the shipper has patronized another carrier, or has filed a complaint with the commission, or for any other reason." 46 U.S.C. § 41104(a)(3) (2021). The Commission provided guidance on how it would interpret the phrase "for any other reason" in the Statement on Retaliation. *See* Policy Statements on Representative Complaints, Attorney Fees, and Retaliation, Docket 21-15, 87 Fed. Reg. 13292 (Mar. 9, 2022).

HSDG's arguments that the ALJ erred are unpersuasive. HSDG first argues that the Commission's Statement on Retaliation does not state that a "mere threat of legal action" constitutes "for any other reason." HSDG Exceptions at 19. Such a threat does nothing to air a grievance to the Commission and HSDG argues that the ALJ erred by finding such a threat protected. HSDG Exceptions at 19. HSDG is correct that the Commission's Statement on Retaliation did not specifically prohibit retaliation against notices of an intention to file a case with the Commission. But the Statement also did not try to address every possible scenario, instead advising the Commission "will interpret… the anti-retaliation provision…

broadly to effectuate Congress's intent that shippers feel free to air their grievances to the Commission, and to address new shipping practices and new forms of retaliation." Statement on Retaliation at 1. And if a shipper is protected in filing a complaint with the Commission — one of only two situations that Congress deemed important enough to explicitly describe — it is reasonable to protect a shipper for stating that it intends to file such a complaint, a more limited but closely related action that would serve the same goals. The ALJ's inclusion of notices of intention to file a complaint with the Commission is not a misinterpretation of the Commission's guidance.

> **b.    HSDG's Argument that the ALJ Established an Unworkable Precedent is Unpersuasive**

The Commission disagrees with HSDG's predictions of the implications of the ALJ's decision. HSDG Exceptions at 20. HSDG argues that all a shipper would need to do to obtain a service contract from a carrier is threaten litigation during negotiations, and a carrier would be forced to sign a contract or face an adverse decision for retaliation. HSDG extrapolates that the Commission would be forced to evaluate many complaints of failed negotiations to determine whether each refusal was reasonable. Moreover, HSDG argues that cases will be filed where the Commission clearly lacks jurisdiction given that it clearly lacks jurisdiction in this case. Finally, HSDG argues that OJC's threats were governed by the arbitration clause in the service contract, so since this threatened action would never come before the Commission, it is not the type of threat the prohibition on retaliation was intended to protect. HSDG Exceptions at 21.

HSDG's speculation is not well-grounded. The ALJ's decision does not vastly expand the types of retaliation claims the Commission will consider, it only clarified that the category includes formal notices of an intention to file a case with the Commission, like OJC's notice. Most carriers and shippers want to

OJC v. HSDG and HSNA                                                    33

maintain a business relationship, so notices of an intention to file a case with the Commission will be rare, and rarer still will be the type of abrupt disengagement HSDG pursued here.[15] Further, the Commission affirms the ALJ's decision was appropriate for the facts of this case, which included two formal notices of an intention to pursue legal action. Offhand bluster or idle threats are of a different class. Shippers may feel more emboldened to bring cases where a notice of an intention to file a case with the Commission led to retaliation, but these cases are not prohibited now. Merely publicly reinforcing that the Commission will consider cases like this one, which it could always consider, does not radically alter the Commission's jurisdiction.

Second, OJC's notices of an intention to pursue legal action were not baseless, as HSDG alleged, and they are due protection against retaliation. HSDG Exceptions at 20-21. As the ALJ found, OJC sought cargo space it was due under the contract, objected to demurrage fees HSDG ultimately refunded, and otherwise raised legitimate concerns, so OJC's notices of intention to file pursue legal action were not spurious. I.D. at 34. Further, the Commission strongly disagrees with HSDG's suggestion that it should be free to retaliate against notices it considers invalid. The Commission allowed a passenger vessel operator to discriminate against a customer who had already lost a case against a related entity in court in the *Cornell* case and referenced the unique characteristics of passenger vessel carriage that underpinned that decision. Docket No. 13-02, 2014 WL 5316340, at *8. In contrast, HSDG now asserts it can retaliate not just before a court or the Commission decides on the merits of a claim, but before the claim is even filed. HSDG argues that it made a decision that OJC's claims were meritless and reasonably decided to cut off OJC from available cargo space accommodations. The logical outcome of HSDG's argument is that HSDG's decision about whether OJC's claims had merit, made solely by one inherently biased party, would control the

---

[15] Further, carriers are aware of the prohibition on retaliation, as Mr. Pump testified and indicated HSDG's compliance training reinforces. I.D. at 22.

Commission's later decision made after full production of evidence and briefing by both parties. If HSDG decided there was an error in OJC's notice, the Commission must now conclude that HSDG was reasonable in cutting off OJC from available space. This would usurp the Commission's jurisdiction to decide Shipping Act claims and transfer that to carriers. The Commission is not persuaded by HSDG's reasoning.

Further, HSDG does not point to contemporaneous evidence that suggests it thought OJC's claims were meritless at the time. OJC's claims had sufficient merit to prompt two warnings from HSDG's risk manager[16] and internal emails show HSDG knew OJC was not receiving the required space. HSDG tried to make up for its failures by proposing an increase in the space allocated to OJC. If such clearly meritorious claims do not warrant protection from retaliation, it is not clear from HSDG's arguments when a carrier would be prohibited from retaliating. The Commission's Statement on Retaliation makes clear that shippers serve a greater good by filing private party complaints with the Commission, and for this to occur shippers must be free to do so without fear of retaliation. HSDG's proposal would have the opposite effect, allowing subjective carrier judgments to support retaliation and chilling shipper openness to discussing potential complaints with carriers. The Commission disagrees with HSDG's interpretation.

Third, the ALJ did not err by suggesting that protecting a notice of intention to file a complaint would deter Shipping Act violations. HSDG argues that OJC's notice did not raise any Shipping Act claims and the law does not require a carrier to identify any potential violation or explain it to the shipper. HSDG Exceptions at 21. First, though HSDG is right the law does not require it to identify and explain its own Shipping Act violations to shippers, it does require HSDG to not commit willful Shipping Act

---

[16] HSDG's Mr. Gast twice informed HSDG that OJC's claims had merit and OJC was likely to recover far more than the liquidated damages in the service contract. I.D. at 8, 17.

violations as HSDG did here. Second, HSDG does not explain why the ALJ was wrong in concluding that protecting notices of an intention to file a case with the Commission will deter Shipping Act violations. The ALJ explained that ideally the parties can discuss potential Shipping Act violations and resolve them before they become litigation. I.D. at 42. HSDG fails to offer a persuasive argument why that is not true.

Moreover, a notice of intention to file a case with the Commission does not mean a complaint is valid and the carrier can always ensure that their conduct does not violate the Shipping Act. Instead, as the ALJ explained, it starts a conversation that can avoid complaints to the Commission. In this case, OJC clearly wanted to continue the relationship despite sending a notice of intent to complain to the Commission, and Ms. Casanova seemed to share the desire to continue the relationship, as she provisionally increased OJC's MQC for the next year. Had HSDG not violated the Shipping Act by cutting off OJC, the record suggests OJC's notice could have crystalized HSDG's failures and spurred the parties to overcome them through an ongoing relationship. The Commission disagrees with HSDG that the ALJ erred by suggesting that protecting notices of an intent to complain to the Commission would deter Shipping Act violations.

The policy implications of the ALJ's decision are also consistent with the Commission's previous guidance. Private threats of legal action are different from some of the types of public airing of grievances listed by the Commission in the Statement on Retaliation, such as commenting on a rulemaking or participating in investigation or enforcement activities. HSDG Exceptions at 19. But the Commission's Statement on Retaliation also highlighted using the Commission's Consumer Affairs and Dispute Resolution Services ("CADRS"), which provides non-public procedures directed at a specific counterparty. OJC's two formal demand letters served essentially the same purpose as enlisting CADRS, by putting HSDG on notice of OJC's claims and providing an opportunity to resolve them before more formal litigation. In both scenarios, a

OJC v. HSDG and HSNA                                                      36

carrier can freely ignore the warnings provided, whether of a notice of intent to file a case with the Commission or CADRS proceeding, if it is confident it has not violated the Shipping Act. A carrier is not forced to sign a service contract with a shipper once it engages in negotiations, contrary to HSDG's fears, if it has reasonable grounds for rejecting an agreement.

In contrast, failing to protect shipper notices of an intention to file a case with the Commission from carrier retaliation might cause shippers to hide disagreements from carriers until they are filed. Notifying a carrier of potential claims could cause the carrier to immediately disengage from all contact because the carrier knows it can retaliate freely up until a complaint is filed. This is inconsistent with the Commission's Statement on Retaliation and the purpose of the retaliation provisions first conceived in the Alexander Report. Report of the Committee on the Merchant Marine and Fisheries on Steamship Agreements and Affiliations in the American and Foreign Domestic Trade Under H. Res. 587 (1914) ("Alexander Report"). The Alexander Report predated the 1916 Shipping Act and laid the groundwork for the Commission's prohibition on retaliation because shippers were willing to provide confidential information to the Commission, but "very few were willing (fearing retaliation) to testify openly." Alexander Report at 5. Carriers, through monopolist power, "so completely dominate the shippers" that the shippers "can not afford, for fear of retaliation" to address grievances in the open or antagonize the carriers. Alexander Report at 306. The 1916 Shipping Act accepted the recommendation of the Alexander Report to prohibit retaliation, and the final language of the prohibition closely approximates the prohibition at issue here. 46 U.S.C. § 41104(a)(3) (2021). The Commission's instant decision is consistent with the Commission's long history of prioritizing protecting shippers given the imbalance of power between shippers and carriers.

Based on this record, the Commission affirms the ALJ's finding that HSDG retaliated against OJC in violation of 46 U.S.C. § 41104(a)(3). 46 U.S.C. § 41104(a)(3) (2021).

### C.    Reparations

The Commission affirms the majority of the ALJ's analysis but modifies specific findings for the reasons discussed below. The award of double reparations to OJC is well supported by the evidence that HSDG's violations of the Shipping Act were knowing and willful. The ALJ calculated damages based on OJC's lost profits calculation, but that calculation is an inaccurate reflection of OJC's average profits for the periods in question. The ALJ also concluded that the parties would have negotiated a renewal of the service contract for the 2021-2022 year with the same MQC of 200 FFE. But there is substantial evidence supporting a conclusion that the parties would have doubled this MQC when renewing the service contract and the Commission concludes 400 FFE is an accurate estimate of an MQC for the 2021-2022 Service Contract.

### 1.    Award of Damages

#### i.    Sufficiency of Evidence

The Commission affirms the ALJ decision to award damages. HSDG argues that no award is appropriate because the evidence of OJC's damages is too speculative. HSDG relies on *California Shipping Line, Inc. v. Yangming Marine Transport Corp*., where the Commission denied an award because the damages were inherently speculative, but the ALJ correctly rejected HSDG's argument, concluding the evidence in this case is "vastly" different. Docket No. 88-15, 25 S.R.R. 1213, 1230 (FMC Oct. 19, 1990); I.D. at 50; HSDG Exceptions at 28. HSDG now argues, as it did before the ALJ, that *California Shipping* was about the lack of "underlying documentation" to support the Complainant's damages and claims the ALJ was wrong that the "underlying data" there differed from OJC's data here. HSDG Exceptions at 28; I.D. at 50. To HSDG, the *California Shipping* case turned on a lack of the underlying documentation to support a claim that was entirely the work of California Shipping Line's ("CSL") president and based on his

estimates of the amount and types of cargo he could have generated. HSDG Exceptions at 28.

But in contrast to the instant case, the estimates the president provided in that case were based on "his experience in the industry, his knowledge of [CSL]'s operations and customer base" and his knowledge of the market. I.D. at 50. The estimates included damages for potential customers, including many that were not strictly CSL's, and there was no convincing evidence that CSL would have had a sufficient customer base to satisfy the volume required by each contract. I.D. at 50; *California Shipping* 1990 WL 427266, at *12. Further, CSL admitted a "good portion" of the cargo would have been supplied by its agents, even though the decision states such conduct was not permitted under the law at the time. I.D. at 50; *California Shipping* 1990 WL 427266, at *11. Much of CSL's information was "'subjective' in nature." *California Shipping* 1990 WL 427266, at *11.

In contrast, OJC supplied objective data in the form of a spreadsheet reflecting actual shipments. OJC Ex. 101. The estimates of how many containers it could have shipped in the 2021-2022 service contract year are necessarily somewhat uncertain, but they are informed by OJC's actual previous year shipments. The Commission affirms the ALJ's finding that the underlying data in *California Shipping* is "vastly" different than the data in this case. I.D. at 50.

HSDG points to other Commission cases for the proposition that sufficient documentation is necessary to establish damages. But none of the cases HSDG cites state that the type of evidence OJC offers is insufficient. The type of evidence provided in *Consolo v. Flota Mercante Grancolombia,* 6 F.M.B. 262 (1961), certainly would have helped prove OJC's claims, but HSDG cites no language saying alternative evidence is unacceptable. HSDG Exceptions at 29. In *Muzorori v. Canada States Africa Lines Inc.*, the ALJ refused to award damages where the charges such as hotel stays, meals, and wages, were unsupported by any documentation,

but in no way suggested some sort of internal documentation would be insufficient. No. 1949(F), 2015 WL 9582593, at *11 (FMC Dec. 23, 2015). HSDG's characterization of the disallowed damages in the *Adair* case is misleading at best. *Adair v. Pennnordic Lines, Inc.,* No. 1695(F), 1991 WL 383091, at *24 (FMC Sept. 24, 1991). The ALJ disallowed a claim for interest as interest would be computed later based on the total award, a claim for "loss of use" of a vehicle that Mr. Adair admitted was purely subjective, and a filing fee the Commission was not allowed to consider. *Id*. at FN 11.[17] HSDG's arguments that OJC's evidence is insufficient under Commission precedent are unpersuasive.

OJC's damages documentation is not accompanied by the level of support HSDG desires, but the ALJ correctly determined that OJC submitted sufficient documentation to support its lost profit calculations. Detailed information about the data points HSDG seeks is present in OJC's spreadsheet and, as OJC explained, it is an e-commerce company so many of the paper records that HSDG says are necessary for corroboration do not exist. SCX at 500; I.D. at 48; RX at 1082-83. Importantly, OJC does not need to provide absolute precision, it merely needs evidence sufficient to reasonably infer the actual loss. *MAVL Capital Inc. v. Marine Transport Logistics, Inc.*, Docket No. 16-16, 2022 WL 2209421, at *3 (FMC June 10, 2022). The Second MTC and the Initial Decision both found that HSDG had not identified specific problems with the detailed information provided in the spreadsheet, and this remains true. I.D. at 48. OJC's spreadsheet contains at the "Sales" tab much of the information HSDG says is missing from the record. OJC Ex. 101. The spreadsheet includes tens of thousands of specific order numbers, with order types (e.g., Amazon, Walmart, website), order dates, item identification, and sales price. The specificity of the order number, order date, order type, and item identification provides strong evidence that OJC's spreadsheet reflects actual identifiable orders for specific products OJC ended up importing, not imports that failed to sell. Further, Mr. Weiss declared that

---

[17] Further, these decisions by the ALJ are not binding on the Commission.

OJC v. HSDG and HSNA                                              40

OJC's data was based on actual products shipped and the selling price of each product. CX at 470-71. Similarly, HSDG looks for shipping records to confirm the number of containers OJC shipped and their contents, but OJC provides an entire tab dedicated to container contents broken down by item identification with corresponding stock-keeping-unit ("SKU") numbers and item descriptions. A final tab provides a wealth of information about the shipment of those containers, like carrier, origin and destination, shipping rate, date shipped, date received, and waybill. HSDG and Maersk combine for 238 of these shipments and would have plenty of their own information on these shipments with which to challenge any inaccuracy in OJC's data.

Further, HSDG's desired specificity of corroborating documentation is not necessary according to Commission rules and precedent. The Commission clarified in a 2016 Final Rule that standards of evidence in administrative proceedings are more liberal and relaxed than those applied by courts. *See* Rules of Practice and Procedure; Presentation of Evidence in Commission Proceedings, Docket No. 16-08, 81 Fed. Reg. 93831-32 (Dec. 22, 2016). In that rule, the Commission cited to a recent case where the ALJ had excluded evidence that the Commission deemed admissible when identifying the need to clarify the Commission's evidentiary standards. Currently, the Commission's regulations permit considering "all evidence which is relevant, material, reliable, and probative, and not unduly repetition or cumulative." 46 C.F.R. § 502.204. The evidence rejected in the cases cited by HSDG was much more speculative than the evidence provided by OJC.

Neither side challenges the provenance or foundation of the spreadsheet, but the Commission finds sufficient support in the record to establish the reliability of this evidence under Commission regulations. *See* 46 C.F.R. § 502.204. The ALJ referred to the spreadsheet OJC "provided" but did not explain further. I.D. at 49. Mr. Weiss's first declaration identified the spreadsheet as reflecting relevant data the company assembled and this provides a reasonable

form of authentication in this context. CX at 475.[18]  As noted above, the Commission has recently emphasized the flexibility to use lower standards for considering evidence in Commission proceedings than those required by federal courts. Rules of Practice and Procedure, 81 Fed. Reg. at 93831-32. Given the great detail of the data OJC provided, the lack of specific challenge to any of the 238 data points representing HSDG and Maersk shipments, the lack of challenge by HSDG to who created the spreadsheet or its data, Mr. Weiss's declaration that the copy of the spreadsheet submitted is "true and correct," Mr. Weiss's statement that OJC created the spreadsheet, and Mr. Berning's statement that the data comes directly from OJC's computers, the Commission finds sufficient support in the record to conclude it is relevant, reliable, and probative. 46 C.F.R. § 502.204.

    HSDG points out that OJC's damages calculations changed over the course of discovery and argues that OJC's data is unreliable. But HSDG has access to both sets of data on which OJC's two different profit per container calculations were based and it has identified no specific data changes that were erroneous or unreasonable. HSDG Exceptions at 30; RX at 1123. Given the thousands of data points contained in each spreadsheet, HSDG had ample opportunity to identify and question specific data points that changed between the two spreadsheets and caused OJC's calculations of profits to shift. OJC's spreadsheet describes exactly how OJC calculated profits, including the costs it subtracted such as shipping, fulfillment, commissions/marketing, discounts, and sales price. HSDG deposed both Mr. Weiss and Mr. Berning, with sufficient opportunity to challenge the changes to damage calculations. HSDG had yet another opportunity to pinpoint specific

---

[18] Elsewhere in the declaration Mr. Weiss states "OJC compiled" or "OJC computed," but given the size of the company and Mr. Weiss's role as CEO, it seems likely he was involved in creating the spreadsheet. CX at 470-1.  Mr. Berning testified that he looked at "the Excel spreadsheets which have the company data… that comes directly from the company's accounting and other systems." I.D. at 48; RX at 1082-83. Mr. Weiss's deposition transcript reflects his deep knowledge of the data and calculations.

OJC v. HSDG and HSNA                                    42

errors with OJC's data and calculations before the Commission. Instead of identifying specific errors, HSDG asserts, "OJC's surface-level damages analysis almost certainly inflated lost profits by failing to exclude variable costs that OJC would not have incurred." HSDG Exceptions at 32. But as Mr. Berning explained, OJC operates as a virtual company outsourcing "pretty much everything" so its costs, like overhead, are minimal. RX at 1082-83; I.D. at 48. HSDG's general assertions that OJC's calculations must be wrong without evidence of error are unpersuasive. [19]

OJC argued and the ALJ found that the change in OJC's damages claims reflect the involvement of Mr. Berning. OJC Reply to HSDG's Exceptions ("OJC Reply") at 22; I.D. at 45. However, it is not clear that Mr. Berning was involved in the preparation of the documents that led to a change in the damages calculations. There were multiple versions of OJC's spreadsheet and Mr. Berning testified that he only had access to the final spreadsheet, not any of the previous versions. RX at 1064. Though OJC and the ALJ appear to have been wrong to suggest Mr. Berning's involvement led to the changes, it is ultimately harmless error. As noted above, HSDG fails to highlight errors in OJC's data or specific miscalculations made by the ALJ, and OJC's thousands of data points provide more than sufficient evidence to reasonably calculate OJC's actual loss. *MAVL,* 2022 WL 2209421, at *3.

ii.    Experts

HSDG also challenges the ALJ's reliance on OJC's expert and the ALJ's alleged failure to consider HSDG's expert. HSDG Exceptions at 23, 26-29. HSDG's complaint that the ALJ did not consider HSDG's expert is not persuasive, as the ALJ specifically cited the HSDG expert reports written by Mr. Zayas and stated that his reports would be "given the weight they are due." I.D. at 44-45.

---

[19] It appears the first spreadsheet may have been created as early as May 2022, before the end of the proposed 2021-2022 Service Contract term. The final OJC spreadsheet included data on profits running through July 2022.

HSDG places much importance on the ALJ's failure to make refer to Mr. Zayas's report as much as the ALJ referenced OJC's expert, Mr. Berning. HSDG Exceptions at 23. But the ALJ did consider many of the arguments made in Mr. Zayas's reports because HSDG argued them. Mr. Zayas lists numerous "Unreasonable Assumptions" OJC made and the ALJ addressed them simply without referencing Mr. Zayas's report. *See* I.D. at 55-56 (refuting paragraphs 55-56 of Mr. Zayas's report at RX at 1164); I.D. at 53-54 (addressing paragraphs 57-58 of Mr. Zayas's report); Second MTC at 4 and I.D. at 45-46 (addressing paragraphs 59-60 of Mr. Zayas's report); I.D. at 59-60 (addressing paragraphs 76-78 of Mr. Zayas's report). The ALJ referenced Mr. Zayas's critiques but attributed them to HSDG, and then stated that they would be addressed while calculating OJC's damages. I.D. at 45-46. The ALJ might have more precisely cited Mr. Zayas's work, but the ALJ did not fail to consider his report as HSDG argues, and the ALJ's conclusions as to Mr. Zayas's points were reasonably explained. *Crocus Invs., LLC v. Fed. Mar. Comm'n*, No. 21-1199, 2022 WL 3012275, at *2 (D.C. Cir. July 29, 2022) (noting agency action must be reasonable and reasonably explained).

As for OJC's expert, Mr. Berning, the Commission disagrees with HSDG's criticism of his expertise and report. The ALJ already correctly addressed and dismissed criticisms of Mr. Berning's qualifications and HSDG offers no persuasive reason to disturb the ALJ's finding. I.D. at 44. Mr. Berning has certifications in accounting, financial forensics, and valuation analysis, as well as education in accounting and economics. I.D. at 44. Mr. Berning's resume shows he has the experience, training, and education to assist the trier of fact, which is sufficient to qualify Mr. Berning as an expert, even if he does not possess the highest possible education or most relevant possible experience. I.D. at 44; *see also Robinson v. D.C.*, 75 F. Supp. 3d 190, 197 (D.D.C. 2014). HSDG's challenges to Mr. Berning's expertise are not persuasive.

The challenges to Mr. Berning's report misunderstand the utility of that report. Mr. Berning's report is not useful for validating

OJC v. HSDG and HSNA                                                    44

or auditing the underlying data OJC provided, and neither Mr. Berning's testimony nor his report professes to do this. CX at 415, RX at 1029. The ALJ's treatment of Mr. Berning's report and testimony was consistent with this. The ALJ used Mr. Berning's expertise to help decide which method to use to value OJC's damages but then conducted her own calculations based on OJC's data.[20] HSDG failed to produce evidence of errors in the methodology of Mr. Berning's report or his testimony, and to the extent that HSDG challenges Mr. Berning's reliance on OJC's data, that argument is unpersuasive. Neither OJC nor HSDG ended up challenging the ALJ's reliance on Mr. Berning's expertise to help decide lost profits were the appropriate valuation method to calculate damages.

The Commission does not find HSDG's argument that Mr. Berning's methodology was flawed and the ALJ erred by citing his report persuasive. HSDG Exceptions at 26-29. HSDG identifies no errors in Mr. Berning's math and instead contends his calculations are inadequate because they "matched exactly" or "blind[ly] accept[ed]" or were "based entirely" on those done by OJC. HSDG Exceptions at 27-28. But as discussed above, Mr. Berning's report is useful for determining how best to calculate the damage OJC suffered, not to audit OJC's data. And as the ALJ explained, the fact that OJC tendered damage estimate data does not disqualify that data, and the source of the calculations is to be taken into account when evaluating the opinions. I.D. at 44-45. HSDG does not persuasively highlight the error in how Mr. Berning calculated the monetary damages OJC suffered due to HSDG's Shipping Act violations and the Commission does not find that the ALJ erred by relying on his report.

2.        Double Reparations

---

[20] As will be discussed below, there are questions about OJC's data, but those are not relevant to Mr. Berning's methodology.

The Commission affirms the ALJ's finding that double reparations were appropriate in this case due to HSDG's knowing and willful violation of the Shipping Act. I.D. at 64. At the time of these violations, the Shipping Act's prohibition on retaliation was[21] subject to double reparations under 46 U.S.C. § 41305(c). *See* 46 U.S.C. § 41305(c) (2021). There is a lack of direct precedent on specific factors the Commission will consider when awarding additional damages, but double damages available in an enforcement proceeding for enhanced civil penalties are an apt guide. I.D. at 61. The ALJ's use of a "knowing and willful" standard, also the standard for enhanced civil penalties, is well supported and consistent with the recommendations in Fact Finding 29. A knowing and willful violation requires showing the violator acted with "reckless disregard or plain indifference to the Shipping Act, or purposeful or obstinate behavior akin to gross negligence." *Rose Int'l Inc. v. Overseas Moving Network Int'l*, Docket No. 96-05, 29 S.R.R. 119, 2001 WL 865708, at *47 (FMC June 1, 2001). For determining the appropriateness of civil penalties, the Commission takes into account factors including "the nature, circumstances, extent, and gravity of the violation committed," as well as the violator's "degree of culpability," "history of prior offenses," and "ability to pay." 46 C.F.R. § 502.603(b). The conclusion that HSDG acted knowingly and willfully is well supported by evidence of Mr. Gast's repeated warnings that HSDG was in breach of the 2020-2021 Service Contract, HSDG's purposeful refusal to allocate available space to OJC to meet the 2020-2021 Service Contract MQC, and Mr. Pump's testimony that he knew that retaliating against OJC for sending a notice of intention to file a case with the Commission was prohibited and it was clearly understood at HSDG that such a notice was not to factor into decisions about a service contract. I.D. at 63.

HSDG argues that it did provide services to OJC after negotiations on a renewal broke down by providing OJC space

---

[21] This is no longer true after OSRA 2022 moved the Commission's anti-retaliation statute from section 41104 to 41102.

through the spot market. HSDG Exceptions at 40. But HSDG purposefully failed to meet contractual requirements and wrongfully rejected a continued business relationship in retaliation for a notice of intention to file a case with the Commission. Further, as discussed above, service contracts and spot market shipments are not the same, and HSDG clearly wrongfully refused to negotiate a service contract. Finally, the ALJ did consider the fact that HSDG shipped cargo for OJC after April 28, 2021, but simply did not find it relevant to the question of whether HSDG knowingly and willfully violated the Commission's authorities. I.D. at 19, 63-64. Therefore, HSDG's argument that the ALJ erred by failing to consider HSDG's shipments for OJC after April 28, 2021, is not persuasive.

HSDG also argues both the Initial Decision and the August 2022 Second MTD Order incorrectly held that Mr. Gast's first email is not protected work product. HSDG Exceptions at 39; Second MTD Order at 9-10. The ALJ did imprecisely describe the work product doctrine, as it does not require the work product to be prepared by an attorney as the ALJ stated in the Second MTD Order, but this was at most harmless error. Work product protection applies to documents prepared "in anticipation of litigation" by or for a "party or for his representative." *Gucci America, Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 74 (S.D.N.Y. 2010). "[D]ocuments prepared in the ordinary course of business or that would have been prepared absent the prospect of litigation, do not receive work product protection." *Id.* at 74. The purpose behind the broader scope of protection is to allow attorneys to rely on non-attorneys to help prepare for litigation or trial. But in this case, HSDG did not assert that any of those copied on Mr. Gast's first email were attorneys or that it had asked Mr. Gast to prepare the document in preparation for litigation, and it appears to be the type of document Mr. Gast prepared in the ordinary course of business, as he sent a similar email after the April 28 Demand Letter. HSDG Exceptions at 39, I.D. at 17; *United States v. Nobles*, 422 U.S. 225, 238–39 (1975). Since the ALJ's ultimate conclusion that the work product doctrine does not apply to Mr. Gast's emails was correct, and the Commission reviews ALJ discovery orders under the more

OJC v. HSDG and HSNA                                                47

deferential abuse of discretion standard, HSDG's argument is unpersuasive. *See Rana,* 2022 WL 1744905, at 4.

Finally, HSDG cites to the Commission's regulations governing civil penalties and suggests the ALJ erred by failing to consider the factors outlined there. HSDG Exceptions at 41. But the ALJ did analogize the award of double damages to the Commission's civil penalties authority, just by using the statute and not the regulation as HSDG suggests. I.D. at 62. Further, the factors listed in 46 C.F.R. § 502.603(b) such as HSDG's culpability, the nature and circumstances of the violation, and HSDG's ability to pay do support awarding double damages, as explained above. HSDG argues that this case poses novel issues, but the ALJ thoroughly documented how Mr. Gast warned HSDG that "[t]his is a very bad case…which we will likely lose" in October 2020; HSDG employees suggested how to meet the MQC but HSDG chose not to; Ms. Casanova used pretextual reasons to refuse to enter a service contract with OJC; and Mr. Pump testified he knew, and it was widely known in his organization, that he could not retaliate against a shipper that sent a notice of an intention to file a case with the Commission. I.D. at 62-63. Turning to other relevant factors, while HSDG suggests that it cannot pay because it no longer exists, in reality, it simply was absorbed into Maersk and, as OJC points out, Maersk's head of United States litigation signed HSDG's exceptions. HSDG Exceptions at 42. HSDG recorded $61.8 billion in revenue in 2021 and $81.5 billion in 2022, ample evidence it has the ability to pay this award. OJC Exceptions at 4.

Lastly, HSDG's argument that supply chain disruptions reduce its culpability is at odds with the evidence of HSDG employees finding sufficient space to meet the MQC and evidence that HSDG had sufficient space to accommodate a renewal with OJC. I.D. at 13-14, 16-17. Based on this record, HSDG's argument that the ALJ erred by awarding additional damages is not persuasive.

### 3.    Profit Per Container

The ALJ adopted OJC's calculations of lost profits, since they were based on data reflecting actual profits per container made during the relevant period. I.D. at 56. While HSDG argues that the ALJ erred in adopting OJC's profits per container, HSDG's reasons are not persuasive. That is not to say that OJC's profit calculation is without error, but that will be discussed further below and is not related to the purported errors HSDG highlights. For the reasons below, the Commission modifies the ALJ's award to more accurately reflect the actual loss suffered by OJC.

i.    HSDG's Arguments

HSDG's challenges to OJC's calculations do not persuasively identify errors in the damages calculations or the ALJ's decision. Many were previously addressed in this decision or by the ALJ's findings and do not require repeating. HSDG argues that OJC failed to differentiate between "fixed and variable" costs when calculating damages, and therefore inflated the damages by not excluding variable costs. HSDG Exceptions at 32. HSDG also argues that OJC's expert and the ALJ ignored inconsistent information that projected far less revenue than OJC's data reflects. HSDG Exceptions at 33. Both arguments are unpersuasive.

First, HSDG continues to make general reference to errors by the ALJ or in OJC's data, such as a failure to differentiate between fixed and variable costs, without grounding the arguments in actual numbers. Next, HSDG seems confused about the distinction between fixed and variable costs. HSDG argues, variable costs "are saved costs that do <u>not factor</u> into a lost profit calculation because OJC would not incur them." HSDG Exceptions at 32 (emphasis added). Then HSDG argues that OJC's damages analysis "almost certainly inflated lost profits by failing to <u>exclude</u> variable costs that OJC would not have incurred." *Id*. (emphasis added). But HSDG's own expert was concerned that OJC's profit calculations "may not have <u>included</u> all variable costs." RX at 1156 (emphasis added). Regardless, HSDG does not identify which of the costs OJC

included, such as outbound shipping, fulfillment, discounts, or marketing, should not have been included but were, or which costs OJC should have included but did not. HSDG's citation to the *Rose* case highlights the information OJC did provide. *Rose Int'l Inc*, 2001 WL 865708, at *77. There, Rose simply subtracted a payable from a corresponding receivable and used that to calculate profit. *Id*. In contrast, OJC has subtracted costs such as fulfillment, shipping, marketing, and discounts. OJC Ex. 101. OJC's expert explained that OJC captured all costs, "including the purchase cost, sales commissions, fulfillment center costs, shipping costs and any other direct costs associated with the product." CX at 423. OJC used third parties for many tasks, reducing other costs to the point that a significant increase in sales in 2021 would only nominally increase its fixed costs. I.D. at 48. As Mr. Berning testified, "the way [OJC] operated is almost as… a virtual company. So their costs, overhead and stuff, are very limited because they outsource pretty much everything." RX at 1082. HSDG's general assertions that OJC's calculations must be wrong without evidence of error are unpersuasive and do not undermine the ALJ's conclusion that OJC's evidence is sufficient to reasonably infer the actual loss sustained. I.D. at 51.[22]

Second, HSDG raises Mr. Berning's and the ALJ's failure to address two reports in the record created by consultants, BTIG and Nomura, when OJC was considering selling itself. HSDG Exceptions at 33. The flaw in HSDG's argument is that it tries to use projections to dispute actual data. OJC's damages data is based on actual shipments and profits from 2020 through 2022. OJC Ex. 101. The Nomura and BTIG reports were based on data and projections provided to them by OJC. These reports were produced in September 2020 and October 2020 respectively, so the data OJC provided predated those reports. OJC Exhibits 109, 110. Neither report took into account the spike in demand OJC saw for its

---

[22] Even if OJC's data fails to include nominal costs that should reduce OJC's average profits, the Commission below takes a conservative approach to calculating OJC's damages that would more than accommodate these nominal costs.

products starting in late 2020 and early 2021. CX at 471. As HSDG itself argued, OJC's profits for the 2021-2022 service contract period exceeded those for the 2020-2021 Service Contract. HSDG Exceptions at 38. Further, Mr. Berning did address the BTIG and Nomura valuations in his report, and he calculated one measure of damages based on the reports. CX at 430-32. He did not address discrepancies in profits between OJC's actual profits and the consultants' projections, but the failure to question actual data based on outdated projections does not undermine the ALJ's conclusions.

### ii.    Calculations

OJC's spreadsheet of calculations does contain multiple unreasonable assumptions incorporated into OJC's profit per container calculation, though neither HSDG nor the ALJ identified them. When OJC calculates its average profit per container, it does so based on unsupported assumptions, first that HSDG is responsible for any costs OJC paid to other carriers above the rate of the 2020-2021 Service Contract rates and second that HSDG would have renewed the contract at the 2020-2021 Service Contract rates. First, OJC's assumption that it should be reimbursed for rates it paid carriers aside from HSDG that exceeded HSDG's rates during the 2020-2021 Service Contract is not supported by argument or evidence. Second, HSDG has argued it would never have renewed the contract at 2020-2021 Service Contract rates for another year given the market in May 2021. I.D. at 55-6; HSDG Exceptions at 24. The ALJ rejected this argument against OJC's calculation by pointing out that OJC provides data through 2022 and reasoning that OJC's averages thus include actual shipping costs for 2021-2022, including elevated spot rates. I.D. at 55-6. But OJC's calculations do not calculate its profits using the actual shipping costs it paid during the 2020-2021 Service Contract or the proposed 2021-2022 Service Contract. OJC does not calculate its profits based on what it actually paid to ship containers, but instead a number "HS Est Rate" which seems to be pegged to the shipping rate of OJC's service contract with HSDG. OJC Ex. 101. OJC does this for both the period of the 2020-2021 Service Contract and the proposed

2021-2022 Service Contract, even though the actual shipping rates it paid to ship containers are available for both periods.

For the 2020-2021 period, this is clearly unsupported as damages should represent the actual loss OJC sustained due to HSDG's actions. The only harm OJC suffered during this period due to HSDG was HSDG's failure to meet the MQC, not the fact that OJC got better shipping rates from HSDG than from other carriers. I.D. at 51. HSDG did not have an obligation to ship more containers than the 200 FFE MQC of the 2020-2021 Service Contract and the ALJ correctly rejected OJC's arguments that HSDG had some obligation to make weekly shipments for OJC. I.D. at 51-52. Basing the profit calculations on the lowest price OJC could have paid during this period instead of the price it actually did pay incorrectly inflated OJC's damages. For the proposed 2021-2022 Service contract, there is no evidence that HSDG was willing to renew for the 2020-2021 shipping rates, the contract did not contain an automatic renewal provision, HSDG's expert report states that marketplace dynamics at the beginning of 2021 would have dictated higher rates for the new contract, and the spot rates supplied by OJC show rates at least doubled over the course of 2020-2021. RX at 1150, 1163; OJC Ex. 104. Based on this record, OJC's decision to calculate profits using the "HS Est Rate" for both the 2020-2021 Service Contract and the proposed 2021-2022 Service Contract is not reasonable.

OJC's data also includes other unsupported decisions. OJC calculates an average profit per container based on containers shipped across a two-year period, even though there are two distinct damage periods. The Commission can easily calculate an average profit figure for containers shipped during the 2020-2021 Service Contract term and a different average for containers carried during the 2021-2022 Service Contract term. Splitting these averages out separately is more accurate given the significant fluctuations in shipping costs and OJC's profits per container. Further, OJC includes in its calculations 53 containers shipped before the 2020-2021 Service Contract started and 51 containers shipped after the

OJC v. HSDG and HSNA                                          52

date the proposed year-long 2021-2022 Service Contract would have expired. Finally, OJC's calculations include shipments from Brazil and to Kentucky in its profit averages even though the ALJ expressly rejected OJC's arguments that shipments originating from Brazil or destined for Kentucky should be included in damages. I.D. at 54-55.

The Commission chooses to adjust the calculations in OJC's spreadsheet itself instead of remanding the case for essentially the same work to be completed. OJC and the ALJ calculated average profits for containers shipped between June 1, 2020, and July 12, 2022. Ex 101. It is certainly one way to calculate the damage to OJC by averaging profits over a longer period. But the more precise method of evaluating OJC's loss is to calculate two sets of damages. The first is based on the period of the 2020-2021 Service Contract, specifically from the June 23, 2020, effective date until the May 31, 2021, expiration. I.D. at 6. This number is used to calculate damages for the 15 FFE shortfall of the 2020-2021 Service Contract. The second period of damages runs during the proposed term of the 2021-2022 Service Contract, specifically from June 1, 2021, until May 31, 2022.[23] This average is used to calculate damages for the proposed 2021-2022 Service Contract. This excludes from consideration shipments made outside the relevant dates that OJC still included in the spreadsheet, such as those made before June 23, 2020, and after May 31, 2022.

Next, the Commission finds the appropriate shipping costs to deduct from OJC's profits measure are most accurately calculated using the actual prices OJC paid to ship. For the 2020-2021 Service Contract, using the actual shipping rates OJC actually paid is a simple change that clearly more accurately represents the harm OJC suffered due to HSDG's actions. As for the proposed 2021-2022 Service Contract, OJC unreasonably assumed its shipping rates

---

[23] Though it is not completely confirmed by the record when the proposed contract was to end, partially because negotiations were never completed, Ms. Casanova suggested the end date would be May 31, 2022. I.D. at 14.

OJC v. HSDG and HSNA                                                    53

would remain the same as the prior year. The Commission considered using the spot rate price for the week when OJC sent the April 28 Demand Letter and HSDG retaliated against it as a reasonable rate the parties would have negotiated, or the week following, or the week when OJC's contract expired. OJC Ex. 104. But HSDG may have negotiated a higher service contract rate than that of the spot market to protect itself against shipping rates jumping, which rates ended up doing. Or OJC may have been able to negotiate a discount given HSDG's failure to meet the commitments of the previous contract. There are also other potential data points that could be used to benchmark OJC's shipping costs for the 2021-2022 Service Contract, but none of them as accurately represent OJC's costs to ship as the actual costs OJC paid to ship containers. For the proposed 2021-2022 Service Contract the actual shipping costs OJC paid likely overestimate the rates OJC would have paid, but it is the most supportable data point in the record.

Finally, the Commission decides to exclude shipments from Brazil and those sent to Kentucky when calculating OJC's profits but includes shipments to CRISOSA and GLM. The ALJ was correct to exclude consideration of OJC's volume shipped on the Brazil and Kentucky routes from potential damages. I.D. at 54. But OJC's spreadsheet includes many entries for shipments from Brazil or destined for Kentucky that impacted the calculation of damages. The Commission excludes those shipments when recalculating damages to approximate more closely the profits OJC would have earned through the 2021-2022 Service Contract with HSDG for shipments from Asia to the West Coast. The Commission does not exclude shipments to "CRISOSA" or "GLM" as those appear to be shipments OJC sent from Asia to Mexico to be sold in the United States when it lost access to a service contract serving "LA/LB" and at a time when container shipments to the Los Angeles area were facing a traffic jam. RX at 1000; Greg Miller, *Zero Ships Waiting Off Southern California for First Time Since 2020*, Freightwaves, (Nov. 23, 2022) https://www.freightwaves.com/news/zero-ships-waiting-off-southern-california-59-off-other-ports. The purpose of the damages analysis is to reasonably infer actual loss. HSDG's

wrongful Shipping Act violations prevent the Commission from calculating damages based on actual shipments carried by HSDG during the 2021-2022 period. To prevent HSDG from profiting from its wrongdoing, the Commission must use just and reasonable estimates from the relevant data. *California Shipping*, 1990 WL 427266, at *23. Transpacific shipments from Asia to Mexico provide relevant and reasonable estimates of OJC profits on furniture shipments originating in Asia and shipping to the West Coast for sale in the United States.

Based on this analysis, the Commission has recalculated a more accurate approximation of OJC's profits per container. For the shortfall under the 2020-2021 Service Contract, OJC's average profit per container for OJC shipments is $20,737.24. For the period of the proposed 2021-2022 Service Contract, the most accurate measure of OJC's average profit per container is $18,983.01, which removes shipments outside the relevant time frame and shipments to Kentucky or from Brazil, and adjusts OJC's shipping costs to reflect actual shipping rates it paid.

### 4.    Volume

While OJC argues the ALJ wholly underestimates OJC's potential 2021-2022 volume and HSDG argues even 200 FFE is too high and unsupported by the record, the record supports a finding in between. The ALJ chose 200 FFE because "[i]t is reasonably certain that OJC would have shipped at least that same 200 FFE in 2021-2022, given OJC's actual performance in 2020-2021, OJC's constant requests for even higher volumes throughout 2020-2021, OJC's internal projection of and request for a significantly higher 2021-2022 volume, and the increased demand for consumer goods that even Hamburg recognized." I.D. at 53. As the ALJ pointed out, HSDG was interested in contracting with OJC for at least the same volume for the next year. I.D. at 53. But the ALJ then rejected a higher number because "it is not clear whether or not [HSDG] could handle a higher volume." I.D. at 54.

However, the Commission finds 400 FFE is an appropriate estimate of the MQC for the 2021-2022 Service Contract. There is no question OJC would have accepted an MQC higher than 200 FFE, the only question is whether they would have accepted anything as low as 200 FFE, given that they were trying to consolidate all their volume with HSDG and had shipped 542 containers the year before. OJC Exceptions at 24. As for HSDG, Mr. Li's emails acknowledge OJC's 200 FFE MQC for the 2020-2021 Service Contract and do not reflect any hesitance to renew at similar levels. I.D. at 13. When Ms. Casanova created a template in HSDG's system, she chose 400 FFE. I.D. at 14. She emailed this proposed MQC internally twice, without any negative responses. I.D. at 14. The next relevant actions taken by HSDG were to violate the Shipping Act. "[W]here a wrongdoer has by its own actions prevented the precise computation of damages… the wrongdoer must bear the risk of the uncertainty and that damages can be shown by just and reasonable estimates based on relevant data." *California Shipping*, 1990 WL 427266, at *23 (*citing Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264-65 (1946)); OJC Exceptions at 26-27.

The 143 containers OJC did ship across 2021-2022 do raise questions. HSDG argued that number shows that there was insufficient customer demand for OJC to ship 200 containers in 2021-2022, let alone greater numbers. HSDG Exceptions at 35. But as HSDG later notes, OJC's shipments during the 2021-2022 period have higher profits than those of the 2020-2021 period even with higher shipping rates on the spot market, suggesting demand was not waning. HSDG Exceptions at 38. Moreover, OJC projected demand for 4,700 containers during the 2021-2022 Service Contract. This number suggests they would have easily eclipsed the 542 FFE shipped the previous year, which was only constrained by OJC's ability to obtain space as evidenced by OJC's repeated requests for additional space during the 2020-2021 Service Contract. The Commission finds based on this record that the fact that OJC only shipped 143 containers throughout the 2021-2022 period is more due to OJC's inability to secure predictable and

affordable space with carriers and less a reflection of declining demand. CSX at 510-12.[24]

The ALJ addressed a different argument about the 143 containers OJC shipped, namely that any award should be reduced by the number of containers OJC was actually able to ship. I.D. at 56. But as the ALJ noted, OJC tried to secure as much space as possible during the 2020-2021 Service Contract to keep up with surging demand for its products. I.D. at 56. The ALJ concluded that the 143 containers represented spot market shipments OJC would have made in addition to any made pursuant to a service contract. I.D. at 56. OJC was anchoring projections around 4,700 FFE for the 2021-2022 Service Contract, shipped 542 FFE the year prior, was looking to consolidate all of its volume with HSDG, and was experiencing a surge in demand. I.D. at 10, 12, 56; OJC Exceptions at 14. The Commission concludes that OJC would have shipped at least as many containers as the prior year given the chance.

Certainly, as Mr. Pump testified, space was an issue for HSDG, and allocating it between customers was a challenge. HSDG's inability to fulfill the MQC of the 2020-2021 Service Contract does not portend well for HSDG's ability to fulfill a renewal. But the evidence shows that HSDG could have fulfilled this the MQC and chose not to. Moreover, Ms. Casanova mentioned OJC's desire to increase the MQC for the 2021-2022 Service Contract and plan to ship up to 4,700 FFE. Mr. Li's response suggests he was skeptical that OJC could meet a higher MQC given his belief that OJC had failed to meet the 2020-2021 Service Contract MQC, but it seems he did not realize that HSDG had failed

---

[24] As described above, OJC's business model required a 60-to-90-day lead time to produce products and certainty that they would be able to ship the products from Asia. SCX at 510. OJC operated as essentially a virtual company, and not having access to a predictable, year-long service contract negatively affected OJC's ability to schedule production and therefore ship goods. I.D. at 48; RX at 1082-83.

to provide sufficient space.[25] In any case, Mr. Li was open to a renewal, and Mr. Li then asked for a new MQC based on the existing 200 FFE MQC. I.D. at 12-13. Before HSDG's Shipping Act violations cut off negotiations and after OJC sent the April 28 Demand Letter, Ms. Casanova mentioned OJC was looking for a solution to offset the 2020-2021 Service Contract deficit; referenced HSDG's desire to renew the 2020-2021 Service Contract; proposed increasing the MQC to 400 FFE; and stated that OJC was not a short-term account, was constant in shipping volume, and was willing to commit much more volume.[26] I.D. at 14-15. Further, evidence produced by HSDG shows service contracts with much higher MQCs starting after April 28, 2021, and Mr. Weiss testified that Ms. Casanova was attempting to woo a larger share of OJC's volume throughout the renewal process. I.D. at 10. Based on this evidence, the Commission concludes that a reasonable estimate of an MQC both parties would have accepted would be 400 FFE and that number can be used to calculate OJC's actual loss. *MAVL Capital*, 2022 WL 2209421, at *3 (finding actual damages does not require absolute precision but does require evidence sufficient to reasonably infer the actual loss sustained).

OJC argues that this number is too low. While OJC's arguments are comprehensive, they lack contemporaneous support in the record. OJC offers no contemporaneous evidence that HSDG seriously considered an MQC of 4,700 FFE. OJC Exceptions at 13. Agreeing on an MQC would have required both OJC and HSDG to make binding commitments to reach that level of space. HSDG refused OJC's attempts to secure more space during the 2020-2021 Service Contract and Mr. Pump testified that space constraints were the biggest challenge HSDG faced. When Ms. Casanova raised the

---

[25] "They signed 200 FFE last year for City of Industry, CA and almost fulfilled that this year. Based on that what would be the MQC target for next year with and without KY business?" I.D. at 13.

[26] Ms. Casanova's email actually says, "willing to commit to much more of the current MQC." But given the context of the email where she describes proposing a higher MQC, it seems she is referring to OJC committing much more volume to HSDG.

4,700 FFE number in an internal email, it was essentially ignored, and Mr. Li referenced OJC's 2020-2021 Service Contract 200 FFE MQC that OJC "almost fulfilled." When Ms. Casanova seemed to be scrambling to appease OJC in the wake of the April 28 Demand Letter, she chose 400 FFE as an MQC. She chose 400 FFE as a way "of offsetting the anticipated deficit," but only "if we can truly satisfy this volume." I.D. at 14-15. Even trying to appease OJC, no evidence suggests HSDG was willing to commit to transporting more than 23 times the 2020-2021 Service Contract MQC. Ms. Casanova declared she did not have the power to agree to "such a substantial increase of the [MQC]."[27] RX at 1139.

Further, nothing at the time suggests OJC was willing to commit to such a significant increase and pay penalties if it did not ship that much cargo. If OJC agreed to an MQC with HSDG of 4,700 FFE with the same liquidated damages as the 2020-2021 Service Contract, it could face over $1,000,000 in liquidated damages if OJC shipped the same number of containers as the year before. I.D. at 7 ($250 liquidated damages clause). OJC projected 4,700 FFE[28] but was reticent to offer an MQC when engaging in renewal negotiations, instead waiting for HSDG to propose an MQC. I.D. at 12-13.

OJC argues that HSDG was offering a 400 FFE bridge service contract and agreed to an MQC of 4,700 FFE. OJC Exceptions at 13. But only Mr. Weiss's later declaration supports this, and Ms. Casanova claims that Mr. Weiss's statement was false. RX at 1139. No contemporaneous evidence confirms that HSDG

---

[27] Ms. Casanova's declaration that she did not have power to agree to "such a substantial" increase suggests she did have the power to agree to something less substantial, such as the doubling of the MQC she proposed internally.

[28] HSDG internal emails relate that OJC told HSDG that it shipped, "3500x40HC in 2020," despite stating to the Commission that it shipped only 542 FFE in the 2020-2021 service contract year across three carriers. I.D. at 12, OJC Exceptions at 14. In Mr. Weiss's declaration, he clarified that OJC had the "demand" during the 2020-2021 Service Contract to ship 3500 High Cube FFEs if HSDG provided the space.

agreed to either the bridge contract or a 4,700 FFE MQC, and Ms. Casanova's email of April 28, 2021, requesting OJC commit to an MQC suggests that there was no agreement. I.D. at 13. OJC is right that some uncertainty is due to HSDG wrongfully cutting off negotiations, but even before HSDG's actions, there is no evidence that either side seriously considered 4,700 FFE for an MQC. OJC argues that its continued requests for more space during the 2020-2021 Service Contract show the 4,700 FFE MQC was reasonable, but HSDG's continued rejection of these requests suggests the opposite; HSDG was unlikely to commit to 23 times as much space for OJC the following year.

The ALJ correctly found that it was not reasonably certain the new contract would have included shipments to Kentucky. OJC argues that it could have shipped all 4,700 containers to California if needed because it had a warehouse to accommodate extra cargo. But in February 2021 OJC asked HSDG to reroute shipments because its warehouse had run out of space, which is not consistent with the capability to handle 23 times as much volume four months later. I.D. at 10. HSDG did not express to OJC that it wanted to ship to Kentucky and though some employees wanted to revisit this business, others responded that it had a negative impact on profit. I.D. at 21. Ms. Casanova internally proposed revisiting OJC's request for shipments to Kentucky in January 2021 and again when discussions about a renewal began in earnest. I.D. at 13. While Mr. Li asked OJC to propose an MQC for a contract including the Kentucky route, he also stated "suggest to maintain focus on local destination only," presumably excluding inland ports. I.D. at 13. Further, in an April 28, 2021, email Ms. Casanova stated, "[p]lease consider this commitment for the place of delivery City of Industry CA only," suggesting HSDG was declining to bid on shipping to Kentucky. RX at 812.

OJC's last argument for a 4,700 FFE MQC conflates shipping to a port with shipping to an inland port. Mr. Pump testified that shipments to Savannah or Charleston were more desirable than shipments to New York only because New York has a surplus of

export containers and Savannah and Charleston need containers for exports. CX at 92. But OJC did not propose to move containers to those ports, it needed them moved inland to Kentucky by rail. I.D. at 12, 21 (*citing* CX at 242-43). Given this record, OJC's argument that the ALJ erred in excluding the Kentucky shipments from the damages calculation is not persuasive.

In the alternative, OJC argues 1,410 FFE is the appropriate number to use for calculating damages. OJC Exceptions at 22. But again, there is no evidence that HSDG ever entertained such a substantial increase in volume committed to OJC and HSDG rejected OJC's requests to add space during the existing contract. HSDG doubled OJC's allocation in a draft contract, but even that had yet to be approved by management and is nowhere near 1,410 FFE.

Finally, OJC argues in the alternative for 542 FFE as the appropriate number to calculate damages, because OJC shipped that many containers during the 2020-2021 Service Contract across the three carriers and it was consolidating all of its volume with HSDG. Failing this, OJC argues that 400 FFE is the very least the ALJ should have used to calculate damages because that was "the initial MQC of the bridge contract drafted by [HSDG]." OJC Exceptions at 24. As explained above, the Commission concludes that 400 FFE is the right measure of volume to calculate OJC's damages and when this 400 FFE is added to the 143 containers OJC actually shipped during the 2021-2022 period, the result is very close to the 542 FFE OJC shipped in 2020-2021. As noted above, there is no contemporaneous evidence that HSDG ever entertained a MQC above 400 FFE for the 2021-2022 Service Contract.

HSDG argues the opposite, that there is insufficient evidence to support the conclusion that OJC could ship 200 FFE or that HSDG would have committed 200 FFE of space to OJC. As discussed above, there is sufficient evidence that OJC was actively seeking extra space during the 2020-2021 Service Contract, was seeking more space for the proposed 2021-2022 Service Contract,

had projected a significant growth in demand during that period, and did actually earn more from shipments during this period.[29] Further, HSDG showed a willingness to renew the 2020-2021 Service Contract, proposed internally a new MQC of 400 FFE, allocated space to other shippers in magnitudes far exceeding what Ms. Casanova proposed for OJC, and did not finalize negotiations because it committed a Shipping Act violation. Based on this record, there is sufficient evidence to conclude that OJC could have shipped more than 200 FFE and HSDG would have committed more than 200 FFE to OJC. *California Shipping*, 1990 WL 427266, at *23.

The Commission concludes that it can be shown by just and reasonable estimates based on the record that OJC and HSDG would have agreed to a service contract with an MQC of 400 FFE. Thus, the Commission uses this figure when calculating OJC's damages.

### 5.    Mitigation of Damages

The Commission affirms the ALJ's finding that there was nothing further OJC could have reasonably done to mitigate its losses. The requirement to mitigate damages prevents a party from recovering damages for losses it could have reasonably avoided without undue risk or burden, and the ALJ correctly found there were no losses OJC reasonably could have avoided. *See Rose Int'l Inc. v. Overseas Moving Network Int'l*, Docket No. 96-05, 29 S.R.R. 119, 2001 WL 865708, at *77-78 (FMC June 1, 2001). "Failure to mitigate damages is an affirmative defense, on which the party opposing the award of damages bears the burden of proof." *Adenariwo v. FMC*, 808 F.3d 74, 79 (D.C. Cir. 2015). HSDG argues that there is no evidence beyond a statement by Mr. Weiss that it attempted to obtain a service contract with a different carrier or otherwise mitigate damages. HSDG Exceptions at 37. Further, HSDG argues that OJC's evidence shows it earned over $7,000 per

---

[29] The only reason the profits per container awarded as damages are higher for the 2020-2021 Service Contract is because OJC was forced to pay elevated spot rates to ship during the 2021-2022 period, which would not have occurred if HSDG concluded negotiations towards a renewal contract.

container in 2021-2022 and it should have been able to ship many more containers profitably. But the evidence shows that OJC's business required certainty when shipping products to the United States, that OJC was unable to negotiate a service contract with another carrier, that it did make some shipments on the spot market, and that HSDG's management testified that the period when HSDG discontinued negotiations with OJC was already "very very late in the game" for negotiating service contracts. CSX at 510-12; I.D. at 61; RX at 992. The ALJ found Mr. Weiss's testimony that he attempted to negotiate with other carriers credible and consistent with testimony by Mr. Li that the majority of contracts are negotiated through April or possibly May. I.D. at 60. HSDG submitted no evidence showing space offered to OJC that it rejected or otherwise contradicting OJC's evidence of its attempts at mitigation. Based on this record, HSDG has not carried its burden and its argument is not persuasive.

### 6.    Discovery Sanctions

The ALJ correctly concluded sanctions against HSDG were not required, as the information OJC sought and HSDG refused to supply was not necessary to resolve the proceeding. I.D. at 63; OJC Exceptions at 28-29. The record suggests that HSDG failed to make witnesses and evidence available to OJC, even after orders from the ALJ. OJC Exceptions at 28-29. Some of this information dealt with space availability which would have relevance to HSDG's argument that it lacked space OJC sought. While it seems that HSDG did not meet all of its discovery obligations, the Commission's conclusion is that additional evidence would not have materially impacted the outcome of this case.[30]  The Commission rejects OJC's request for

---

[30] OJC was able to establish a reasonable measure of profits-per-container and there is sufficient evidence to establish a reasonable projection of the 2021-2022 Service Contract MQC. OJC does not persuasively explain why testimony from HSDG executives further removed from negotiations with OJC or evidence of blank sailings would have permitted it to prove a higher MQC. As will be discussed above there was evidence of OJC's hesitance to commit to an MQC for

sanctions, as the ALJ did, because sufficient evidence exists to resolve this case and the missing information would not impact the final determination.

### 7.        Final Calculations

Pursuant to the discussion above, the Commission must recalculate the damages award. For the 2020-2021 Service Contract, the average profits per container OJC earned was $20,737.24. OJC missed the MQC by 15 FFE so the profits per container are multiplied by that number to give a measure of the total harm done to OJC by HSDG's actions during this period of $311,058.60, plus interest of $34,538.02. Because it is appropriate to double this damage award based on HSDG's knowing and willful violations, the total award for the 2020-2021 Service Contract period is $691,193.24.

For the period of the proposed 2021-2022 Service Contract, the average profits per container OJC would have earned based on just and reasonable estimates is $18,983.01. The record supports the conclusion that OJC and HSDG would have agreed to an MQC of 400 FFE for this period, so the measure of the total harm done to OJC by HSDG's actions is $7,593,204, plus interest of $843,102.45. When doubled due to HSDG's knowing and willful violations, the total award for the proposed 2021-2022 Service Contract is $16,872,612.90. Combined, the total award for the two periods is $17,563,806.14.

### III.    CONCLUSION

For the reasons discussed in this order, the Commission denies the Exceptions filed by HSDG in their entirety. The

---

2021-2022, and further, more data on HSDG's available space does not prove HSDG would have allocated the space to OJC. There is no evidence HSDG ever considered an MQC as high as the 4,700 FFE OJC projects, and general evidence about HSDG's availability of space would not provide sufficient certainty.

OJC v. HSDG and HSNA                                                    64

Commission also denies OJC's Exceptions except with respect to the calculation of damages. The Commission modifies the damages award consistent with the findings above and the Commission's best judgment of the appropriate measure of damages. The Commission awards OJC reparations for the 2020-2021 Service Contract of $691,193.24 and $16,872,612.90 for the proposed 2021-2022 Service Contract, for a total award of $17,563,806.14.

The Commission hereby:

(1) **DENIES** Respondent Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft's June 29, 2023 Exceptions;

(2) **DENIES** Complainant OJ Commerce, LLC's June 29, 2023 Exceptions as to liability;

(3) **AFFIRMS** the ALJ's June 7, 2023 Initial Decision as to liability;

(4) **ORDERS** HSDG to pay OJC reparations in the amount of $17,563,806.14. This amount includes interest on the reparations award running from April 29, 2021.[31]

By the Commission.

David Eng
Secretary

---

[31] The ALJ chose to award interest based on this date and neither party challenged this decision. The Commission also finds it to be a reasonable date from which to calculate interest based on the facts of this case.