NO. 25-1156
(oral argument not yet scheduled)

IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

HAMBURG SÜDAMERIKANISCHE DAMPFSCHIFFFAHRTS-GESELLSCHAFT A/S & Co. KG; HAMBURG SUD NORTH AMERICA, INC.; MAERSK A/S, MAERSK AGENCY USA, INC.,
*Petitioners,*

v.

FEDERAL MARITIME COMMISSION,
*Respondent,*

&

OJ COMMERCE LLC,
*Intervenor for Respondent.*

Petition for Review
of an Order of
the Federal Maritime Commission (21-11)

# PETITIONERS' FINAL OPENING BRIEF

Bryan Killian
Brendan J. Anderson
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, D.C. 20004
T: 202-739-3000
bryan.killian@morganlewis.com

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

In accordance with Circuit Rule 28(a)(1), Petitioners (1) Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG ("HSDG"); (2) Hamburg Sud North America, Inc.; (3) Mærsk A/S, *as successor in interest to Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG* ; and (4) Maersk Agency USA, Inc., *as successor in interest to Hamburg Sud North America, Inc.* certify:

**(A) Parties and Amici.**

Petitioner Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG states that it was formerly a corporation organized under the laws of Germany with a principal place of business in Hamburg, Germany, until it merged with Mærsk A/S in November 2021.

Petitioner Hamburg Sud North America, Inc. states that it was formerly a corporation organized under the laws of New Jersey, with a principal place of business in Morristown, New Jersey, until it merged with Maersk Agency USA, Inc. in January 2022.

Petitioner Mærsk A/S is a direct subsidiary of A.P. Møller – Mærsk A/S. A.P. Møller – Mærsk A/S is a publicly traded company organized under the laws of Denmark, with a principal place of business in

Copenhagen, Denmark. A.P. Møller Holding A/S controls 51% of its voting shares. No other publicly traded company owns 10% or more of its stock.

Petitioner Maersk Agency USA, Inc. states that it is a corporation organized under the laws of Delaware, with a principal place of business in Florham Park, New Jersey. Maersk Agency USA, Inc. is a direct U.S. subsidiary and agent of Mærsk A/S.

Pursuant to the requirement of Circuit Rule 26.1(b) that Petitioners provide a statement of their general nature and purpose as relevant to the litigation, Petitioners state that they provide or have provided ocean shipping services worldwide, including to and from the United States.

Respondents are the Federal Maritime Commission and the United States.

OJ Commerce, LLC ("OJC") was Complainant in the case before the Federal Maritime Commission, has intervened in this appeal.

There are currently no *amici curiae* in this case.

**(B) Rulings Under Review.**

The ruling under review is the Federal Maritime Commission's *Order Affirming Initial Decision*, FMC Dkt. 21-11 (served August 27, 2024), and all orders or rulings encompassed in or made reviewable by that Order,

including the *Order Denying Petition for Reconsideration*, FMC Dkt. 21-11 (served June 27, 2025).

**(C) Related Cases.** Case No. 25-1179 is in this Court, with which this case is consolidated.

/s/ Bryan Killian
Bryan Killian
Brendan J. Anderson
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, D.C. 20004
T: 202-739-3000

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, and District of Columbia Circuit Rule 26.1, Petitioner Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG ("HSDG") states that it was formerly a corporation organized under the laws of Germany with a principal place of business in Hamburg, Germany, until it merged with Mærsk A/S in November 2021.

Petitioner Hamburg Sud North America, Inc. states that it was formerly a corporation organized under the laws of New Jersey, with a principal place of business in Morristown, New Jersey, until it merged with Maersk Agency USA, Inc. in January 2022.

Petitioner Mærsk A/S is a direct subsidiary of A.P. Møller – Mærsk A/S. A.P. Møller – Mærsk A/S is a publicly traded company organized under the laws of Denmark, with a principal place of business in Copenhagen, Denmark. A.P. Møller Holding A/S controls 51% of its voting shares. No other publicly traded company owns 10% or more of its stock.

Petitioner Maersk Agency USA, Inc. states that it is a corporation organized under the laws of Delaware, with a principal place of business in

Florham Park, New Jersey. Maersk Agency USA, Inc. is a direct U.S. subsidiary and agent of Mærsk A/S.

Pursuant to the requirement of Circuit Rule 26.1(b) that they provide a statement of their general nature and purpose as relevant to the litigation, Petitioners state that they provide or have provided ocean shipping services worldwide, including to and from the United States.

/s/ Bryan Killian
Bryan Killian
Brendan J. Anderson
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, D.C. 20004
T: 202-739-3000

# CONTENTS

Page

Certificate as to Parties, Rulings, and Related Cases .............................. i
Corporate Disclosure Statement ........................................................ iv
Contents ........................................................................................ vi
Table of Authorities ......................................................................... ix
Glossary ....................................................................................... xiv
Jurisdiction ...................................................................................... 1
Questions Presented ........................................................................... 2
Introduction ...................................................................................... 3
Statutes and Regulations .................................................................... 6
Background ....................................................................................... 7
I. Statutory Background ...................................................................... 7
  A. The Shipping Act .......................................................................... 7
  B. Tariffs and Service Contracts ......................................................... 7
  C. Nondiscrimination ......................................................................... 8
  D. The FMC and enforcement of the Shipping Act. .................................. 9
II. Factual and Procedural Background .................................................. 11
  A. The 2020–2021 Service Contract. .................................................... 11
  B. Negotiations for a 2021–2022 Service Contract. ................................. 14
  C. HSDG continues to ship for OJC. ..................................................... 16
  D. Procedural History ....................................................................... 17
    1. The ALJ's Initial Decision ........................................................... 17
    2. The FMC's Decisions .................................................................. 18
Summary of Argument ....................................................................... 21
Standard of Review ........................................................................... 24

Argument ........................................................................ 25

I. The FMC's adjudication of reparations claims and award of punitive reparations violate Article III and the Seventh Amendment. ........................................................................ 25

A. Petitioners' constitutional challenges are squarely presented. ........................................................................ 25

B. The FMC adjudicated private rights in violation of Article III. ........................................................................ 27

1. The FMC adjudicated private rights. ......................... 28

2. The public rights exception does not apply. ............... 32

3. The FMC's award of punitive reparations makes Article III adjudication particularly necessary. ......... 34

C. The Seventh Amendment requires jury factfinding for OJC's Shipping Act claims and for punitive reparations. ........................................................................ 37

II. The Shipping Act prohibits awarding reparations for a breach of a service contract. ........................................................ 39

III. The Commission's liability determinations are arbitrary, capricious, and contrary to law. ................................................. 44

A. HSDG did not "unreasonably refuse to deal or negotiate" with OJC. ........................................................ 45

1. HSDG did not "refuse to deal" by failing to meet its contractual commitments under the 2020–2021 Service Contract. ............................................. 45

2. HSDG did not "refuse to deal or negotiate" by declining a new service contract for 2021–2022. ......... 47

B. HSDG did not unlawfully retaliate against OJC. ............... 50

1. OJC did not engage in protected activity. .................. 50

2. HSDG's declining to enter a service contract with OJC was not a failure to provide "cargo space accommodations when available." .............................. 52

IV. The FMC's reparations award was arbitrary, capricious, and contrary to law. ........ 53

A. OJC did not demonstrate its entitlement to reparations with a reasonable degree of certainty........ 53

B. The FMC arbitrarily held that OJC was entitled to lost profits based on a hypothetical 2021–2022 service contract with a 400 FFE minimum volume........ 56

C. The FMC's award of punitive reparations was arbitrary and capricious........ 59

Conclusion ........ 61

Certificate of Compliance........ 62

# TABLE OF AUTHORITIES

## Cases

*All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*,
135 F.3d 740 (11th Cir. 1998) .................... 49, 59

*AT&T, Inc. v. FCC*,
149 F.4th 491 (5th Cir. 2025) .................... 29, 32, 37

*Atl. Sounding Co. Inc. v. Townsend*,
557 U.S. 404 (2009) .................... 38

*Atlas Roofing Co. v. OSHA*,
430 U.S. 442 (1977) .................... 33

*Axon Enters., Inc. v. FTC*,
598 U.S. 175 (2023) .................... 27

*Cal. Shipping Line, Inc. v. Yangming Marine Transp. Corp.*,
Docket No. 88-15, 1990 WL 427466 (FMC Oct. 19, 1990) .................... 54

*Cargo One, Inc. v. COSCO Container Lines Co., Ltd.*,
28 S.R.R. 1635 (2000) .................... 44

*Carr v. Saul*,
593 U.S. 83 (2021) .................... 27

*CFTC v. Schor*,
478 U.S. 833 (1986) .................... 26, 31

*Citizens' Bank v. Nantucket Steamboat Co*,
5 F. Cas. 719 (C.C.D. Mass. 1811) .................... 29

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025) .................... 1

*Freytag v. Comm'r*,
501 U.S. 868 (1991) .......... 25, 26

*Glidden Co. v. Zdanok*,
370 U.S. 530 (1962) .......... 26

*Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989) .......... 37, 38

*Halverson v. Slater*,
129 F.3d 180 (D.C. Cir. 1997) .......... 41

*Hicks v. Ferreyra*,
64 F.4th 156 (4th Cir. 2023) .......... 34

*Honda Motor Co., Ltd. v. Oberg*,
512 U.S. 415 (1994) .......... 35, 36

*Kuretski v. Comm'r*,
755 F.3d 929 (D.C. Cir. 2014) .......... 26

*Lake Shore & M.S. Ry. Co. v. Prentice*,
147 U.S. 101 (1893) .......... 34

*Matson Nav. Co. v. FMC*,
959 F.2d 1039 (D.C. Cir. 1992) .......... 24

*MAVL Capital Inc. v. Marine Transport Logistics, Inc.*,
No. 16-16, 2022 WL 2209421 (FMC June 10, 2022) .......... 53

*The Montana*,
22 F. 715, 727 (C.C.E.D.N.Y. 1884) .......... 29

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......... 29

*MSC Mediterranean Shipping Co. S.A. v. FMC*,
141 F.4th 222 (D.C. Cir. 2025) .......... 24, 27, 43, 44

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
59 U.S. 272 (1856) .......... 28

*N. Pipeline Const. Co. v. Marathon Pipe Line Co.*,
458 U.S. 50 (1982) .......... 27, 30, 37

*NASDAQ Stock Mkt., LLC v. SEC*,
961 F.3d 421 (D.C. Cir. 2020) .......... 51

*Nat'l Ass'n of Recycling Indus., Inc. v. FMC*,
658 F.2d 816 (D.C. Cir. 1980) .......... 24

*NetChoice, LLC v. Paxton*,
49 F.4th 439 (5th Cir. 2022) .......... 29

*New Orleans Stevedoring Co. v. Board of Commissioners of the Port of New Orleans*,
2002 WL 33836158 (FMC 2022) .......... 46, 49

*New York v. Meta Platforms, Inc.*,
66 F.4th 288 (D.C. Cir. 2023) .......... 49

*Pac. Mut. Life Ins. Co. v. Haslip*,
499 U.S. 1 (1991) .......... 35

*Rose Int'l Inc. v. Overseas Moving Network Int'l*,
Docket No. 96-05, 29 S.R.R. 119, 2001 WL 865708 (FMC June 1, 2001) .......... 60

**SEC v. Jarkesy*,
603 U.S. 109 (2024) .......... 21, 26, 28, 29, 30, 32, 33, 36, 37, 38, 39

*Sprint Corp. v. FCC*,
151 F.4th 347 (D.C. Cir. 2025) .......... 26

*Stern v. Marshall*,
564 U.S. 462 (2011) .......... 27, 28, 33, 36

*Sun Valley Orchards, LLC v. U.S. Dep't of Lab.*,
148 F.4th 121 (3d Cir. 2025) .......... 27, 29, 30, 31, 32, 35

*Thomas v. Union Carbide Agricultural Products Co.*
473 U.S. 568 (1985) .......... 31

*Tull v. United States*,
481 U.S. 412 (1987) .......... 38

*United States v. Kim*,
595 F.2d 755 (D.C. Cir. 1979) .......... 54

*Waterman v. Stockholms Rederiaktiebolag Svea et al.*,
3 F.M.B. 248 (1950) .......... 54, 55, 56

*York Co. v. Cent. R.R.*,
70 U.S. 107 (1865) .......... 29, 30

**Statutes**

28 U.S.C. §2342 .......... 1

28 U.S.C. §2344 .......... 1

46 U.S.C. §40101 .......... 4

46 U.S.C. §40102 .......... 7, 8, 30, 52

46 U.S.C. §40501 .......... 8, 48, 50

*46 U.S.C. §40502 .......... 2, 8, 22, 33, 39, 40, 41, 42, 43, 44, 49

46 U.S.C. §41104 .......... 9, 17, 18, 29, 44, 46, 50, 51, 52

46 U.S.C. §41301 .......... 9, 10, 26

46 U.S.C. §41304 .......... 10

46 U.S.C. §41305 .......... 10, 53, 58, 59, 60

46 U.S.C. §41309 .......... 10

46 U.S.C. §46101 .......... 9

Pub. L. No. 117-146 .......... 9

U.S. Const. Amend. VII .......... 2, 21, 26, 37, 38, 39

**Other Authorities**

46 C.F.R. §502.603(b) .......... 59

*Deal*, Websters New Universal Dictionary 512 (unabr. 1996) .......... 46

Fed. R. Evid. 803(6) .......... 54

*Refusal*, Websters New Universal Dictionary 1622 (unabr. 1996) .......... 47

*Refuse*, Websters New Universal Dictionary 1622 (unabr. 1996) .......... 46

Restatement (Second) of Contracts §344 (1981) .......... 41

23 Williston on Contracts §63:1 (4th ed.) .......... 30

24 Williston on Contracts §64:3 (4th ed.) .......... 40

# GLOSSARY

| | |
|---|---|
| ALJ Dec. | the Initial Decision, dated June 7, 2023, signed by Chief Administrative Law Judge Erin M. Worth |
| "CX#" | Citation of Claimant's appendix in the agency proceedings. |
| Dec. | The Federal Maritime Commission's Order Affirming the Initial Decision, dated August 27, 2024, |
| FFE | Forty-foot equivalent |
| FMC | Federal Maritime Commission |
| HSDG | Petitioner Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG |
| MQC | Minimum Quantity Commitment |
| OJC | Intervenor OJ Commerce, LLC, |
| "RX#" | Citation of Respondent's appendix in the agency proceedings. |
| TEU | Twenty-foot equivalent unit |

# JURISDICTION

This Court has jurisdiction under the Hobbs Act, 28 U.S.C. §§2342(3)(B) and 2344, to review the FMC's *Order Denying Petition for Reconsideration*, FMC Dkt. 21-11 (served June 27, 2025), which made final the *Order Affirming Initial Decision*, FMC Dkt. 21-11 (served August 27, 2024).

Petitioners timely filed their Petition for Review within 60 days of the Commission's final order. 28 U.S.C. §2344. Petitioners have standing because the orders under review imposed punitive reparations against Petitioners. *See, e.g.*, *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 113 (2025).

# QUESTIONS PRESENTED

1. Claiming that HSDG breached a contract and breached its duty to deal with OJC, OJC sued HSDG in the FMC. Did the FMC's adjudication of OJC's claims and imposition of punitive reparations violate Article III and/or the Seventh Amendment?

2. The Shipping Act provides that "the exclusive remedy for a breach of a service contract is an action in an appropriate court." 46 U.S.C. §40502. Did the FMC violate Section 40502 by awarding punitive reparations for HSDG's breach of the 2020–2021 Service Contract?

3. The FMC held that HSDG unreasonably refused "to deal or negotiate" with OJC and to provide OJC "cargo space accommodations when available" by breaching the 2020–2021 Service Contract and failing to enter into a new contract. Is that holding arbitrary, capricious, and/or contrary to law when HSDG undisputedly provided shipping services for OJC throughout the entire period?

4. The FMC held that OJC's threat to sue HSDG for breach of contract was "protected activity" under the Shipping Act. Is that holding arbitrary, capricious, and/or contrary to law?

5. Is the FMC's award of maximum punitive reparations arbitrary, capricious, and/or contrary to law?

# INTRODUCTION

During the COVID-19 pandemic, a sudden increase in demand for consumer goods collided with sudden supply-chain bottlenecks to make ocean shipping extremely difficult. Cargo space became very, very tight. Carriers endeavored to fulfill their contractual obligations to shippers, yet many ultimately failed to fulfill them perfectly.

Petitioner HSDG was one of those carriers. Despite agreeing to carry 200 Forty-Foot Equivalents ("FFEs") for Respondent OJC between June 2020 and May 2021, HSDG carried only 185 FFEs. OJC was not content with HSDG's 92.5% performance and repeatedly threatened to sue. Yet in a puzzling display, OJC at the same time broke off negotiating service contracts with other carriers and demanded that HSDG alone negotiate a new 2021–2022 Service Contract. OJC's terrible business strategy unsurprisingly backfired. HSDG declined to enter a new service contract after the 2020–2021 Service Contract expired and instead carried for OJC under prevailing market rates. As a result, OJC had no service contracts with any carriers during that period.

Like other sophisticated enterprises whose business plans the pandemic thwarted, OJC should have gone to court to try to resolve its commercial dispute with HSDG. State and federal courts have adjudicated

countless such cases. Instead, OJC ran to a federal administrative agency, the FMC, and asked it not only to resolve this commercial dispute but also to hit HSDG with the FMC-equivalent of punitive damages. OJC turned to the FMC to save the company from its own bad decisions.

Looking for scapegoats to take political blame for supply-chain disruptions, the FMC was happy to oblige. The FMC administers the Shipping Act, 46 U.S.C. §40101 *et seq.*, a federal law that *requires* ocean common carriers (like HSDG) to post tariffs; to that end, the Act imposes standard, common-carrier duties on carriers, breaches of which the FMC may review. The Act also *allows* ocean common carriers to negotiate service contracts with individual shippers; to that end, the Act forbids the FMC from awarding any remedy to shippers complaining about a breach of a service contract.

In the Order on review, the FMC flouted the Shipping Act's limitations and adjudicated a run-of-the-mill contract dispute. The FMC held that HSDG breached its *statutory* duties when it breached the 2020–2021 *contract* and when it failed to sign a new 2021–2022 *contract*. To make matters worse, the FMC based its damages award on speculation about OJC's lost profits—speculation ultimately grounded in one, unsubstantiated, made-for-litigation spreadsheet. Finally, to make an example of

HSDG, the FMC imposed a punitive penalty on HSDG, doubling the damages award for what is the largest award the FMC has ever issued—approximately $17.5 million.

This case illustrates the wisdom of the Nation's founders, who entrusted federal courts alone, staffed with life-tenured judges and overseeing civil juries, with sole power and responsibility to adjudicate private disputes and award punitive damages. The administrative adjudication here resembles nothing like the process HSDG would have received in federal court. Nor was the FMC shy about that; it repeatedly stressed "that standards of evidence in administrative proceedings are more liberal and relaxed than those applied by courts." JA46 (Dec. 40).

The FMC's decision is unconstitutional, contrary to the Shipping Act, and arbitrary and capricious. The Court should grant HSDG's petition and vacate the decision.

# STATUTES AND REGULATIONS

Statutes and regulations are reproduced in the addendum to this brief.

# BACKGROUND

## I. Statutory Background

### A. The Shipping Act

The Shipping Act regulates "common carriers" and "shippers." Ocean common carriers hold themselves "out to the general public to provide transportation by water of passengers or cargo between the United States and a foreign country for compensation." 46 U.S.C. §40102(7). "Shippers" are "the person[s] for whose account the ocean transportation of cargo is provided." 46 U.S.C. §40102(23).

### B. Tariffs and Service Contracts

Today, the Shipping Act envisions two primary ways for carriers to serve shippers. Since 1961, the Act has required carriers to post a tariff. *See* "An Analysis Of The Maritime Industry And The Effects Of The 1984 Shipping Act," FEDERAL TRADE COMMISSION, at 3 (hereinafter "*FTC Analysis*").[1] A carrier must publicly display a tariff with "all its rates, charges, classifications, rules, and practices between all points or ports on its own route and on any through transportation route that has been

1 Available at https://www.ftc.gov/sites/default/files/documents/reports/analysis-maritime-industry-and-1984-shipping-act/198911maritime.pdf

established." 46 U.S.C. §40501(a). A common carrier cannot provide service not in accordance with its tariff. *Id.* §41102(a)(2)(A).

Since 1984, carriers have had a second, optional means of providing services—through individualized service contracts. *See FTC Analysis* at 10. A service contract is "a written contract" in which a shipper agrees "to providing a certain volume or portion of cargo over a fixed time period" and the carrier agrees "to a certain rate or rate schedule and a defined service level, such as assured space, transit time, port rotation, or similar service features." 46 U.S.C. §40102.

There are two significant differences between a tariff and a service contract. First, tariffs are mandatory; service contracts are optional. *Compare id.* §40501(a), *with id.* §40502(a). Second, the Shipping Act restricts remedies for service contract breaches: "Unless the parties agree otherwise, the exclusive remedy for a breach of a service contract is an action in an appropriate court." *Id.* §40502(f). To that end, one of a service contract's "essential terms" is "the liquidated damages for nonperformance, if any." *Id.* §40502(c)(8).

### C. Nondiscrimination

Along with regulating the means by which common carriers provide services, the Shipping Act prohibits certain activities by common carriers

in carrying out services. One general prohibition, manifested throughout the Act, is against unfair or unjust discrimination. The Act prohibits a common carrier from "unreasonably refus[ing] to deal or negotiate." 46 U.S.C. §41104(a)(10). The Act also provided[2] that a carrier cannot "retaliate against a shipper by refusing, or threatening to refuse, cargo space accommodations when available, or resort to other unfair or unjustly discriminatory methods because the shipper has patronized another carrier, or has filed a complaint, or for any other reason." *Id.* §41104(a)(3) (2021).

### D. The FMC and enforcement of the Shipping Act.

The FMC is "an independent establishment of the United States Government." 46 U.S.C. §46101. The FMC has five, Senate-confirmed commissioners. *Id.* Commissioners serve five-year terms and may be removed only for "inefficiency, neglect of duty, or malfeasance in office." *Id.*

The FMC may enforce violations of the Shipping Act. *See id.* §41301. After notice and a hearing, the FMC may adjudicate liability, seek civil penalties, and collect those penalties through an action by the Attorney

2 The past tense here is intentional; the Ocean Shipping Reform Act of 2022 amended this portion of the Act. *See* Pub. L. No. 117-146. All parties and the FMC applied the pre-amendment version, in effect during the relevant time.

General in court. *See id.* §41109. Sometimes, the FMC may seek injunctive relief in federal court. *Id.* §41307.

The FMC also can adjudicate private complaints and award remedies. *See id.* §41301. Private parties can seek "reparations" equal to the "actual injury caused by a violation of this part." *Id.* §41305 (2021). The Act defines "actual injury" as including "the loss of interest at commercial rates compounded from the date of injury." *Id.* The Act also empowers the FMC to award punitive reparations exceeding a complainant's actual injury, "but the total recovery of a complainant may not exceed twice the amount of the actual injury." *Id.*

Final FMC orders "remain[] in effect for the period specified in the order or until suspended, modified, or set aside by the Commission or a court of competent jurisdiction." *Id.* §41304. "If a person does not comply with an order of the Federal Maritime Commission for the payment of a refund of money or reparation, the person to which the refund or reparation was awarded may seek enforcement" in a district court. *Id.* §41309. In such an action, "the findings and order of the Commission are prima facie evidence of the facts stated in the findings and order." *Id.*

## II. Factual and Procedural Background

HSDG operated as ocean common carrier until October 31, 2021. JA620–621 (CX067–CX068). HSDG provided shipping services to shippers via tariffs and service contracts.

This case concerns HSDG's provision of services to OJC during two time periods: June 23, 2020, to May 31, 2021, and June 1, 2021, to July 2022. OJC is an e-commerce retailer. It buys household goods, like furniture and office products, and directly imports them into the U.S. from Asia and Brazil. JA864, JA1044–1045 (CX467 ¶4; RX998–999, 9:20–11:15). Jacob Weiss is founder, owner, and CEO of OJC. JA863 (CX466).

### A. The 2020–2021 Service Contract.

An HSDG sales representative, Andrea Casanova, negotiated the 2020–2021 Service Contract with Weiss covering the Asia-to-California trade lanes. JA1170–1171 (RX1132–1133, ¶¶8–9). Under the Contract, the Minimum Volume Commitment, which OJC agreed to tender and HSDG agreed to transport, was 200 FFEs. JA1170–1171 (RX1132–1133; RX1133, ¶9). OJC agreed that "tender of cargo under this Contract shall be reasonably spaced throughout the term hereof." JA660 (CX 125). The Contract term was June 23, 2020, to May 31, 2021.

The Service Contract included dispute resolution and remedies provisions. The parties agreed "that any and all disputes arising out of or in connection with the Contract, including any failure by Shipper to pay or by either or both Carrier(s) to perform as required by the Contract, shall be resolved by arbitration." JA658 (CX123). The Contract also included liquidated damages provisions. *See* JA660 (CX125). The Service Contract did not automatically renew or otherwise require service contracts for later years. *See* JA654–670 (CX119–135).

During the COVID-19 pandemic, everyone spent more time at home, resulting in increased demand for consumer goods. The increased demand led to increased imports from Asia. JA1032–1033; JA915 (RX987–988, 151:24–156:3; RX378). The increase in cargo volume, coupled with tight workforce regulations, created supply-chain congestion. Warehouses and distribution centers struggled to handle cargo volume, and a shortage of truck drivers caused delays transporting inland. JA1032–1033 (RX987–988, 151:24–156:3). The backup caused congestion at shipping terminals, which in turn reduced sailing frequency and shipping capacity. JA1032–1033; JA1024; JA880 (RX987–988, 151:24–156:3; RX979, 30:1–32:18; RX343).

During the term of the 2020–2021 Service Contract, Casanova communicated extensively with Weiss and Noemi Torres at OJC. They repeatedly complained and demanded more space. JA1173 (RX1135, ¶20). Though not required under the Service Contract, Casanova tried to accommodate OJC's needs on a weekly and monthly basis—as she did for all customers—based on the information she received from Weiss. JA1172; JA1013; JA742; JA966–975; JA983–989; JA990–994 (RX1134, ¶16; RX960, 206:23–207:18; CX208, 209:2–13; RX726–735; RX815–821; RX906–910).

OJC repeatedly threatened to sue HSDG for breach of contract. On October 16, 2020, and April 28, 2021, OJC's counsel served demand letters entitled "NOTICE OF BREACH OF SERVICE AGREEMENT." JA693–694; JA743–745 (CX159–160; CX209–211). The letters claimed a "breach of a service contract" for "refus[ing] to accept the agreed upon 10 TEUs ['twenty-foot equivalent units'] per week." JA693; JA744 (CX159; CX210). In the April demand letter, OJC threatened that the "breach" "may result in legal action against you and your affiliates, as well as the filing of a petition to the Federal Maritime Commission to seek relief." JA744 (CX210).

After receiving OJC's threats, HSDG and Maersk continued to transport cargo for OJC. From April 28, 2021 (the date of OJC's second demand letter) to May 31, 2021 (the end of the Service Contract), OJC's data shows HSDG and Maersk transported 20 FFEs for OJC (or 11% of the total volume HSDG carried for OJC in 2020–2021). *See* JA1222 (Weiss Ex. 101 ("Containers" tab)).

HSDG transported 185 FFEs for OJC under the 2020–2021 Service Contract—92.5% of the 200 FFE requirement. *See* JA124 (Amended Complaint ¶32).

### B. Negotiations for a 2021–2022 Service Contract.

Despite threatening to sue HSDG for breach, Weiss abandoned renewing service contracts with other carriers and focused solely on securing one from HSDG. JA1056–1057 (RX1010–1011, 81:11–82:16). Weiss admitted that it was "a big mistake to put all my eggs in one basket." JA1070 (RX1024, 229:12–15), and that "it made absolutely no sense what I did." JA1072 (RX1026, 245:19).

HSDG and OJC began negotiating in April 2021. *See* JA125 (Amended Complaint ¶41). Weiss told Casanova that OJC projected to transport 4,200 to 4,700 FFEs in 2021–2022. JA737; JA1175; JA1006; JA1015–1016 (CX203; RX1137, ¶34; RX953, 170:4–7; RX962–963,

216:20–217:13). Weiss also claimed that OJC had had demand for 3,500 FFEs in 2020–2021, JA737; JA1006–1007 (CX203; RX953–954, 171:24–172:3), but in reality, OJC actually shipped only 542 FFEs during the 2020–2021 shipping season. *Compare* JA865 (Weiss Decl. ¶10) *with* JA1222 (Weiss Ex. 101 (containers tab, sorted by shipped date)).

During negotiations, because Weiss had not committed to a specific minimum volume, Casanova created a template in HSDG's system for 400 FFE—double the volume from 2020–2021. JA1177; JA756 (RX1139, ¶44; CX222). This template was not provided to OJC. JA1177 (RX1139, ¶45). It only circulated internally at HSDG. *See* JA749; JA1177; JA1016 (CX215; RX1139, ¶45; RX963, 220:17–20. RX1139, ¶47).

After receiving an email from Casanova about the possibility of a new contract for 400 FFEs, Kevin Li sought guidance from Juergen Pump. JA745–755 (CX220–221). Li noted that OJC was "threatening us on liquidated damage against the space that we couldn't provide." JA754 (CX220). Li mistakenly stated that OJC was "proposing a renewal contract with 400 FFE MQC but all rates remain the same from last year contract." JA754; JA1026 (CX220; RX981, 147:9–17). Proceeding from Li's misstatement that OJC had proposed 400 FFEs, and not previously knowing about OJC's threats, Pump believed it was "not a reasonable

starting position" and should be rejected. JA1037; JA1040–1041 (RX991, 226:14–228:25; RX994–995, 248:24–249:6).

HSDG and OJC never exchanged drafts and never reached an agreement. JA1176 (RX1138, ¶¶38, 40). On May 4, 2021, Casanova sent Weiss an email stating that HSDG would not renew a service contract with OJC. JA1178 (RX1140, ¶51). She stated that HSDG would not renew due to "the lack of space and equipment in Asia and the shortage of truck power in the US that we and the entire industry are facing." JA981 (RX812). She stated that HSDG would continue transporting for OJC using the space available for all customers, pursuant to its common-carriage responsibilities. *See* JA981; JA1017 (RX812; RX964, 221:4–10).

### C. HSDG continues to ship for OJC.

After the 2020–2021 Service Contract expired, HSDG continued to transport cargo for OJC from Asia to California. *See* JA1222 (Weiss Ex. 101 ("Containers" tab)). HSDG transported 13 FFEs the week after the expiration, and HSDG and Maersk continued to transport significant amounts of OJC's cargo throughout 2021 and 2022. Based OJC's data, of the 195 FFEs that OJC shipped from June 1, 2021, to July 16, 2022, HSDG and Maersk transported 46 FFEs—24% of OJC's total. *Id.* All told, HSDG and Maersk transported 66 FFEs after OJC threatened litigation

in the April demand letter. *See* JA1222 (Weiss Ex. 101 ("Containers" tab, sorted by shipper and shipped date)).

## D. Procedural History

### 1. The ALJ's Initial Decision

On December 13, 2021 OJC filed an amended complaint with the FMC alleging that HSDG and HSNA violated the Shipping Act—by unlawfully retaliating under 46 U.S.C. §41104(a)(3) and unlawfully refusing to deal under 46 U.S.C. §41104(10)—in connection with the 2020–2021 Service Contract and the unsuccessful negotiations over a 2021–2022 contract. *See* JA85–111 (Verified Complaint).

On June 7, 2023, the ALJ issued an Initial Decision. It claimed jurisdiction despite many of OJC's claims being based on a breach of the 2020–2021 Service Contract. *See* JA404 (ALJ Dec. at 22). The ALJ held that HSDG refused to deal or negotiate by failing to ship all 200 FFEs under the 2020–2021 Service Contract and by declining to enter a new contract for 2021–2022. JA392 (*Id.* at 10). The ALJ also held that HSDG retaliated against OJC for threatening litigation. The ALJ found that the retaliation was willful and awarded punitive reparations purportedly equal to double OJC's lost profits—$9,843,766.40. JA397 (*Id.* at 15). The ALJ purported to calculate OJC's lost profits by assuming the parties would have

agreed to 200 FFEs for 2021–2022—the ALJ found no evidence that the parties would have agreed to a higher minimum volume—and by accepting OJC's self-serving and unsubstantiated calculation of damages. JA436 (*Id.* at 54).

### 2. The FMC's Decisions

On August 27, 2024, the FMC affirmed the Initial Decision. The FMC first held that it had jurisdiction over OJC's claims involving breach of the Service Contract because, "OJC does not seek breach of contract remedies and seeks only remedies for Shipping Act violations." JA21 (Dec. 15). The FMC then affirmed the ALJ's liability determinations:

- The FMC held that HSDG's failure to ship 200 FFEs in 2020–2021 was a refusal to deal: "HSDG refused to provide the required space under the 2020–2021 Service Contract because of OJC's notice of intention to file a case with the Commission and not because space was unavailable." JA24 (*Id.* at 18). The FMC did not tackle the basic logical error inherent in its decision—that HSDG failed transport the last 15 FFEs *in response to* OJC's litigation-backed complaint that HSDG had failed to transport all contractually-required FFEs.

- The FMC held that HSDG refused to deal "by refusing to finalize negotiations towards a 2021–2022 Service Contract." JA25 (*Id.* at 19).

The FMC disregarded the fact that HSDG continued to ship for OJC at market rates, claiming "these are qualitatively different products." JA26 (*Id.* at 20).

- The FMC concluded that HSDG retaliated against OJC by failing to provide available cargo space, stating that the "Commission concludes that refusing to sign a service contract that guarantees cargo space and rates is a form of refusing cargo space accommodations." JA32 (*Id.* at 26). Moreover, the FMC held that OJC's threatening to bring breach-of-contract claims against HSDG in the FMC was protected activity. JA36–37 (*Id.* at 30–31).

The FMC affirmed the ALJ's decision to award punitive reparations equal to twice OJC's lost profits. JA53 (*Id.* at 47). Yet, the FMC *increased* the total after developing its own calculation of OJC's lost profits. Relying on a single, made-for-litigation spreadsheet, the FMC found that the hypothetical 2021–2022 Service Contract would have doubled the prior year's minimum volume to 400 FFEs. *See* JA42–43, JA48 (*Id.* at 36, 37, 42). The FMC awarded OJC $17,563,806.14.

OJC petitioned for reconsideration, arguing that it was entitled to even more. *See* JA590–602 (Petition for Reconsideration). The FMC

denied that motion on June 27, 2025. *See* JA71–84 (*Order Denying Petition for Reconsideration*, FMC Dkt. 21-11).

# SUMMARY OF ARGUMENT

Adjudication of a reparations claim between two private parties in an administrative agency without a jury violated Article III and the Seventh Amendment.

Article III. Only Article III courts can adjudicate private commercial disputes like OJC's. *SEC v. Jarkesy*, 603 U.S. 109, 127 (2024). OJC's claims are plainly private rights, as they are analogous to claims for violation of a common carrier's duties and for breach of contract. The FMC's award of punitive reparations separately violates Article III. Under the Shipping Act, judicial review of punitive reparations is limited to substantial-evidence review, violating HSDG's right to a *de novo* judicial determination of any penalty imposed against it.

Seventh Amendment. Separately (but relatedly), the FMC proceedings violate the Seventh Amendment because they provided OJC with legal remedies (compensatory reparations and punitive reparations) without the factfinding of a civil jury. *See Jarkesy*, 603 U.S. at 127. Both aspects of the FMC's award are characteristically legal remedies, *see id.* at 125, and OJC's contract and tort claims "target the same conduct" as common-law claims, *id.*

Apart from the constitutional deficiencies, the FMC decision is arbitrary, capricious, and contrary to the Shipping Act in several ways.

Remedy. The Shipping Act expressly states that the "exclusive remedy" for a "breach of service contract" is an action in a court. 46 U.S.C. §40502(f). Here, OJC alleged that HSDG breached the 2020–2021 Service Contract, and for that breach, OJC sought a reparations remedy instead of a judicial remedy. The FMC's decision to award OJC a reparations remedy violates the plain text of Section 40502(f) and, if permitted, would render Section 40502(f) a nullity.

Liability. The FMC's findings that HSDG violated the Shipping Act are premised on misinterpretations of the Act. HSDG's provision of 185 FFEs of space, when the 2020–2021 Service Contract required 200 FFEs, may have fallen short of the contract's requirement but was not, as a matter of law, a "refusal to deal" with OJC. Similarly, HSDG's decision not to enter a 2021–2022 service contract with OJC—under the Act, service contracts are optional—is neither a refusal to "deal" nor a refusal to "negotiate," particularly when HSDG provided OJC with transportation at prevailing market rates. Finally, the FMC's determination that HSDG's conduct (falling short of the 200 FFE requirement and not entering a new service contract) amounted to unlawful retaliation

contradicts the text of the Shipping Act, which only prohibits retaliation by refusing "cargo space accommodations when available." HSDG provided OJC with substantial cargo space in both periods, and there is no evidence that HSDG refused OJC available space.

Reparations. The primary document on which the FMC based its reparations award (a made-for-litigation spreadsheet) is not substantial evidence, and the FMC's reasoning for basing reparations on that document are arbitrary and capricious. The FMC's calculation of OJC's lost profits is based entirely on unfounded speculation that the parties would have entered a new service contract with *double* the volume requirement as the prior one. Finally, the FMC's decision to impose the maximum amount of punitive reparations (and the largest award the FMC has ever ordered) is unjustified and ignored the FMC's own standard for punitive reparations.

# STANDARD OF REVIEW

This Court interprets the Shipping Act *de novo*. *MSC Mediterranean Shipping Co. S.A. v. FMC*, 141 F.4th 222, 231 (D.C. Cir. 2025). The Court reviews the FMC's factual determinations for "substantial evidence," "[b]ut substantial evidence is not adduced by mere agency assertion." *Nat'l Ass'n of Recycling Indus., Inc. v. FMC*, 658 F.2d 816, 824 (D.C. Cir. 1980). The Court will reverse if the FMC's decision is "arbitrary, capricious, an abuse of discretion, not in accordance with law or unsupported by substantial evidence in the record." *Matson Nav. Co. v. FMC*, 959 F.2d 1039, 1043 (D.C. Cir. 1992).

# ARGUMENT

## I. The FMC's adjudication of reparations claims and award of punitive reparations violate Article III and the Seventh Amendment.

In an ordinary commercial dispute between private entities, the FMC granted OJC a punitive award based on evidence the agency admitted wouldn't cut it in court. This entire proceeding violated the separation of powers and HSDG's constitutional rights. Only Article III courts can adjudicate private rights, and in court, defendants can demand that juries find the facts underlying penalties and punitive damages. The Court must vacate the FMC's unconstitutional decision.

### A. Petitioners' constitutional challenges are squarely presented.

Federal courts consider objections that agency proceedings are structurally unconstitutional, even when the objections were not clearly raised during the agency proceedings. The usual error-preservation and issue-exhaustion rules do not limit courts when a petition challenges the "constitutional authority" of a non-Article III adjudicator. *Freytag v. Comm'r*, 501 U.S. 868, 879 (1991). Those rules are premised on efficiency concerns that do "not always overcome 'the strong interest of the federal judiciary in maintaining the constitutional plan of separation of powers.'" *Id.* at

878–879 (quoting *Glidden Co. v. Zdanok*, 370 U.S. 530, 536 (1962)); *see, e.g.*, *CFTC v. Schor*, 478 U.S. 833 (1986). Heeding *Freytag*, this Court will consider a separation-of-powers challenge that is "neither frivolous nor disingenuous." *Kuretski v. Comm'r*, 755 F.3d 929, 936–937 (D.C. Cir. 2014). This is one of those cases.

Petitioners' challenges to the structure and validity of the FMC's reparations adjudications are far from frivolous and disingenuous. Since *Jarkesy*, similar Article III and Seventh Amendment questions are increasingly being presented for judicial review.

Petitioners have not affirmatively acted in ways that "waived the jury trial that was available to them." *Sprint Corp. v. FCC*, 151 F.4th 347, 360 (D.C. Cir. 2025) (citation omitted). That is, Petitioners have not paid the penalty or otherwise rebuffed the chance for a trial *de novo*. *See id.* On the contrary, Petitioners have not had yet any chance to raise these issues in an Article III Court; the Shipping Act, for example, does not provide Petitioners with initial Article III judicial review or the option to have a case tried before a jury. *See* 46 U.S.C. §41301.

Finally, the government is not prejudiced by this Court taking up the constitutional questions. The Shipping Act does not require defendants "to raise their [constitutional] challenges in administrative proceedings."

*Carr v. Saul*, 593 U.S. 83, 92 (2021). Indeed, Petitioners' constitutional challenge presents pure questions of law, questions this Court would review *de novo* even if Petitioners had raised them below. *See MSC,* 141 F.4th at 231. Nor is constitutional interpretation an area where the FMC has expertise. *Carr*, 593 U.S. at 88. Questions of "constitutional law" are "detached from considerations of agency policy." *Axon Enters., Inc. v. FTC*, 598 U.S. 175, 194 (2023) (citations omitted).

Accordingly, this Court is uniquely positioned to say what constitutional law is.

### B. The FMC adjudicated private rights in violation of Article III.

Article III of the Constitution is "an inseparable element of the constitutional system of checks and balances." *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 58 (1982) (plurality opinion). Article III give federal courts exclusive authority to adjudicate private rights. *See Sun Valley Orchards, LLC v. U.S. Dep't of Lab.*, 148 F.4th 121, 127 (3d Cir. 2025) (quoting The Federalist No. 78, p. 469 (C. Rossiter ed. 1961) (A. Hamilton)). No statute can "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Stern v. Marshall*, 564 U.S. 462, 484 (2011)

(quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272 (1856)).

OJC's reparations proceeding violated Article III because executive agencies like the FMC cannot adjudicate private rights and impose punitive damages without *de novo* review.

### 1. The FMC adjudicated private rights.

"[M]atters concerning private rights may not be removed from Article III court." *Jarkesy*, 603 U.S. at 127. Private rights are "the liability of one individual to another under the law as defined." *Stern*, 564 U.S. at 489 (citation omitted). A hallmark that a dispute involves private rights is the "suit is made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Id.* at 484.

OJC's case against HSDG concerned private rights. One private party (OJC) sued another (HSDG) for commercial injuries. OJC alleged HSDG failed to meet its obligations under the parties' Service Contract and by declining to enter a future service contract. The reparations award went to OJC, not to the government—the government was not even a party.

A further indication that OJC's suit involves private rights is that it has several common law analogues. It "target[ed] the same basic conduct," "employ[ed] the same terms of art, and operate[d] pursuant to

similar legal principles," as actions traditionally adjudicated by Article III courts. *Jarkesy*, 603 U.S. at 112; *see Sun Valley Orchards*, 148 F.4th at 128 (a suit "need not match the agency's action to an exact historical comparator").

First, OJC's claims against HSDG are analogous to common-law claims that could be asserted against a common carrier for failure to meet its common-carrier responsibilities. "[T]he common carrier doctrine is deeply rooted in the common law." *AT&T, Inc. v. FCC*, 149 F.4th 491, 501 (5th Cir. 2025). It is based on "a body of common law dating back long before our Founding." *NetChoice, LLC v. Paxton*, 49 F.4th 439, 469 (5th Cir. 2022), *vacated and remanded on other grounds*, *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). Historically common carriers—including those who deliver goods by sea, *see Citizens' Bank v. Nantucket Steamboat Co,* 5 F. Cas. 719, 724–725 (C.C.D. Mass. 1811) (Story J.)—had "to accept all goods offered within the course of [their] employment." *York Co. v. Cent. R.R.*, 70 U.S. 107, 112 (1865). They could be held "liable to an action in case of refusal." *Id.*; *see The Montana*, 22 F. 715, 727 (C.C.E.D.N.Y. 1884).

The Shipping Act builds on and incorporates these common-law concepts. The Act's prohibition of "unreasonably refusing to deal" and "retaliation," 46 U.S.C. §41104(a)(3), (a)(10) (2021), mirrors historic common-

law duties of common carriers to "accept all goods offered within the course of [their] employment." *York Co.*, 70 U.S. at 112. This similarly is no accident. Congress clearly intended for the Act to track the common law; the Act even uses traditional common-law terms, like "common carrier." 46 U.S.C. §40102(7).

Second, OJC's claims against HSDG arising out HSDG's breach of the 2020–2021 Service Contract "closely resemble," *Jarkesy*, 603 U.S. at 127, a breach-of-contract claim, which "would have traditionally been heard in common law courts." *Sun Valley Orchards*, 148 F.4th at 129; *see N. Pipeline*, 458 U.S. at 90 (Rehnquist, J., concurring in the judgment) (recognizing "breach of contract" as "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789"). Like a traditional breach-of-contract plaintiff, OJC alleges that HSDG is liable for failing to meet commitments under a binding agreement. *See e.g.*, 23 Williston on Contracts §63:1 (4th ed.) ("a breach of contract is a failure, without legal excuse, to perform any promise that forms the whole or part of a contract."). Also like a traditional breach-of-contract plaintiff, OJC seeks lost profits, a.k.a. expectation damages.

OJC's Shipping Act claims here are even more closely analogous to breach-of-contract claims than the claims in *Sun Valley Orchards*,

148 F.4th at 128. In that case, the Department of Labor's enforcement of "employment agreement[s] formed under the H-2A nonimmigrant visa program" was analogous to breach of contract. Department of Labor regulations required employers to enter "job orders" specifying the terms and conditions of employment, and the Third Circuit held that administrative claims to enforce a job order were akin to breach-of-contract claims because job orders were akin to employment agreements. *Id.* at 124, 128–129. Here, service contracts are not even required; they are voluntary agreements and function as ordinary commercial contracts.

* * *

OJC's Shipping Act claims involve private rights and are undeniably analogous to claims that courts, not agencies, traditionally adjudicate. The claims must be adjudicated in an Article III court.[3]

3 The two cases where the Supreme Court held that agencies could adjudicate private commercial disputes are inapposite because, in both, the challenger had consented to administrative adjudication. In *CFTC v. Schor*, 478 U.S. at 834–835, the challenger initiated the administrative proceeding before objecting to its opponent's counterclaim. In *Thomas v. Union Carbide Agricultural Products Co.* 473 U.S. 568, 570–575 (1985), both parties were "voluntary participants" because both agreed to the scheme. Petitioners here have not consented; they did not initiate these proceedings or bring their own claims.

### 2. The public rights exception does not apply.

The public rights exception permits agency adjudication in a "narrow" class of cases. *AT&T*, 149 F.4th at 500. Examples include claims related to "revenue collection," "relations with Indian tribes," "administration of public lands," or "giving of public benefits." *Jarkesy*, 603 U.S. at 112, 130. Because the public rights exception "has no textual basis in the Constitution," courts pay "close attention to the basis for each asserted application of the doctrine." *Sun Valley Orchards*, 148 F.4th at 127–128 (quotation marks omitted). Accordingly, even if a proceeding is related to one of the broad categories where the Court has applied the public rights exception, adjudication outside of Article III may still be unconstitutional. *See, e.g.*, *id.* (claims tangentially related to immigration were nonetheless not public rights).

OJC's reparations claims do not fit within the public rights exception. For one thing, the proceeding was brought by one private party against another. Although the Supreme Court has declined to hold that a case involves public rights only when the government is the claimant, the Court has made clear that "what makes a right 'public' rather than private is that the right is integrally related to particular Federal

Government action" *Stern*, 564 U.S. at 490–491. There is no government complaint here.

For that matter, there is no federal action here at all. OJC's claims and allegations all turn on private conduct concerning service contracts, which the federal Shipping Act does not require. The 1984 amendments to the Shipping Act introduced service contracts as a means to *obviate* the tariff system. Congress plainly intended that service contracts be treated like normal contracts. The Act allows common-law actions for "breach" of service contracts, 46 U.S.C. §40502(f), a remedy that confirms that disputes concerning service contracts are not uniquely integrated into a scheme that only the FMC can administer.

Nor did OJC's reparations complaint come from a "self-consciously novel" statutory scheme. *Jarkesy*, 603 U.S. at 137. Unlike the novel occupational safety requirements the Supreme Court deemed to be public rights in *Atlas Roofing Co. v. OSHA*, 430 U.S. 442 (1977), the Shipping Act is infused with the common law. With that "common law soil," *Jarkesy*, 603 U.S. at 137, comes Article III's requirements for judicial determination.

### 3. The FMC's award of punitive reparations makes Article III adjudication particularly necessary.

An award of compensatory reparations by itself violates Article III. But here, the FMC went further and awarded *punitive* reparations—double the amount of the injury the FMC found OJC suffered. The punitive reparations award independently violates the separation of powers.

The FMC awarded punitive reparations to punish and deter HSDG. Because the Shipping Act does not provide a standard for punitive reparations (only an upper limit), the FMC adopted a "'knowing and willful' standard" because that is "also the standard for enhanced civil penalties." JA51 (Dec. 45). Thus, as the FMC sees them, punitive reparations are indistinguishable from penalties and punitive damages because they are designed, not to compensate, but "to punish the defendant's conduct and to deter future wrongdoing." *Hicks v. Ferreyra*, 64 F.4th 156, 176 (4th Cir. 2023). Punitive reparations are more like punitive damages than penalties because they are paid to private parties, not the government.

Because only Article III courts can award punitive damages, only Article III courts can award punitive reparations.

<u>First</u>, punitive damages are private rights. They are a traditional common law remedy. *See Lake Shore & M.S. Ry. Co. v. Prentice*, 147 U.S. 101, 107 (1893) (collecting cases establishing this proposition). The

common-law origin of punitive damages confirms that agencies cannot award them, because the nature of a remedy is a critical aspect of the constitutional analysis. *See Sun Valley Orchards*, 148 F.4th at 127–129 (holding that Article III was violated where an agency awarded a remedy that "was a type of remedy at common law that could only be enforced in courts of law") (citation omitted). Petitioners are aware of no case where the Supreme Court has held that Article III allows an agency to award punitive damages from one private party to another.

Second, the Constitution requires that judges supervise punitive damages and independently review an award's amount and reasonableness. *See Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18 (1991). When that judicial power of review is reallocated to juries, it violates due process. *See Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 430–432 (1994) (holding that it was unconstitutional under the due process clause for Oregon to prevent a judge from reviewing the size of a jury's punitive damages award, as well as the facts going to the size). It follows that, when that judicial power is reallocated to administrative agencies, it violates Article III.

Substantial-evidence review of punitive reparations does not satisfy Article III. Substantial-evidence review might be enough for ordinary

agency fact-finding, where an "administrative adjudicator ha[s] only limited authority to make specialized, narrowly confined factual determinations regarding a particularized area of law and to issue orders that could be enforced only by action of the District Court." *Stern*, 564 U.S. at 490 n.6. But even assuming this appellate review model of preserving Article III in private rights disputes survives *Jarkesy*,[4] it is not enough for punitive reparations. The Supreme Court in *Oberg* specifically considered whether substantial-evidence review is appropriate for punitive damages and found it insufficient—because it "ensures only that there is evidence to support some punitive damages, not that there is evidence to support the amount actually awarded." *Oberg*, 512 U.S. at 429.

The record here demonstrates the complications that flow from the FMC's so-called factfinding for punitive reparations. In calculating and awarding reparations here, the FMC did many things a court would not. Among these was finding that OJC proved lost profits via a single spreadsheet, prepared for litigation, for which OJC provided no underlying contemporaneous documentation to support. JA45 (Dec. 39). Such evidence

4 *Jarkesy*, 603 U.S. at 154–155 (Gorsuch J. concurring) (stating that "[s]ome of our past decisions have allowed the government to chip away at the courts' historically exclusive role in adjudicating private rights").

would not pass muster in federal court. *See infra* at 52–55. Yet the FMC made the spreadsheet dispositive, over Petitioners' objections, supposedly because the agency's evidentiary standards are more "liberal and relaxed than those applied by courts." JA46 (Dec. 40). Such a willy-nilly attitude to evidence is exactly the kind of problem that Article III prevents by requiring courts to adjudicate disputes over civil punishments. *See N. Pipeline*, 458 U.S. at 58 (plurality opinion).

### C. The Seventh Amendment requires jury factfinding for OJC's Shipping Act claims and for punitive reparations.

Article III and the Seventh Amendment are fellow travelers; many separation-of-powers cases discuss both because both focus on private rights. Just as Congress cannot assign private rights from Article III courts to agencies, Congress cannot "conjure away the Seventh Amendment by mandating that traditional legal claims" be resolved by an "administrative tribunal." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 52 (1989). In considering whether the Seventh Amendment requires jury factfinding, the Court looks to "the substance of the action." *Jarkesy*, 603 U.S. at 134. The Court considers "two things: the cause of action and the remedy provided." *AT&T, Inc.*, 149 F.4th at 497 (citing *Jarkesy*,

603 U.S. at 122). As between the two, remedy is "more important." *Granfinanciera*, 492 U.S. at 42.

Considering those factors, it's clear the FMC's adjudication of OJC's Shipping Act claims, and its award of punitive reparations in particular, violated the Seventh Amendment.

Remedy. Both regular reparations and punitive reparations are remedies typically awarded by juries in common-law actions. (1) Reparations, the compensatory remedy for Shipping Act claims, are money damages, "the prototypical common law remedy," which juries must award. *Jarkesy*, 603 U.S. at 123. (2) Punitive reparations are "enhanced civil penalties," which the FMC admittedly imposed to punish HSDG for "willful" conduct and to deter similar conduct. JA51 (Dec. 45). Those punishment-focused features in and of themselves render punitive reparations a legal remedy, which juries must award. *See Jarkesy*, 603 U.S. at 123 (discussing *Tull v. United States*, 481 U.S. 412, 422 (1987)). Another feature of punitive reparations underscores that conclusion: unlike ordinary civil penalties *paid to the government*, the FMC ordered HSDG to pay punitive reparations *to OJC*. Punitive reparations, then, are *de facto* punitive damages, a common-law remedy which a jury has "authority to award." *Atl. Sounding Co. Inc. v. Townsend*, 557 U.S. 404, 409 (2009).

Cause of action. As discussed above, OJC's Shipping Act claims "target[] the same basic conduct" as common-law claims like breach of contract and tort claims concerning common-carrier duties. *Jarkesy*, 603 U.S. at 125. For this reason, as well, the Seventh Amendment requires jury factfinding.

* * *

Because the remedies the FMC awarded and the causes of action the FMC adjudicated resemble those that required jury trial at common law, Petitioners' Seventh Amendment rights have been violated. Petitioners were entitled not just to Article III adjudication, but also to a civil jury.

## II. The Shipping Act prohibits awarding reparations for a breach of a service contract.

The FMC awarded OJC reparations based on HSDG's failure to meet all of its commitments under the 2020–2021 Service Contract. That award violates the Shipping Act, which clearly restricts the *remedies* available for breaches of a service contract: "Unless the parties agree otherwise, the ***exclusive remedy*** for a breach of a service contract is an action in an appropriate court." 46 U.S.C. §40502(f) (emphasis added). The plain meaning of this provision is that "a breach of a service contract" can *only* be remedied by a court (unless the parties agree otherwise) awarding

breach-of-contract damages (or liquidated damages, if parties provide for it in a service contract, *see* 46 U.S.C. §40502(c)(8)). Shippers cannot seek reparations for a breach of contract at the FMC.

Here, OJC sought reparations for HSDG's failure to transport all 200 FFEs it had agreed to transport in the 2020–2021 Service Contract. The FMC recognized as much: "the *only* harm OJC suffered during this period due to HSDG was HSDG's failure to meet the [minimum volume]." JA57 (Dec. 51 (emphasis added)). Section 40502(f) required the FMC to refuse to grant OJC an administrative remedy for that harm.

Instead, the FMC not only awarded OJC reparations; the FMC calculated OJC's reparations the same way a court might calculate expectation damages for a standard breach-of-contract claim. The FMC explained its damages formula: "OJC missed the MQC by 15 FFE so the profits per container are multiplied by that number to give a measure of the total harm done to OJC by HSDG's actions during this period." *Id.* That's the same the same approach a court would have taken. *See* 24 Williston on Contracts §64:3 (4th ed.) ("Generally, the courts determine contract damages calculated based on protection of the nonbreaching party's expectation interest … awarding a sum of money that will place the promisee in as good a position as he or she would have been in had the contract been

performed"); Restatement (Second) of Contracts §344 (1981) ("Ordinarily, when a court concludes that there has been a breach of contract, it enforces the broken promise by protecting the expectation that the injured party had when he made the contract.").

The FMC's reasoning for disregarding Section 40502(f) is arbitrary, capricious, and contrary to law. First, the FMC contended that Section 40502(f) doesn't apply because OJC sought Shipping Act remedies. *See* JA21 (Dec. 15). That contention completely misunderstands Section 40502(f) and eviscerates the statute. Section 40502(f) plainly states that the "exclusive remedy" for "a breach of a service contract" is an action in court. 46 U.S.C. §40502(f). Because of Section 40502(f), OJC *cannot* lawfully seek Shipping Act remedies in the first place. FMC's interpretation of Section 40502(f) renders it a meaningless nullity, for parties asserting Shipping Act claims always, by definition, are seeking Shipping Act remedies. "Congress cannot be presumed to do a futile thing." *Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997).

Perhaps the FMC reads Section 40502(f) as if it says that the "exclusive remedy" for a "breach of contract ***claim***" is an action in court. But that, of course, is not what the statute says. Section 40502(f) does not

speak to remedies for certain claims; it speaks to remedies for "a breach of a service contract." 46 U.S.C. §40502(f).

Second, the FMC contended that Section 40502(f) doesn't apply because OJC sought reparation, not for HSDG's breach of the 2020–2021 Service Contract, but for HSDG's failure to perform under the Service Contract *after OJC's April demand letter threatened suit. See* JA22 (Dec. 16). This contention is factually and legally untenable; it is irrational and does not avoid Section 40502 (f)'s clear terms.

- Factually, the April demand letter, which OJC sent about one month before the Service Contract expired, expressed OJC's view that HSDG was *already* breaching the Service Contract and threatened suit if HSDG didn't *cure* the then-existing breach. JA744 (CX210). The 15 FFE shortfall did not occur in one fell swoop in the one month after OJC sent the April demand letter; it was a shortfall that had accumulated over the entire term Service Contract.
- Legally, the April demand letter doesn't change the underlying reality that OJC sought relief for HSDG's breach of the Service Contract. That is, even if HSDG breached *in response to* the April demand letter, the breach would still be the injurious conduct for which OJC wants a remedy. Otherwise, any shipper could trivially convert any breach-of-

service-contract claim into a Shipping Act claim, circumventing Section 40502 (f), by sending a letter threatening suit.

This Court's recent decision in *MSC Mediterranean Shipping Co. S.A. v. FMC*, 141 F.4th 222 (2025), is not to the contrary because it considered Section 40502(f)'s application to a materially different situation. In *MSC*, the FMC imposed the ultimate sanction on an ocean common carrier for discovery violations—a default judgment. On review, the carrier attacked the default judgment as void for want of jurisdiction; it contended that Section 40502(f) stripped the FMC of jurisdiction over Shipping Act claims based on a breach of service contract. *Id.* at 231–235. The Court rejected the carrier's argument. The FMC had jurisdiction because two of the shipper's claims were *not* tethered to service contracts. *See id.* at 235; *see also id.* at 233–234 (describing one of those two claims: "a systemic pattern and practice of misconduct that transcends one individual contractual dispute and claims statutory violations as to other shippers, too"). Though the Court expressed doubt about the FMC's conclusion that Section 40502(f) allowed it to decide the shipper's *other* claims, *see id.*, the FMC's jurisdiction to hear the two claims gave the FMC jurisdiction to sanction the shipper for discovery violations and enter default judgment.

*MSC*'s uniqueness makes it inapplicable here. Here, HSDG challenges the *remedy* the FMC awarded OJC on the merits, a matter distinct from whether the FMC had *jurisdiction* to accept OJC's complaint. Furthermore, though the parties in *MSC* invoked Section 40502(f), they also all agreed to follow the FMC's interpretation of Section 40502(f), expressed twenty-five years ago in *Cargo One, Inc. v. COSCO Container Lines Co., Ltd.*, 28 S.R.R. 1635, 1645 (2000). Because the carrier in *MSC* did not question *Cargo One*'s consistency with Section 40502(f), the Court explicitly premised its holding on "assuming that *Cargo One* is consistent with the Act." *MSC*, 141 F.4th at 233–234. Here, by contrast, Petitioners don't agree that *Cargo One* controls the remedial question. Petitioners' objection is based on Section 40502(f), not the FMC's interpretation of it.

## III. The Commission's liability determinations are arbitrary, capricious, and contrary to law.

The FMC's errors extend to its determinations that HSDG "refused to deal and negotiate" and "retaliated" in violation of 46 U.S.C. §§41104(a)(3) and 41104(a)(10) (2021). Both stem from two fundamental errors. <u>First</u>, the FMC erroneously held that HSDG refused to deal with OJC and retaliated by breaching the 2020–2021 Service Contract. <u>Second</u>, and more significantly, the FMC erroneously held that HSDG

refused to deal with OJC and retaliated by not agreeing to a 2021–2022 Service Contract—even though HSDG actually provided shipping services to OJC during that period. The effect of the FMC's unlawful decision is to require a carrier to agree to a service contract, even though the Shipping Act clearly makes service contracts optional.

## A. HSDG did not "unreasonably refuse to deal or negotiate" with OJC.

The FMC concluded that HSDG unreasonably refused to deal with OJC for (1) failing to meet its contractual obligations under the 2020–2021 Service Contract and (2) failing to enter a 2021–2022 service contract. Neither of these is valid as a matter of law, and each independently requires reversal.

### 1. HSDG did not "refuse to deal" by failing to meet its contractual commitments under the 2020–2021 Service Contract.

The FMC's only basis for finding that HSDG refused to deal with OJC during the term of the 2020–2021 Service Contract was HSDG's failure to ship all 200 FFEs the contract required. *See* JA25 (Dec. 19). In other words, the FMC's refusal-to-deal finding was based entirely on HSDG's breach of the Service Contract. That finding is arbitrary, capricious, and contrary to law because it ignores undisputed evidence that HSDG

"dealt" with OJC both *before* the April demand letter and *after*. *See* JA24 (Dec. 18). Between the April demand letter and the Service Contract's expiration on May 31, 2021, HSDG and Maersk transported 20 FFEs for OJC (or 11% of the total volume HSDG carried for OJC in 2020–2021). *See* JA1222 (Weiss Ex. 101 ("Containers" tab)). It is also undisputed that this occurred under market rates as well as under the Service Contract. JA24 Dec. 18).

The FMC's refusal-to-deal finding cannot be squared with statutory text. The Shipping Act prohibits unreasonably refusing to deal with a shipper. 46 U.S.C. §41104(a)(10) (2021). "Refuse" means "[t]o decline" something. *Refuse*, Websters New Universal Dictionary 1622 (unabr. 1996). Here, that something is "dealing" with a shipper, *i.e.*, "to trade or do business with." *Deal*, Websters New Universal Dictionary 512 (unabr. 1996). A carrier refuses to deal with a shipper when, as the FMC has historically recognized, the carrier "shut[s] out" another party. *See New Orleans Stevedoring Co. v. Board of Commissioners of the Port of New Orleans*, 2002 WL 33836158, at *5 (FMC 2022).

HSDG's transportation of 185 out of 200 FFEs did not "shut out" OJC during the 2020–2021 Service Contract term. A carrier who transports *nothing* for a shipper is a carrier who refuses to deal. In no universe is it

fair to characterize a carrier who transports 92.5% of an agreed-upon amount during a global pandemic as refusing to deal with the shipper. Yet that irrational conclusion is the conclusion the FMC drew.

The FMC found a refusal to deal because HSDG supposedly transported 185 FFEs instead of 200 FFEs for an impermissible reason—OJC's litigation demands. *See* JA25 (Dec. 19 (affirming "the ALJ's conclusion that the shortfall of 15 FFE was not a result of space being unavailable but was because of potential litigation")). Even accepting *arguendo* that the FMC correctly identified HSDG's reason for incomplete performance, HSDG's intent cannot establish a refusal to deal. A "refusal" is an "*act* or *instance* of refusing." *Refusal*, Websters New Universal Dictionary 1622 (unabr. 1996) (emphases added). It is an expressed, outward manifestation of resistance, ascertainable to an objective observer.[5]

#### 2. HSDG did not "refuse to deal or negotiate" by declining a new service contract for 2021–2022.

The FMC arbitrarily, capriciously, and unlawfully found that HSDG "refuse[d] to deal or negotiate" with OJC during the 2021–2022 period.

5 *E.g.*, no one needs to know *why* a child refuses to eat his dinner to identify a child who refuses to eat his dinner.

HSDG transported OJC's goods during that period, and HSDG negotiated with OJC during that period. HSDG transported 13 FFEs for OJC the week immediately after the 2020–2021 Service Contract expired, and HSDG and Maersk transported significant amounts of OJC's cargo throughout 2021 and 2022. Based OJC's own data, of the 195 FFEs that OJC shipped from June 1, 2021, to July 16, 2022 (the last date for which OJC provided data), HSDG and Maersk accounted for 46 FFEs or 24% of OJC's total shipments. See JA1222 (Weiss Ex. 101 ("Containers" tab)). In short, HSDG did not shut out OJC after the 2020–2021 Service Contract expired.

The FMC held that, during this period, HSDG refused to deal with OJC "by refusing to finalize negotiations towards a 2021–2022 Service Contract." JA25 (Dec. 19). But no ordinary English speaker would say that a carrier who deals with a shipper and negotiates with the shipper nonetheless "refuses to deal and negotiate" with the shipper simply because the two don't agree to a new contract. Service contracts are *optional*. *See* 46 U.S.C. §40501(a). The Shipping Act's refusal-to-deal provision does not make them *mandatory*. This is particularly so when a customer has repeatedly and wrongly threatened litigation. That would turn the Act into a statutory outlier; in other contexts, a refusal to accept a

customer's "preferred terms" is not an actionable refusal to deal. *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 306 (D.C. Cir. 2023); *see also All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 748 (11th Cir. 1998) ("[i]n this case, no refusal to deal has been shown.").

The FMC embraced that illogic. It found that HSDG refused to deal with OJC, despite carrying OJC's cargo, because carriage under a service contract and market-rate carriage are "qualitatively different products" and because OJC's business model required it to have a service contract. JA25 (Dec. 19). But those are both ways of saying the same, unlawful thing—that a shipper can force a carrier to enter a service contract notwithstanding the Act's clear statement that a common carrier "may" enter a service contract. 46 U.S.C. §40502(a). And, notwithstanding a shipper's repeated threats of litigation over the parties' prior service contract. Before this case, the FMC consistently held that "the Shipping Act does not guarantee the right to enter into a contract, much less a contract with any specific terms." *New Orleans Stevedoring Company, Complainant*, 2002 WL 33836158, at *5 (citation omitted). Service contracts may be qualitatively different than shipping at market rates, but Congress chose

to make tariffs, not service contracts, the default method of shipping. *See* 46 U.S.C. §40501(a).

As a matter of law, a carrier who negotiates with a shipper but declines to sign a service contract, yet provides that shipper service under market rates, does not refuse to deal.

### B. HSDG did not unlawfully retaliate against OJC.

The FMC erred in concluding that HSDG retaliated against OJC for engaging in protected activity. The FMC erred in finding that OJC engaged in protected activity and that HSDG refused "cargo space accommodations when available." 46 U.S.C. §41104(a)(3) (2021).

#### 1. OJC did not engage in protected activity.

The FMC erred in holding that OJC engaged in protected activity by "threatening to file a complaint with the Commission." JA30 (Dec. 24).

At the time, the Shipping Act prohibited a carrier from declining "cargo space accommodations when available" because "the shipper has patronized another carrier, or has filed a complaint, or for any other reason." 46 U.S.C. §41104(a)(3) (2021). Here, the FMC relied on the residual clause ("any other reason"). A residual clause is interpreted to include

only things that are similar to the things enumerated before it. *See NASDAQ Stock Mkt., LLC v. SEC*, 961 F.3d 421, 428 (D.C. Cir. 2020).

Threatening to bring a breach-of-service-contract claim is not the sort of "other reason" the Shipping Act protects. Threats are not formal, official, or binding. Threats are trivially easy to make and are not always sincere. In this case, OJC's threat was baseless in that it was based on OJC's never-established assertion that the 2020–2021 Service Contract required HSDG to provide a weekly minimum of FFEs. JA744 (CX210).

In the past, the FMC interpreted the residual clause narrowly, in line with its plain meaning. In the FMC's Statement on Retaliation dated December 28, 2021, designated Docket No. 21-15 (the "Statement on Retaliation"), the FMC stated that it "interprets 'any other reason' to mean that protected activity under 46 U.S.C. §41104(a)(3) includes other ways that shippers *may bring allegations of unlawful activity to the Commission*, such as participating in Commission investigatory or enforcement efforts, commenting on a rulemaking, or using CADRS' dispute resolution procedures." Statement on Retaliation at 7 (emphasis added). OJC's threat to sue HSDG for breach-of-service-contract did not bring *anything* to the FMC's attention.

### 2. HSDG's declining to enter a service contract with OJC was not a failure to provide "cargo space accommodations when available."

In 2021 and 2022, after OJC broke off negotiating service contracts with other carriers, HSDG carried goods for OJC at market rates on numerous occasions. *See* supra at 45. Nonetheless, the FMC found that, in retaliation for OJC's supposed protected activity, HSDG failed to provide "cargo space accommodations when available" insofar as HSDG failed to enter into a 2021–2022 service contract. 46 U.S.C. §41104(a)(3) (2021). That finding is arbitrary, capricious, and contrary to law.

Cargo space accommodations and service contracts are distinct, such that refusing one does not necessarily refuse the other. A service contract is simply an agreement in which "the shipper or shippers commit to providing a certain volume or portion of cargo over a fixed time period," and "the ocean common carrier … commits to a certain rate or rate schedule and a defined service level." 46 U.S.C. §40102(21). The parties can negotiate for "assured space" in a service contract, but don't have to. *Id.* Accordingly, a shipper with a service contract may have a contractual right to carriage, but not to particular cargo space. The shipper must schedule its shipments with the carrier. *See, e.g.*, JA660 (CX 125) (2020–

2021 Service Contract). In turn, the carrier will provide cargo space, when available, along with cargo space provided to other shippers.

As such, the FMC was wrong to find that HSDG's failure to commit to a service contract for 2021–2022 by itself denied OJC "cargo space accommodations when available." As a service contract does not guarantee cargo space, neither does the absence of a service contract refuse cargo space. Without evidence that HSDG had available cargo space that it refused to give OJC, the FMC could not find for OJC on its retaliation claim.

## IV. The FMC's reparations award was arbitrary, capricious, and contrary to law.

### A. OJC did not demonstrate its entitlement to reparations with a reasonable degree of certainty.

"Establishing a Shipping Act violation alone does not justify reparations—complainants must also show that they sustained a pecuniary loss as a result of the unlawful act." *MAVL Capital Inc. v. Marine Transport Logistics, Inc.*, No. 16-16, 2022 WL 2209421, at *3 (FMC June 10, 2022). Reparations are available only "for actual injury caused by a violation" of the Act. 46 U.S.C. §41305(b). And OJC bore the burden of proving that it was entitled to reparations. *MAVL Capital*, 2022 WL 2209421, at *3.

OJC did not meet its burden. Its primary "evidence" was a spreadsheet prepared in anticipation of litigation. *See* JA1222 (Weiss Ex. 101).

OJC never produced any documentation to verify the spreadsheet's data points or any of the bases for its calculation—despite HSDG's numerous discovery requests for it to do so. *See* JA1164–1165 (RX1120–1121, ¶¶6–16). Under prior FMC decisions, this should have been insufficient, for before OJC's case, the FMC had held that a complainant cannot show entitlement to reparations without contemporaneous documentation for its losses. *See Cal. Shipping Line, Inc. v. Yangming Marine Transp. Corp.,* Docket No. 88-15, 1990 WL 427466 (FMC Oct. 19, 1990); *Waterman v. Stockholms Rederiaktiebolag Svea et al.*, 3 F.M.B. 248, 253 (1950) ("[T]he record is completely lacking in details from which a finding might be made whether reparation is due" and the "evidence is far too vague, general in character, and indefinite."). The FMC's effort to distinguish this case from those precedents is ultimately arbitrary and capricious.

First, the FMC accepted OJC's spreadsheet because it contained "great detail." JA44, JA47 (Dec. 38, 41). True, the spreadsheet includes thousands of data points, including specific item numbers and shipping identifiers. *See* JA1222 (Weiss Ex. 101). Yet for all its superficial detail, the spreadsheet is *still* hearsay, and it is *not* a business record because it was made for litigation. *See e.g., United States v. Kim*, 595 F.2d 755, 763 (D.C. Cir. 1979); *see also* Fed. R. Evid. 803(6). The essential problem with

hearsay is not that it lacks detail; it is that HSDG had no opportunity to test the truth of matters asserted.

Second, the FMC faulted HSDG for not identifying "specific problems with the detailed information provided in the spreadsheet." JA45 (Dec. 39). That finding is both false and immaterial.

- The FMC's finding is false because HSDG and the FMC both identified specific problems. HSDG identified problems with the assumptions underlying the spreadsheet's calculations, such as the projections of OJC's profits and future sales. *See* JA1192–1196 (RX1155–1159). The FMC identified problems, too. It found that OJC's data changed substantially over time without justification. JA48 (Dec. 42). And it agreed with HSDG that "OJC's spreadsheet of calculations does contain multiple unreasonable assumptions incorporated into OJC's profit per container calculation." JA56 (*Id.* at 50).

- The FMC's finding is immaterial because, as noted above, the spreadsheet was thoroughly hearsay and HSDG was therefore handicapped in its ability to challenge specific data points in the spreadsheet. OJC refused to produce any underlying documentation that HSDG could have used to mount an attack. *See* JA1192–1196 (RX1155–1159).

Third, testimony by Weiss and OJC's proffered expert, Berning, don't resolve the spreadsheet's problems. JA47 (Dec. 41). Weiss testified primarily that OJC produced the spreadsheet. *Id.* And Berning testified only that he believed the spreadsheet's data points "come[] directly from OJC's computers." JA49 (*Id.* at 43).[6] Neither witness's testimony turns the spreadsheet into a business record or otherwise provided HSDG with the underlying data.

### B. The FMC arbitrarily held that OJC was entitled to lost profits based on a hypothetical 2021–2022 service contract with a 400 FFE minimum volume.

The FMC based its reparations award on the assumption that HSDG unlawfully refused to agree to a 2021–2022 service contract for 400 FFEs—double the volume of the 2020–2021 Service Contract (and double the volume the ALJ speculated the parties would have entered, *see*

6 Berning was no true expert witness. His experience is in valuing corporations in divorce proceedings, and his calculations here, such as they were, were a "rubber stamp" of OJC's spreadsheet. JA1092 (RX1045, 63:22–64:25; 62:6–19). The FMC thus agreed that Berning's report was "not useful for validating or auditing the underlying data OJC provided, and ***neither Mr. Berning's testimony nor his report professes to do this***." JA49–50 (Dec. 43–44) (emphasis added). As such, the FMC's acceptance of the spreadsheet because of Berning's testimony is arbitrary and capricious.

JA436 (ALJ Dec. 54). The FMC's 400 FFE assumption is made up. On the undisputed record, the FMC could not rationally have found that HSDG and OJC were "reasonably certain" to agree to 400 FFEs in a (hypothetical) 2021–2022 service contract. *California Shipping Line*, 25 S.R.R. at 1230.

First, there is no evidence that HSDG "would have agreed to a higher volume than the previous year." JA436 (ALJ Dec. 54). At the same time that HSDG and OJC were negotiating, HSDG was failing to provide the 200 FFEs required by the 2020–2021 Service Contract and, owing to the global pandemic, was struggling to provide required space to other customers as well. *See* JA1039 (RX 993).

Second, there is no evidence that OJC demanded 400 FFEs from HSDG. During their negotiations, the parties never exchanged proposed quantities. Internally as HSDG, Casanova used 400 FFEs as a placeholder in a contract she drafted, *see* JA749 (CX215), but that's not evidence that OJC demanded that much. Indeed, no evidence suggests that OJC even had the demand from its customers to ship 400 FFEs in 2021–2022, *i.e.*, that OJC would have been able to fulfill its end of a 400 FFE minimum-volume requirement. After breaking off negotiations for

service contracts with other carriers, OJC ended up shipping only 143 FFEs in that period. *See* JA57 (Dec. 51).

Even if 400 FFEs represents the volume that HSDG and OJC would have agreed upon in a hypothetical 2021–2022 contract, it does not follow that OJC is entitled to 400 FFEs worth of lost profits. Yet, that's what the FMC found. In so doing, the FMC arbitrarily refused to account for OJC's *actual* profits and so violated the Shipping Act's requirement that reparations be based on "actual injury." 46 U.S.C. §41305 (2021).

- Undeniably, OJC actually shipped and earned profits from 143 FFEs in 2021–2022. Accordingly, the FMC should have subtracted those 143 FFEs from the 400 FFEs that HSDG supposedly would have agreed to transport; on this view, OJC lost profits only for 257 FFEs. Yet the FMC awarded OJC the full 400 FFEs worth of lost profits, reasoning that OJC had projected demand for 4,700 FFEs in 2021–2022. *See* JA16 (Dec. 10). Putting aside that OJC had a habit of wildly over-projecting its demand—in 2020–2021, OJC projected 3,500 FFEs yet actually shipped only 542 FFEs, *see* JA64 (Dec. 58 n.28)—OJC's *projections* are not its actual injury.

- Alternatively, HSDG and Maersk actually transported 24% of the shipments that OJC actually made in 2021–2022. *See* JA1222 (Weiss Ex.

101 (containers tab, sorted by shipper and shipped date)). So, even if the FMC didn't have to subtract *all* of OJC's actual profits from its lost profits calculation, the FMC could not rationally refuse to subtract the actual profits from shipments HSDG and Maersk actually made.

### C. The FMC's award of punitive reparations was arbitrary and capricious.

The Shipping Act provides that for certain violations, "the Commission *may* order the payment of additional amounts, but the total recovery of a complainant may not exceed twice the amount of the actual injury." 46 U.S.C. §41305(c) (2021) (emphasis added). There is no statutory standard for when punitive reparations are appropriate. The FMC applied the standard for civil penalties, which requires the FMC to consider "the nature, circumstances, extent, and gravity of the violation committed," as well as the violator's "degree of culpability" and "history of prior offenses." 46 C.F.R. §502.603(b). In awarding its largest ever punitive reparations award, the FMC arbitrarily ignored several factors.

First, the FMC arbitrarily disregarded that HSDG has no "history of prior offenses." 46 C.F.R. §502.603(b).

Second, the FMC arbitrarily brushed aside the fact that this case contained "novel legal issue[s]." JA36 (Dec. 30). Novelty establishes that

HSDG could *not* have acted in "reckless disregard or plain indifference to the Shipping Act … ." *Rose Int'l Inc. v. Overseas Moving Network Int'l*, Docket No. 96-05, 29 S.R.R. 119, 2001 WL 865708, at *47 (FMC June 1, 2001).

Third, the FMC arbitrarily imposed the maximum penalty even though HSDG continued to ship for OJC, which reduces HSDG's culpability as a matter of law. Indeed, the FMC failed to explain why HSDG deserved to pay the *maximum* penalty here, *see* 46 U.S.C. §41305(c) (2021), that is, why this case is among the worst the FMC has ever encountered.

# CONCLUSION

The FMC's order should be reversed and vacated.

Respectfully submitted,

/s/ Bryan Killian

Bryan Killian
Brendan J. Anderson
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, D.C. 20004
T: 202-739-3000
bryan.killian@morganlewis.com

April 2, 2026

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 11,438 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word 365 in Century 14-point font, a proportionally spaced typeface.

/s/ Bryan Killian