**ORAL ARGUMENT NOT YET SCHEDULED**

---

**No. 25-1156, consolidated with No. 25-1179**

---

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

HAMBURG SÜDAMERIKANISCHE DAMPFSCHIFFFAHRTS-GESELLSCHAFT A/S & CO. KG, ET AL.,
*Petitioners*,

v.

FEDERAL MARITIME COMMISSION AND UNITED STATES OF AMERICA,
*Respondents*.

---

ON PETITION FOR REVIEW OF AN ORDER OF THE
FEDERAL MARITIME COMMISSION

---

# BRIEF OF RESPONDENT FEDERAL MARITIME COMMISSION

---


PHILLIP "CHRIS" HUGHEY
*General Counsel*
HARRY J. SUMMERS
DANIEL P. BASSETT
*Attorney-Advisors*
FEDERAL MARITIME COMMISSION
800 NORTH CAPITOL ST., N.W.
WASHINGTON, D.C. 20573
PHONE: (202) 523-5740
phughey@fmc.gov
hsummers@fmc.gov
dbassett@fmc.gov


April 3, 2026

## RULE 28(a)(1) CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### I. Parties and Amici

The parties to this consolidated proceeding are Petitioners Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG (HSDG A/S), Hamburg Sud North America, Inc. (HSNA) (both collectively Hamburg), Maersk A/S, and Maersk Agency USA, Inc. (both collectively Maersk) (all four entities collectively HSDG),[1] and OJ Commerce LLC (OJC), and Respondents Federal Maritime Commission (Commission or FMC) and United States of America. The Court consolidated Hamburg's and OJC's petitions, and Hamburg and OJC also intervened in each other's cases. No amicus curiae briefs have been filed.

The parties to the proceeding before the Federal Maritime Commission were OJC as Complainant and HSDG as Respondents.

### II. Rulings Under Review

Petitioners seek review of the Commission's Order Affirming Initial Decision in *OJ Commerce, LLC v. Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG, Hamburg Sud North America, Inc.*, FMC Docket No. 21-11, 2024 WL 5714569 (FMC Aug. 27, 2024) (JA7). OJC also seeks review of

[1] Maersk A/S and Maersk Agency USA are successors in interest to HSDG A/S and HSNA, respectively, after they merged with Maersk in November 2021.

the Commission's Order Denying Petition for Reconsideration, FMC Docket No. 21-11 (Doc. 83), 2025 WL 1828625 (FMC June 27, 2025) (JA71).

## III. Related Cases

The Commission knows of no related cases.

# TABLE OF CONTENTS

Page

**RULE 28(a)(1) CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........ i**

**TABLE OF AUTHORITIES ........ vi**

**GLOSSARY ........ xiii**

**INTRODUCTION ........ 1**

**STATEMENT OF JURISDICTION ........ 3**

**STATEMENT OF THE ISSUES ........ 4**

**STATUTES AND RULES ........ 4**

**STATEMENT OF THE CASE ........ 4**

- **I. The Applicable Legal Framework ........ 4**
- **II. The Shipping Relationship Between Hamburg and OJC ........ 6**
  - **A. Hamburg and OJC Had a Service Contract from June 2020 to May 2021, But Problems Developed and It Was Not Renewed ........ 6**
  - **B. Financial Effects on OJC ........ 12**
  - **C. Proceedings Before the Commission ........ 13**

**SUMMARY OF ARGUMENT ........ 16**

**ARGUMENT ........ 19**

- **I. Standard of Review ........ 19**
- **II. The Commission Had Jurisdiction Over OJC's Shipping Act Claims ........ 21**
  - **A. HSDG Did Not Contest the FMC's Jurisdiction over OJC's Claims of Retaliation, nor the Applicable Standard to**

**Determine FMC Jurisdiction Over Claims Related to a Service Contract ..........21**

1. **HSDG Did Not Contest FMC Jurisdiction over OJC's Retaliation Claims, Which Support the Entire Reparations Award ..........**Error! Bookmark not defined.
2. **HSDG Cannot Now Contest for the First Time the Standard for Assessing FMC Jurisdiction over Service Contract-Related Complaints ..........23**

**B. This Court's Opinion in *MSC* Confirms FMC Jurisdiction over OJC's Complaint ..........24**

**III. The Commission's Determination That HSDG Violated the Shipping Act Was Reasonable and Within the Agency's Discretion ..........26**

**A. The Commission Reasonably Concluded that HSDG Retaliated Against OJC ..........27**

1. **OJC's Statements That It Was Considering Bringing a Complaint to the Commission Constitute Protected Activity.. ..........27**
2. **HSDG Retaliated Against OJC by Refusing to Provide Available Space for OJC's Cargo ..........30**

**B. The Commission Reasonably Concluded that HSDG Refused to Deal with OJC ..........31**

1. **2020-2021 Refusal ..........32**
2. **2021-2022 Refusal ..........34**

**IV. The Commission Did Not Abuse Its Discretion in Calculating Reparations ..........37**

**A. HSDG Objections ..........37**

1. **Evidentiary Standards in an Administrative Proceeding ....37**
2. **The Spreadsheet ..........38**
3. **400 Container Minimum Quantity Commitment ..........40**

B. OJC Objections ........................................................................ 41

1. 4,700 Container Minimum Quantity Commitment .............. 41

2. Space Constraints .................................................................. 42

C. The FMC's Decision to Award Additional Amounts of Reparations Was Supported by the Record ............................... 42

V. The FMC's Denial of OJC's Request for Reconsideration of the Reparations Award Was Supported by the Record ....................... 44

VI. The Commission's Determination That HSDG Violated the Shipping Act Was Consistent with the Seventh Amendment Because Congress Permissibly Directed the Agency to Resolve These Claims Under Its Plenary Power to Regulate Foreign Maritime Commerce ........................................................................ 46

A. HSDG Has Forfeited Any Seventh Amendment Claim Because It Failed to Raise the Issue Before the Commission ................... 47

B. The Seventh Amendment and *Jarkesy* ........................................ 49

C. The Seventh Amendment Does Not Apply Here Because the Shipping Act Claims at Issue Do Not Replicate Common Law Claims .......................................................................................... 51

D. Even if the Seventh Amendment Were Implicated by the Claims at Issue Here, They Would Fall Within the Public Rights Exception ............................................................................. 58

1. The Public Nature of Foreign Maritime Commerce Regulation ......................................................................... 58

2. The Retaliation and Refusal-to-Deal Claims at Issue Here Fall Within the Public Rights Exception ................................ 61

E. Even if HSDG Had a Right to a Jury Trial Here, an Enforcement Provision of the Shipping Act Would Provide That Option ........................................................................... 66

CONCLUSION ....................................................................................... 68

## TABLE OF AUTHORITIES

Page(s)

**<u>Cases</u>**

*Anchor Shipping Co. v. Alianca Navegacao E Logistica Ltda.*,
FMC Docket No. 02-04, 2006 WL 2007808 (FMC May 10, 2006) ............23, 25

*A/S Ivarans Rederi v. United States*,
895 F.2d 1441 (D.C. Cir. 1990)........................................................................25

*Ass'n of Am. Railroads v. U.S. Dep't of Transp.*,
896 F. 3d 539, 544 (D.C. Cir. 2018)................................................................. 20

**Atlas Roofing Co. v. OSHA*,
430 U.S. 442 (1977)........................................................... 50, 51, 61, 63, 64, 66

*Axalta Coating Systems v. FAA*,
144 F.4th 467 (3d Cir. 2025) ...............................................................63, 64, 66

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946)...........................................................................................40

*Buttfield v. Stranahan*,
192 U.S. 470 (1904)...........................................................................................59

*California v. United States*,
320 U.S. 577 (1944)...........................................................................................60

*Cal. Bankers Ass'n v. Shultz*,
416 U.S. 21 (1974).............................................................................................58

*Cal. Shipping Line, Inc. v. Yangming Marine Transp. Corp.*,
FMC Docket No. 88-15, 1990 WL 427466, (FMC Oct. 19, 1990)....................39

* Authorities upon which we chiefly rely are marked with asterisks.

**Cargo One, Inc. v. Cosco Container Lines Co., Ltd.*,
FMC Docket No. 99-24, 2000 WL 1648961 (FMC Oct. 31, 2000)....... 23-25, 53

*Citizens' Bank v. Nantucket Steamboat Co.,*
5 F. Cas. 719 (C.C.D. Mass. 1811)....................................................................57

*CFTC v. Schor*,
478 U.S. 833 (1986)..........................................................................48, 53, 65

*Consolo v. FMC*,
383 U.S. 607 (1966)...............................................................................20, 67

*Evergreen Shipping Agency (America) Corp. v. FMC*,
106 F.4th 1113 (D.C. Cir. 2024)..........................................................................6

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)...............................................................................19, 26

*FMC v. S.C. State Ports Auth.*,
535 U.S. 743 (2002)...............................................................................21, 60

*Gov't of Guam v. Am. President Lines*,
28 F.3d 142 (D.C. Cir. 1994)...................................................................60, 63

**Granfinanciera, S.A. v. Nordberg*,
492 U.S. 33 (1989)..................................................49, 50-51, 53, 59, 62, 63, 66

*Jarkesy v. SEC*,
34 F.4th 446 (5th Cir. 2022) ..........................................................................48

*Kappos v. Hyatt*,
566 U.S. 431 (2012)..........................................................................................20

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)..........................................................................................20

*Meeker v. Lehigh Valley R. Co.*,
236 U.S. 412 (1915)..........................................................................................67

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)............................................................................................19

**MSC Mediterranean Shipping Co. S.A. v. FMC*,
141 F.4th 222 (D.C. Cir. 2025)................................................ 5, 6, 22-26, 48, 53

*MSC Mediterranean Shipping Co. S.A. – Possible Violations of the Shipping Act, 46 U.S.C. 41102(c), 40501, 41104(a)(4)(A)*,
FMC Docket No. 23-08, 2026 WL 92421 (FMC Jan. 6, 2026) .........................48

*New Orleans Stevedoring Co. v. Bd. of Comm'rs of the Port of New Orleans,*
FMC Docket No. 00-11, (ALJ June 27, 2001) (available at www2.fmc.gov/ReadingRoom/docs/00-11/00-11initialDecision.pdf/) ......................................................................................36

*NextEra Energy Res., LLC v. FERC*,
118 F.4th 361 (D.C. Cir. 2024)......................................................................19

*Ocean Steam Nav. Co. v. Stranahan*,
214 U.S. 320 (1909)........................................................................................59

*Ortega v. Off. of the Comptroller of the Currency*,
155 F.4th 394 (5th Cir. 2025), *pet. for reh'g en banc filed*, No. 23-60617 (Oct. 21. 2025) ............................................................62, 63, 66

**SEC v. Jarkesy*,
603 U.S. 109 (2024)...................................................3, 46-52, 56, 58, 59, 61-65

*Sims v. Apfel*,
530 U.S. 103 (2000)........................................................................................22

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)........................................................................................20

*Spanski Enters., Inc. v. Telewizja Polska, S.A.*,
883 F.3d 904 (D.C. Cir. 2022).......................................................................21

*Sprint Corp. v. FCC*,
151 F.4th 347 (D.C. Cir. 2025)......................................................................67

*Stern v. Marshall*,
564 U.S. 462 (2011)........................................................................................65

*Sun Valley Orchards, LLC v. U.S. Dept. of Lab.*,
148 F.4th 121 (3d Cir. 2025) .........................................................................64

*The Montana*,
22 F. 715 (C.C.E.D.N.Y. 1884) .......... 58

*Tri-County Tel. Ass'n v. FCC*,
999 F. 3d 714 (D.C. Cir. 2021) .......... 20

*U.S. for Use and Benefit of Am. Civ. Constr., LLC v. Hirani Eng'g & Land Surveying, PC*,
26 F.4th 952 (D.C. Cir. 2022) .......... 20

*Waterman v. Stockholms Rederiaktiebolag Svea*,
3 F.M.B. 248 (1950) .......... 39

*Weinberger v. Salfi*,
422 U.S. 749 (1975) .......... 22, 48

**Statutes and Regulations**

5 U.S.C. § 556(d) .......... 5

5 U.S.C. § 706(2)(A) .......... 19

5 U.S.C. § 706(2)(C) .......... 20

5 U.S.C. § 706(2)(E) .......... 20

28 U.S.C. § 2342(3)(B) .......... 3

46 U.S.C. § 40101 .......... 4, 59

46 U.S.C. § 40102(7) .......... 57

46 U.S.C. § 40102(7)(A) .......... 57

46 U.S.C. § 40102(21) .......... 7, 30

46 U.S.C. § 40501 .......... 6

46 U.S.C. § 40502 .......... 6

46 U.S.C. § 40502(f) .......... 5, 21, 23-25, 52, 62

46 U.S.C. § 41102(d) .......... 5

46 U.S.C. § 41104(a) ....................................................................................3

46 U.S.C. § 41104(a)(2)(A) ..........................................................................6

46 U.S.C. § 41104(a)(3) (2021) ....................................... 2, 4, 13, 14, 17, 27, 30, 42

46 U.S.C. § 41104(a)(10) (2021) ............................... 2, 5, 14, 17, 24, 25, 31, 36, 42

46 U.S.C. §§ 41301–41310 ......................................................................5, 62

46 U.S.C. § 41301 ........................................................................................3

46 U.S.C. § 41304 ........................................................................................3

46 U.S.C. § 41305 ........................................................................................26

46 U.S.C. § 41305(c) ............................................................ 2, 5, 14, 22, 42, 52, 65

46 U.S.C. § 41309 ..................................................................19, 46, 66, 67

47 U.S.C. § 504(a) ......................................................................................67

Interstate Commerce Act of 1887,
Pub. L. 49–104, 24 Stat. 379 (1887) ......................................................56, 60, 63

Ocean Shipping Reform Act of 2022,
Pub. L. 117–146, 136 Stat. 1272 (2022) ..................................................5, 31, 36

Shipping Act of 1916,
Pub. L. 64–25, 39 Stat. 728 (1916) .................................................. 53-56, 61, 63

Shipping Act of 1984,
Pub. L. 98–237, 98 Stat. 67 (1984) ......................................................54, 56, 61

46 C.F.R. § 502.204 ..................................................................................5, 38

46 C.F.R. § 502.261 ..................................................................................44, 47

46 C.F.R. § 502.405(a) ..................................................................................30

46 C.F.R. § 542.1 ..........................................................................................36

**Other Sources**


Daniel Marx, *International Shipping Cartels* 45-67, 127 (1953)............................54

Definition of Unreasonable Refusal to Deal or Negotiate With Respect to Vessel Space Accommodations Provided by an Ocean Common Carrier, 89 Fed. Reg. 59648 (July 23, 2024) ......................................36

Federal Maritime Commission, Fact Finding Investigation No. 29: Final Report (May 31, 2022), https://www.fmc.gov/wp-content/uploads/2022/06/FactFinding29FinalReport.pdf....................................6

H.R. Rep. No. 98-600 (1984)..........................................................................57

Malgorzata Anna Nesterowicz, The Mid-Atlantic View of the Antitrust Regulations of Ocean Shipping, 17 U.S.F. Mar. L.J. 45 (2005)...........................................................................56

Note, The American Shipping Industry and Conference System, 11 Stan. L. Rev. 136 (1958)...........................................................................56

Report of the Committee of the Merchant Marine and Fisheries on Steamship Agreements and Affiliations in the American Foreign and Domestic Trade Under H. Res. 587, (1914)............................................................................................. 54-56, 61

Robert B. Jack, Self Policing of Ocean Shipping Conferences, 20 Stan. L. Rev. 724, (1968)...........................................................................54

Rule of Practice and Procedure; Presentation of Evidence in Commission Proceedings, 81 Fed. Reg. 93831, (Dec. 22, 2016)...........................................................5, 37

S. Rep. No. 97-414 (1982) ..........................................................................57

The Federalist Papers No. 22 (Alexander Hamilton), C. Rossiter ed. 1961,............................................................................60

UNCTAD Review of Maritime Transport, November 2022, https://unctad.org/system/files/official-document/rmt2022_en.pdf .....................6

U.S. Const. art. I § 9, cl. 6 ..........................................................................60

U.S. Const. art. III §§ 1, 2 ..............................................................49, 50, 58, 63, 66

U.S. Const. amend. VII..................................1, 3, 4, 15, 16, 18, 19, 46-53, 58, 63-68

## GLOSSARY

| | |
|---|---|
| **Alexander Report** | Report of the Committee of the Merchant Marine and Fisheries on Steamship Agreements and Affiliations in the American Foreign and Domestic Trade Under H. Res. 587 (1914) |
| **ALJ Decision** | Initial Decision of the Administrative Law Judge (ALJ), *OJ Commerce, LLC v. Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG and Hamburg Sud North America, Inc.*, FMC Docket No. 21-11 (ALJ June 7, 2023) |
| **APA** | Administrative Procedure Act |
| **CIR** | Respondent Federal Maritime Commission's Certified Index to the Record in FMC Docket No. 21-11, *OJ Commerce, LLC v. Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG and Hamburg Sud North America,* (D.C. Cir. Sep 3, 2025), Doc. No. 2133310 |
| **FFE** | Forty-Foot Equivalent (shipping container) |
| **FMC or Commission** | Federal Maritime Commission |
| **FMC Order** | Order Affirming Initial Decision, *OJ Commerce, LLC v. Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG and Hamburg Sud North America, Inc.*, FMC Docket No. 21-11 (FMC Aug. 27, 2024) |
| **FMC Recon. Order** | Order Denying Petition for Reconsideration, *OJ Commerce, LLC v. Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG and Hamburg Sud North America, Inc.*, FMC Docket No. 21-11 (FMC June 27, 2025) |

| | |
|---|---|
| **HSDG** | *Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG, Hamburg Sud North America, Inc., Maersk A/S, and Maersk Agency USA, Inc.* |
| **HSDG A/S** | *Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG* |
| **HSNA** | *Hamburg Sud North America, Inc.* |
| **Hamburg** | *Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG and Hamburg Sud North America, Inc.* |
| **JA** | Joint Appendix |
| **Maersk** | *Maersk A/S, and Maersk Agency USA, Inc.* |
| **MQC** | Minimum Quantity Commitment |
| **OJC** | *OJ Commerce, LLC* |
| **OJC's Recon. Petition** | Petition for Reconsideration, , *OJ Commerce, LLC v. Hamburg Südamerikanische Dampfschifffahrts-Gesellschaft A/S & Co. KG and Hamburg Sud North America, Inc.*, FMC Docket No. 21-11 (Sept. 26, 2024) |

## INTRODUCTION

HSDG, an ocean carrier, challenges the Commission's jurisdiction over the adjudication of this Shipping Act complaint, and its determination that HSDG violated the Act by retaliating against and refusing to deal with OJC, a shipper. It also contends, for the first time, that its Seventh Amendment right to a jury trial has been violated by the Commission's adjudication. OJC challenges the $17,563,806 reparations award it received, seeking an amount many times higher. However, the Commission's substantive decisions were reasonable and well-supported under the deferential standard of review, and they should be upheld. HSDG's attempt to insert a Seventh Amendment issue after the administrative proceedings concluded should be rejected; in any event, the Seventh Amendment does not bar this agency adjudication.

OJC, a U.S. importer of furniture, filed a complaint with the Commission in 2021 alleging that HSDG, an ocean common carrier operating in the foreign commerce of the United States, had violated provisions of the Shipping Act in connection with a one-year 2020-2021 service contract for shipments between Asia and the United States, and in connection with negotiations towards a renewal of that contract for the following year. The evidence shows that HSDG knew it was failing to meet the terms of its the 2020-2021 contract with OJC and that it offered OJC the hope of improved service or better terms in a renewal. But when OJC notified HSDG

that it was considering seeking remedies at the Commission, HSDG retaliated against OJC, cutting off access to space under the existing service contract as well as negotiations towards a new contract.

The Commission concluded that HSDG's conduct violated two separate sections of the Shipping Act in effect at the relevant time – the prohibition against retaliation under 46 U.S.C. § 41104(a)(3), and the prohibition against unreasonable refusals to deal under 46 U.S.C. § 41104(a)(10). In considering an award of reparations for these violations, the Commission found clear evidence that both OJC and HSDG had intended to expand the volume of shipping in the renewal contract. And because it was a lucrative period for OJC's furniture business, HSDG's conduct cost OJC significant, quantifiable profit, as shown in the detailed evidence OJC submitted. There was ample basis for the Commission to award $17.56 million in reparations to OJC, which included additional amounts as authorized by 46 U.S.C. § 41305(c), for the violations of the prohibition against retaliation. OJC asked for reparations of more than $100 million, but after careful consideration, the Commission denied that request as unsupported by the record.

HSDG now contends that the Commission lacked jurisdiction over the Shipping Act claims in this case, because, it says, they are disputes about breach of contract, which the statute reserves to "an appropriate court." Those arguments,

however, have already been addressed by this Court in a recently-published opinion, which HSDG cannot convincingly distinguish from the present proceeding.

HSDG also now avers that the Commission's adjudication was inconsistent with the Seventh Amendment because it was entitled to a jury trial. *See SEC v. Jarkesy*, 603 U.S. 109 (2024). But HSDG did not raise this issue before the agency, even though it had the opportunity to do so. In any event, Congress permissibly assigned the adjudication of complaints like OJC's to the Commission, and in the same statute explicitly reserved traditional breach of contract disputes to the courts. There are no common law analogs to the claims at issue here, including retaliation, and even if there were, those claims would be subject to the public rights exception, under Congress's plenary authority to regulate foreign maritime commerce.

In sum, the Commission permissibly applied the relevant regulatory framework to the factual record, and its decision is not arbitrary and capricious or contrary to law, nor inconsistent with the Seventh Amendment.

## STATEMENT OF JURISDICTION

The Commission had jurisdiction over the underlying complaint brought by OJC against HSDG under 46 U.S.C. §§ 41301, 41304 and 41104(a). This Court has jurisdiction over the petitions for judicial review under 28 U.S.C. § 2342(3)(B).

## STATEMENT OF THE ISSUES

Whether the Commission: (1) correctly asserted Shipping Act jurisdiction over OJC's complaint; (2) permissibly determined that HSDG violated the Shipping Act by retaliating against, and unreasonably refusing to deal with, OJC in cutting off access to an existing service contract and cutting off negotiations towards a contract renewal, after OJC indicated that it was considering pursuing a complaint with the Commission; (3) permissibly determined an appropriate measure of reparations for those violations, including statutorily-authorized additional amounts; and (4) adjudicated OJC's complaint consistent with the Seventh Amendment.

## STATUTES AND RULES

The applicable statutes and regulations are contained in the Addendum to HSDG's Petitioners' Initial Opening Brief (Dec. 23, 2025) (Doc. No. 2151939).

## STATEMENT OF THE CASE

### I. The Applicable Legal Framework

The FMC has jurisdiction over the administration, interpretation, and enforcement of the Shipping Act. *See generally* 46 U.S.C. §§ 40101–41310. In particular, ocean common carriers cannot retaliate against shippers for filing a complaint with the Commission or for "any other reason." 46 U.S.C. § 41104(a)(3) (2021). In addition, ocean carriers cannot refuse to deal with shippers for reasons

unrelated to transportation factors. 46 U.S.C. § 41104(a)(10) (2021).[2] The Commission is required to adjudicate administrative complaints alleging violations of the Act, 46 U.S.C. §§ 41301–41310. However, the Act reserves to the courts traditional causes of action alleging breach of contract. 46 U.S.C. § 40502(f) ("the exclusive remedy for a breach of a service contract is an action in an appropriate court"). *See MSC Mediterranean Shipping Co. S.A. v. FMC*, 141 F.4th 222, 231-235 (D.C. Cir. 2025) (*MSC*) (interpreting this provision).

In conducting adjudications, the Commission applies its Rules of Practice and Procedure at 46 C.F.R. Part 502. Under these Rules, the standards for admissibility of evidence are more liberal than those of the Federal Rules of Evidence, since they are drawn from the Administrative Procedure Act (APA). *See* FMC, Rules of Practice and Procedure; Presentation of Evidence in Commission Proceedings, 81 Fed. Reg. 93831 (Dec. 22, 2016). The FMC's adjudicating officer may consider "all evidence which is relevant, material, reliable and probative, and not unduly repetitious or cumulative." 46 C.F.R. § 502.204; 5 U.S.C. § 556(d).

---

[2] In the Ocean Shipping Reform Act of 2022, Congress strengthened these two prohibitions, and moved the retaliation prohibition to what is now 46 U.S.C. § 41102(d). One consequence since enactment of this legislative change is that the provision allowing additional amounts of reparations for violations of certain Shipping Act prohibitions, 46 U.S.C. § 41305(c), no longer covers retaliation.

## II. The Shipping Relationship Between Hamburg and OJC

Due to the COVID pandemic, this dispute took place during a highly disruptive period for the international supply chain. *See*, *e.g.*, *MSC*, 141 F.4th at 227 (D.C. Cir. 2025) ("The Covid-19 pandemic, and ensuing supply chain disruptions, complicated this contractual arrangement"); *Evergreen Shipping Agency (Am.) Corp. v. FMC*, 106 F.4th 1113, 1116 (D.C. Cir. 2024) (Covid-related plant closure led to Shipping Act dispute). Among other things, the pandemic led to an explosion in the demand for goods. *See* FMC Fact Finding Investigation No. 29, Final Report (May 31, 2022) at 9-11, 41 n.63, available at https://www.fmc.gov/wp-content/uploads/2022/06/FactFinding29FinalReport.pdf. In particular, the demand for durable goods, such as the furniture OJC sold, overwhelmed the supply available in the U.S., contributing to the dislocation of global supply chains. *See* UNCTAD Review of Maritime Transport 2022, November 2022, at 17-19, available at https://unctad.org/system/files/official-document/rmt2022_en.pdf.

### A. Hamburg and OJC Had a Service Contract from June 2020 to May 2021, But Problems Developed and It Was Not Renewed

Under the Shipping Act, cargo must be transported under either a tariff or a service contract. *See* 46 U.S.C. §§ 40501 (tariffs), 40502 (service contracts), and 41104(a)(2)(A) (shipping services must be under either a tariff or a service contract). Service contracts are individually-negotiated agreements between a shipper and a carrier that are filed with the Commission, and they must include a volume

commitment from the shipper and a rate and defined service level from the carrier. *See* 46 U.S.C. § 40102(21) (definition of a service contract). The present proceeding concerns conduct under a service contract and negotiations towards a new service contract.

OJC and Hamburg agreed to a service contract in June 2020 (2020-2021 Contract) with a Minimum Quantity Commitment (MQC) that required Hamburg to transport at least 200 forty-foot-equivalent unit (FFE) shipping containers from Asia to California at specific rates. *See* FMC Order at 3 (JA9). Soon, OJC began requesting more space from Hamburg and protesting Hamburg's cancelation or refusal of bookings. *See* ALJ Decision at 9 (JA391). Hamburg told OJC the only way it could accept more weekly shipments was if OJC agreed to pay a premium of $800 per container. *See id.* at 7 (JA389). OJC sent Hamburg a demand letter in October 2020 arguing that Hamburg was in breach of the 2020-2021 Contract and warning that legal action could result. *See* FMC Order at 4 (JA10).

A Hamburg risk manager, Mr. Gast, after reviewing OJC's claims, noted in an email that "[t]his is a very bad case for us which we will likely lose." FMC Order at 4 (JA10). Mr. Gast admitted that "I do not have confidence in our ability to establish that we are doing our part under these terms." *Id*. at 4 (JA10). Notwithstanding this, Hamburg continued to transport containers for OJC, and the parties initiated negotiations towards a new service contract in the spring of 2021.

*See id*. (JA10). The negotiations lasted from January until April 2021, and during this time OJC continued to press Hamburg for more space under the 2020-2021 contract. *See id*. (JA10). On March 2, 2021, Mr. Weiss, CEO of OJC, told Ms. Casanova, OJC's Account Executive at Hamburg, that OJC had not been able to secure contracted space for many weeks, and five times over the next two months he relayed trouble securing space. *See* ALJ Decision at 11-12 (JA393-94).

Both OJC's concerns over space and the renewal contract negotiations came to a head at the end of April 2021. OJC told Hamburg that it intended to ship 4,700 containers across 2021-2022, but Hamburg was skeptical OJC could keep that commitment. *See* FMC Order at 56 (JA62). On April 27, 2021, OJC gave Hamburg an ultimatum to either provide contracted space pursuant to the 2020-2021 Contract or face legal consequences. *See* ALJ Decision at 12 (JA394). On the same day, Ms. Casanova conveyed to Hamburg coworkers that OJC planned to move "4200-4700" containers in 2021-2022 and requested a proposal from Hamburg on an MQC for the contract renewal. ALJ Decision at 12-13 (JA394-95). Another Hamburg employee, Mr. Li, asked what the MQC was for the account, and on April 28, 2021, Ms. Casanova replied that OJC was "open to our proposal." *Id*. at 13 (JA395). Mr. Li replied that Hamburg needed a clear target for the MQC and referenced the prior year's 200 FFE MQC that OJC "almost fulfilled." *Id*. (JA395). While Ms. Casanova had mentioned possibly expanding the geographic scope of the contract to include

shipments to Kentucky, Mr. Li suggested limiting the scope. *Id*. (JA395). Ms. Casanova then asked OJC to provide "an exact minimum quantity commitment you are willing to sign to continue with process renewal." *Id*. (JA395).

Also on April 28, 2021, a lawyer for OJC emailed a second demand letter to Hamburg. *See* FMC Order at 5 (JA11). The letter stated that Hamburg's failure to provide space under the 2020-2021 contract might result in the "filing of a petition to the Federal Maritime Commission to seek relief." *Id*. (JA11). OJC's letter stated that it had accumulated 40 containers awaiting shipment due to Hamburg's refusal to accept containers. *See* ALJ Decision at 13 (JA395). This was the first time it explicitly invoked the Commission in the record. *See id*. at 14 (JA396). After this letter, Ms. Casanova worked on a contract renewal with OJC by creating a contract template in Hamburg's computer system, which increased the MQC to 400 FFE as a "way of potentially offsetting the anticipated deficit in 2020-2021 and showing an interest in handling more of OJC's volume." *Id*. (JA396).

On April 29, 2021, Ms. Casanova emailed others at Hamburg that she had created a new draft contract containing the "same lanes, rates and conditions [as] the current contract." ALJ Decision at 14 (JA396). Ms. Casanova followed up with a more detailed explanation of her template and attached OJC's April Demand. *Id*. at 14-15 (JA396-97). Ms. Casanova explained that OJC was requesting space that was being denied, OJC did not want to end the relationship, and OJC was open to a

solution that would offset the current contract deficit. *See* FMC Order at 5-6 (JA11-12). Based on this, Ms. Casanova stated she had increased the MQC to 400 FFE to "not only cover the deficit" but also show interest in "more of their volume," assuming that Hamburg was capable of handling this increase. *Id*. at 5-6 (JA11-12). Ms. Casanova stated that OJC was not a short-term account, had constant shipment volume, and was willing to commit "to much more of the current MQC." *Id*. Thus, Ms. Casanova emailed this proposal internally twice without evidence of any negative responses. *Id*. at 55 (JA55).

Mr. Li, in contrast, recommended the opposite course of action to Hamburg's Senior Vice President Pump. Mr. Li told Mr. Pump about OJC's "legal action" against Hamburg and OJC's threats against Hamburg for liquidated damages, which he said came despite Hamburg having shipped 182 of the 200 agreed FFE with a month left in the existing contract. ALJ Decision at 15 (JA397). Mr. Li noted that OJC was "proposing a renewal contract with 400 FFE MQC but all rates remain the same from last year." FMC Order at 6 (JA12). But Mr. Li expressed his opinion that "this is pathetic and unacceptable, it will be a risk to continue work [*sic*] with this account." *Id*. (JA12). Mr. Pump "[f]ully agree[d]" and said "we should not engage in any renewal discussions with customer in light of potential litigation, I would also not provide them with space under the existing contract." *Id*. (JA12). Mr. Li then directed Ms. Casanova, based on Mr. Pump's "executive decision," to disengage

from renewal negotiations and directed a different Hamburg employee to handle the remaining 18 FFE of the 2020-2021 Contract, but "consider not to provide them with space under existing [*sic*] contract." *Id*. (JA12).

On April 29, 2021, Mr. Gast, Hamburg's risk manager, again stated in an internal email that he believed Hamburg was unlikely to meet its obligations under the 2020-2021 Contract. *See* ALJ Decision at 17 (JA399). Mr. Gast, who had been copied on Mr. Li's earlier email to Ms. Casanova, now confirmed in this April 29 email that although Ms. Casanova had tried to address the capacity issue with OJC, she had been told no additional space would be granted to them. *Id*. at 18 (JA400). Mr. Gast hoped that OJC would choose not to sue because OJC wanted to sign a renewal contract, but Mr. Gast also said he would not renew OJC's contract. *Id*. (JA400).

While Hamburg employees identified space and advocated for releasing it to OJC, given the small number of FFE remaining in the 2020-2021 Contract, OJC ultimately shipped only 185 FFE total. *See* ALJ Decision at 16 (JA398); FMC Order at 7 (JA13). Ms. Casanova emailed OJC on May 4, 2021, confirming a conversation from the prior day indicating that Hamburg would not renew the contract, "due to lack of space and equipment in Asia and the shortage of truck power in the US." ALJ Decision at 17 (JA399). She explained that Hamburg would still work with OJC to ship individual containers on the spot market. *See id*. (JA399). Hamburg admitted

that there had been no prior notice of this decision and that it was unilateral. *See id.* (JA399). Hamburg rejected renewal of the contract on any terms. OJC's attempts to negotiate a scaled-down contract addressing Hamburg's professed lack of trucking power in the U.S caused Ms. Casanova to change her explanation for the refusal to focus on space in Asia. *See id.* (JA399).

In the end, Hamburg transported only 185 of the 200 FFE required by the 2020-2021 Contract, and it did not offer OJC a renewal. *See* ALJ Decision at 18-19 (JA400-01).

**B. Financial Effects on OJC**

The record showed that Hamburg's conduct adversely affected OJC in two ways. First, OJC was prevented from utilizing contracted space when Hamburg did not meet the MQC for the 2020-2021 Contract. It is undisputed that Hamburg shipped only 185 FFE for OJC, rather than the 200 FFE the contract called for. *See* ALJ Decision at 18 (JA400). Hamburg employees found sufficient space for Hamburg to meet the MQC after OJC's April Demand, but that space was not provided to OJC, as noted above. *See* FMC Order at 6-7 (JA12-13). Hamburg did ship containers for OJC after the April Demand, but these were already scheduled. *See* ALJ Decision at 19 (JA401).

Second, OJC lost access to reliable and cost-controlled shipments for the annual 2021-2022 contract term, and it struggled to find space and economical spot

rates on the open market. OJC had shipped 542 FFE with all carriers over the 2020-2021 contract year. *See* FMC Order at 55 (JA61). But for the 2021-2022 term, OJC only shipped 143 FFE, all on the spot market with rates generally higher than service contract rates. *See* ALJ Decision at 60 (JA442); FMC Order at 55 (JA61). The record indicated that this occurred in part because OJC had not renewed its service contracts with other ocean carriers, deciding to consolidate all its shipping volume with Hamburg for 2021-2022, under the belief this would make OJC a priority customer with more space and better reliability. *See* ALJ Decision at 10 (JA392). When OJC learned in early May 2021 that the Hamburg contract would not be renewed, it was "very very late in the game" to try to find another contract, and OJC's CEO Mr. Weiss stated that his efforts to negotiate one failed. FMC Order at 4 (JA10); *see* ALJ Decision at 60 (JA442).

### C. Proceedings Before the Commission

OJC filed a complaint with the Commission in November 2021, alleging that Hamburg had violated 46 U.S.C. §§ 41104(a)(3) and (a)(10), as then in effect, in connection with the 2020-2021 Contract and unsuccessful negotiations towards a renewal. *See* Verified Complaint (Doc. 1) (Nov. 23, 2021); FMC Order at 12 (JA18). Also in November 2021, Maersk A/S and Maersk Agency USA became successors in interest to HSDG A/S and HSNA. *See id.* at 2-3. Henceforth, for ease of use this

brief will generally refer to all of these entities and the related current petitioners as HSDG.

The Commission assigned the case to an ALJ for an Initial Decision. The parties conducted extensive discovery and filed numerous motions before the ALJ. *Id*. at 12-14 (JA18-20). OJC argued repeatedly that HSDG was stonewalling discovery requests and requested sanctions. *See id*. at 13 (JA19). The ALJ warned HSDG of potential sanctions for continued non-compliance with ALJ orders, *see id*. at 13-14 (JA19-20), but the ALJ ultimately chose not to sanction HSDG because there was a sufficient record to decide the case, ALJ Decision at 64 (JA446). On June 7, 2023, the ALJ issued the Initial Decision, finding that HSDG had knowingly violated sections 41104(a)(3) and 41104(a)(10), and awarding OJC reparations of $9,843,766.40. ALJ Decision at 1-3 (JA383-85).

Both HSDG and OJC filed exceptions, bringing the case before the full Commission for its review. *See* FMC Order at 14 (JA20). The Commission issued its Final Decision on August 27, 2024, modifying the Initial Decision's award of reparations but otherwise affirming the Initial Decision. *See id*. at 64 (JA70). OJC had sought reparations based on lost profits per container, but the Commission found unsupported assumptions underlying the calculations made from OJC's data. *See id*. at 50 (JA56). The Commission agreed with the ALJ that the facts of this case justified an award of additional reparations pursuant to 46 U.S.C. § 41305(c) and

doubled the reparations award. The Commission calculated reparations for the 2020-2021 Contract based on the profits OJC made on shipments during that period and concluded that $20,737.24 per container was reasonable, for a total award including doubling and interest of $691,193.24. *See id*. at 63-64 (JA69-70). For the 2021-2022 period, the Commission chose $18,983.01 per container, based on the profit OJC earned on containers shipped during this period without the benefit of a service contract, for an award including doubling and interest of $16,872,612.90. *See id*. (JA69-70). The Commission rejected OJC's claim to reparations based on the assumption that it would have paid 2020-2021 contract rates during 2021-2022, concluding that the most reasonable measure of its lost profits would be based on the actual rates it paid. *See id*. at 52-54 (JA58-60). Thus, the Commission awarded OJC reparations of $17,563,806.14. *Id*. at 63-64 (JA69-70).

At no point in proceedings before the Commission did HSDG argue that the adjudication contravened the Seventh Amendment. Nor did HSDG make a jurisdictional challenge to the validity of the Commission's usual administrative framework for evaluating a service contract-related dispute.

OJC, however, did allege in a reconsideration that the Commission had made a substantive error of material fact in its reparations calculations and seeking a far higher award. *See* Complainant's Verified Petition for Reconsideration of Section 3(ii) of Order Affirming Initial Decision Petition for Reconsideration (OJC's Recon.

Petition) (JA590). The Commission denied that petition on June 27, 2025. *See* FMC Recon. Order (JA71).

## SUMMARY OF ARGUMENT

The Commission had a statutory obligation to adjudicate OJC's complaint, because it is based on the Shipping Act, not breach of contract, a conclusion supported by precedent from this Court. The Commission reasonably determined that HSDG violated the Shipping Act by retaliating against and refusing to deal with OJC, a decision that was supported by substantial factual evidence and well within the deferential standard of review. Furthermore, the Commission awarded reparations using reasonable estimates, based on the extensive lost profits data supplied by OJC. The Commission's Final Order was consistent with the Seventh Amendment, because Congress permissibly granted the Commission authority to adjudicate disputes as to the unique foreign maritime commerce regulation at issue here, and it reserved traditional common law breach of contract actions, where the right to a jury trial would arise, to "an appropriate court."

The Commission had jurisdiction to adjudicate OJC's Shipping Act complaint. The agency does not resolve alleged breaches of contract, but this case does not involve such claims, and this Court recently confirmed that the mere

involvement of a service contract in the factual background of a Shipping Act adjudication does not prevent the Commission from considering the complaint.

The Commission's determination that HSDG violated sections 41104(a)(3) and 41104(a)(10) by retaliating against and refusing to deal with OJC was reasonable and well-supported under the deferential standard of review. The agency's interpretation of the scope of those statutory prohibitions was correct. The Commission's interpretation of the retaliation prohibition as covering statements that a party intends to pursue a Shipping Act complaint is consistent with the statutory text and legislative history. Further, while the refusal to deal provision does not prohibit reasonable refusals, it does bar refusals for prohibited purposes when they are concealed by post hoc rationalizations, as happened here. Thus, the Commission's decision was reasonable based on the facts of the case, and was not arbitrary or capricious.

The Commission's award of reparations was also well within its discretion. The agency calculated reparations based on the extensive evidence in the record of OJC's lost profits, arriving at an award that reflected an appropriate estimate based on available information. HSDG argues that OJC's evidence was insufficient, and its harm overestimated, while OJC claims that its harm was underestimated and HSDG should bear more of the burden of uncertainty created by its violations. But the agency's resolution of these competing arguments was reasonable in the

circumstances. Moreover, the agency's discretionary decision to award additional amounts, as permitted by the statute, was also reasonable in light of the clear evidence that HSDG knew its conduct was likely unlawful. OJC argues that the award should have been many times higher, but its claim is based on an implausible estimate of the volume that HSDG would have agreed to and that OJC would have been able to ship in the 2021-2022 year. The reparations award was neither arbitrary nor capricious.

Finally, the Commission's adjudication of the complaint was not inconsistent with the Seventh Amendment. Before the agency, HSDG did not raise any Seventh Amendment issues, and it should be found to have waived these arguments. In its brief to this Court, HSDG has failed to show that the specific claims at issue here, including retaliation, have common law analogs that might implicate the right to a jury trial. The Shipping Act did not withdraw common law claims from the courts; instead, the statute explicitly reserves cases alleging breach of contract to "an appropriate court," where the right to a jury trial would presumably be upheld.

Even if the Seventh Amendment were implicated, the claims at issue would fall within the well-recognized public rights exception. Congress originally gave the Commission's predecessor agency the authority to regulate foreign maritime commerce as part of a comprehensive statutory scheme requiring national

uniformity. Congress overstepped no constitutional lines by creating an expert agency to adjudicate the retaliation and refusal to deal claims at issue here.

Finally, even if the Seventh Amendment did require that a jury trial be available, the Shipping Act provides that option. In the event that it was necessary for a claimant like OJC to seek enforcement of an FMC reparations order in federal district court under 46 U.S.C. § 41309, a respondent like HSDG could then seek a jury trial.

For these reasons, this Court should deny the petitions for review.

## ARGUMENT

### I. Standard of Review

In general, review of agency decisions under the Administrative Procedure Act (APA) is deferential. Title 5 U.S.C. § 706(2)(A) prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The arbitrary and capricious standard is "deferential to the agency." *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 368 (D.C. Cir. 2024) (cleaned up). A reviewing court will uphold an agency's decision under that standard so long as the decision is "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). In applying this standard, "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency's findings of fact will

be upheld so long as they are supported by substantial evidence. *Consolo v. FMC,* 383 U.S. 607, 620 (1966).

An agency's legal determinations are subject to de novo review. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386-88 (2024); *Tri-County Tel. Ass'n v. FCC*, 999 F.3d 714, 719 (D.C. Cir. 2021). Still, in reviewing a claim that an agency has acted in excess of statutory jurisdiction or authority under 5 U.S.C. § 706(2)(C), while "[c]ourts must exercise their independent judgment," "[c]areful attention to the judgment of the Executive Branch may help inform that inquiry." *Loper Bright*, 603 U.S. at 412-13. Indeed, *Loper Bright* noted that courts may "seek aid from the interpretations of those responsible for implementing particular statutes," which "'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance' consistent with the APA." *Id*. at 394 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

This Court reviews de novo the question of a statute's unconstitutionality. *Ass'n of Am. Railroads v. U.S. Dep't of Transp.,* 896 F.3d 539, 544 (D.C. Cir. 2018).

Federal appellate courts generally review awards of damages, which are basically findings of fact, under a deferential standard. *See Kappos v. Hyatt*, 566 U.S. 431, 435-36 (2012) (an agency's factual findings are set aside only if "unsupported by substantial evidence," which is a deferential standard) (quoting 5 U.S.C. § 706(2)(E)); *U.S. for Use and Benefit of Am. Civ. Constr., LLC v. Hirani*

*Eng'g & Land Surveying, PC*, 26 F.4th 952, 959 (D.C. Cir. 2022) (damages awards are essentially findings of fact that will not be disturbed unless clearly erroneous); *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 909 (D.C. Cir. 2018) (statutory damages award under Copyright Act reviewed for abuse of discretion).

## II. The Commission Had Jurisdiction Over OJC's Shipping Act Claims

The Commission had a statutory obligation to adjudicate OJC's Shipping Act claims in this case. *See FMC v. S.C. State Ports Auth.*, 535 U.S. 743, 764 (2002) ("the FMC does not even have the discretion to refuse to adjudicate complaints brought by private parties"); FMC Order at 15 (JA21); ALJ's Decision at 22 (JA404). HSDG argues that jurisdiction is precluded by 46 U.S.C. § 40502(f), which reserves claims for breach of a service contract to an appropriate court, and it challenges the Commission's long-standing administrative interpretation of that provision. However, because it did not raise those issues before the agency, HSDG has waived them. And even if the issues are properly before this Court, the statutory claims at issue here are plainly distinct from breach of contract claims.

### A. HSDG Did Not Contest the FMC's Jurisdiction over OJC's Claims of Retaliation, nor the Applicable Standard to Determine FMC Jurisdiction Over Claims Related to a Service Contract

#### 1. HSDG Did Not Contest the FMC's Jurisdiction Over OJC's Claims of Retaliation, Which Supports the Entire Reparations Award

As a preliminary matter, HSDG waived any argument that the Commission lacks jurisdiction over OJC's retaliation claim on the basis of section 40502(f) by

failing to raise that argument before the agency. HSDG did challenge the Commission's exercise of jurisdiction over OJC's refusal to deal claim, but it failed to do so as to the retaliation claim. *See* Respondent HSDG's Exceptions to Initial Decision, FMC Docket No. 21-11 (Doc. 74) (June 29, 2023) (HSDG Exceptions) at 6-8 (JA456-58). Therefore, HSDG failed to exhaust administrative remedies on that point. *See Sims v Apfel,* 530 U.S. 103, 107; *MSC*, 141 F.4th at 235-38 (finding that an ocean carrier forfeited a claim by not raising it before the Commission); *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975) (administrative exhaustion rule enables agencies to function efficiently, correct their own errors, and compile a record which is adequate for judicial review).

The effect of this waiver is not merely to foreclose a jurisdictional challenge as to one of the two claims at issue. Establishing jurisdiction for the retaliation claim is sufficient to support the entire reparations award, and that claim alone supports the full measure of those reparations; its reach is not limited to only part of the injury caused to OJC. This is clear from the fact that the Commission's discretionary decision to double the reparations award under the authority of 46 U.S.C. § 41305(c) applies to the entire reparations amount. *See* FMC Order at 45 (JA51). Section 41305(c) does not apply to unreasonable refusals to deal. And as this Court recently explained, the Commission need only have jurisdiction over one claim to sustain a Commission decision and the reparations awarded as a result, where that claim is

sufficient to support the full amount. *See MSC*, 141 F.4th at 235-36 (upholding a default decision and the resulting reparations based on a carrier's discovery misconduct).

### 2. HSDG Cannot Now Contest for the First Time the Standard for Assessing FMC Jurisdiction over Service Contract-Related Complaints

It is the Commission's statutory obligation to adjudicate Shipping Act complaints, including when they involve performance under service contracts. See FMC Order at 15 (JA21) (citing *Cargo One, Inc. v. Cosco Container Lines Co. Ltd*, FMC Docket No. 99-24, 2000 WL 1648961, at *14-15 (FMC Oct. 31, 2000)); *see also Anchor Shipping Co. v. Alianca Navegacao E Logística Ltda.*, FMC Docket No. 02-04, 2006 WL 2007808, at *7-11 (FMC May 10, 2006). Commission precedent establishes that the agency will hear claims that "involve elements peculiar to the Shipping Act." *Anchor Shipping*, 2006 WL 2007808, at *9; *Cargo One*, 2000 WL 1648961, at *14.

HSDG now puts forward (Br. at 38-43) a novel and unsupported interpretation of section 40502(f), contending that it prohibits reparations awards even for valid Shipping Act claims through its use of the words "exclusive remedy." But HSDG cannot now question (Br. at 43) *Cargo One*'s applicability as the standard for assessing the scope of section 40502(f), which asks if claims are "inherently" contractual, because it first raises this issue on appeal. Before the Commission,

HSDG merely argued that the agency had failed to adhere to the *Cargo One* test. *See* HSDG Exceptions at 8 (JA458). HSDG now argues that *Cargo One* does not control, but it cannot raise this issue before this Court in the first instance. *See MSC*, 141 F.4th at 235-36 (carrier forfeited argument about the proper standard because it was not raised before the Commission).

### B. This Court's Opinion in *MSC* Confirms FMC Jurisdiction over OJC's Complaint

In any event, the Commission had jurisdiction to resolve both claims at issue here because they are Shipping Act matters that Congress has directed it to address. This Court's recent decision in *MSC* strongly supports the Commission's interpretation of section 40502(f). In *MSC*, the court confirmed that many statutory claims involving service contracts, including section 41104(a)(10) claims like the one at issue here, are properly heard by the Commission. *See* 141 F.4th at 235. The court emphasized that, while section 40502(f) states that the Commission does not have jurisdiction over breach of contract claims, the provision cannot be read so broadly as to "swallow the Commission's statutory authority to adjudicate whole categories of Shipping Act violations." *Id*. at 232; *see id*. at 233. Section 41104(a)(10) claims are one such category, as they "concern matters that are particular to the Shipping Act." *Id.* at 235. Here, like the shipper in *MSC*, OJC "does not seek to litigate particular terms of the service agreements, but rather compliance with the Shipping Act in the course of performance under the contracts." *Id.* at 234.

In reaching its conclusion, the *MSC* court relied in part on *Cargo One*, which as noted above had evaluated the reach of section 40502(f) on the basis of whether the claims at issue were "inherently" contractual ones. *Id*. at 233; *Cargo One*, 2000 WL 1648961, at *15; *see Anchor Shipping*, 2006 WL 2007808 at *10 ("the Commission has an interest in ensuring that service contracts are used in a manner that complies with the Shipping Act"); *see also A/S Ivarans Rederi v. United States*, 895 F.2d 1441, 1445 (D.C. Cir. 1990) ("private regulated parties cannot agree to waive the subject matter jurisdiction of the agency charged with the statutory responsibility" to enforce the Shipping Act).

HSDG's attempts to distinguish *MSC* (Br. at 42-43) are unpersuasive. HSDG claims that the case "differed materially" from this one, but the shipper in *MSC* alleged, as OJC does here, that a carrier took advantage of supply chain disruptions to adopt coercive practices, refused to carry the shipper's cargo despite having service contract commitments, and sold space to other shippers for a premium. *See* 141 F.4th at 227-28. And as noted above, one of the claims in *MSC* was a section 41104(a)(10) claim, also at issue here.

In fact, in *MSC* the carrier raised many of the same arguments that HSDG does here, and this Court rejected them. 141 F.4th at 231-235. HSDG argues that the Commission's interpretation renders section 40502(f) a meaningless nullity, yet the Court stressed that section 40502(f) cannot be read to "swallow the Commission's

statutory authority to adjudicate whole categories of Shipping Act violations." *Id.* at 232. HSDG also asserts, as did MSC, that the remedies involved show that this is essentially a contract case. *See* HSDG Br. at 39-40; Brief of Petitioner MSC, *MSC v. FMC*, No. 24-1007 (Doc. #2104575) (D.C. Cir. Mar. 7, 2025) at 29-30. But the *MSC* court did not accept that argument. The analysis does not turn on the available remedy, and if it did, such an approach would appear to foreclose Commission consideration of every complaint-initiated case involving a service contract, since reparations are the standard remedy for private party complaints under the Shipping Act. *See* 46 U.S.C. § 41305; *MSC*, 141 F.4th at 232 ("the Act specifically lays out how reparations are to be calculated for certain specific violations by common carriers," referring to section 41305).

## III. The Commission's Determination That HSDG Violated the Shipping Act Was Reasonable and Within the Agency's Discretion

The Commission's Final Decision concluding that HSDG's conduct violated two Shipping Act provisions — the prohibition against retaliation and the prohibition against unreasonable refusals to deal — was reasonable and well-supported. The substantial evidence the agency relied on, particularly HSDG's internal communications regarding the reasons for its decisions to cut OJC off, was more than adequate to support the agency's decision. And because that decision was "reasonable and reasonably explained," *Prometheus Radio Project*, 592 U.S. at 423, it should be upheld.

### A. The Commission Reasonably Concluded that HSDG Retaliated Against OJC

At the time the facts in this case took place, 46 U.S.C. § 41104(a)(3) provided as follows:

> A common carrier, either alone or in conjunction with any other person, directly or indirectly, may not . . . (3) retaliate against a shipper by refusing, or threatening to refuse, cargo space accommodations when available, or resort to other unfair or unjustly discriminatory methods because the shipper has patronized another carrier, or has filed a complaint, or for any other reason.

The Commission concluded that HSDG had unlawfully retaliated against OJC due to OJC's notification that it was considering bringing a complaint to the FMC. *See* FMC Order at 24-36 (JA30-42). In reaching that result, the agency decided that OJC's statements about filing a complaint constituted protected activity under the statute's prohibition against retaliation "for any other reason." *Id*. at 30-31 (JA36-37). The agency also determined that HSDG's refusal of space to OJC, both under the existing 2020-2021 Contract and in refusing to negotiate a renewal for the following year, constituted a retaliatory refusal of "cargo space accommodations," and that the record showed that cargo space was available during the relevant time period.

#### 1. OJC's Statements That It Was Considering Bringing a Complaint to the Commission Constitute Protected Activity

The facts of this case exemplify the kind of retaliation by carriers that the statute aims to prevent. *See* FMC Order at 32 (JA38). In its decision, the Commission

distinguished offhand bluster or idle threats from the OJC's actions here, where OJC sent two formal legal demand letters with litigation holds to HSDG, and HSDG took these warnings seriously. *See id*. at 33 (JA39). Despite HSDG's characterization, these were not spurious demands. *See* ALJ Decision at 8-9, 17-18 (JA390-91, JA399-400). Mr. Gast, HSDG's risk manager, internally opined that HSDG was not meeting its contractual demands and would likely lose far more than simple service contract remedies. *See id*. at 18 (JA400). Ms. Casanova's initial proposal was to increase OJC's space allocation to make up for HSDG's failures. *See id*. at 14 (JA396). When Mr. Pump was asked if simply threatening to complain to the Commission, as opposed to filing a complaint, was protected against retaliation, Mr. Pump confirmed that it is "clearly understood in the organization." *Id*. at 22 (JA404). HSDG's compliance training confirmed that complaining to the Commission could not be a reason to disengage from negotiations and Ms. Casanova concocted shifting explanations for HSDG's decision to retaliate in order to hide the real reasons. *See* FMC Order at 7, 11-12 (JA13, JA17-18).

The Commission carefully considered competing arguments about the scope of the statute's anti-retaliation provisions. *See* FMC Order at 31-36 (JA37-42). The Commission's Policy Statement on Retaliation made clear that the purpose of the retaliation provision is to encourage shippers to bring grievances against carriers to the government's attention without fear of retaliation. *See* Statement of the

Commission on Retaliation, FMC Docket No. 21-15 (FMC Dec. 28, 2021) (Policy Statement) (included in Addendum) at 1.

Further, HSDG is wrong in claiming (Br. at 50) that the Commission's Policy Statement narrows instead of expands the Commission's view of prohibited retaliation, and the logical extension of HSDG's argument would empower carriers to unilaterally make determinations about shipper complaints. HSDG's position would allow it alone to decide whether a shipper's contentions are baseless and can be retaliated against, and the Commission would be required to defer to HSDG's judgement during later proceedings. *See* FMC Order at 33-34 (JA39-40). Moreover, letting HSDG retaliate in this case would permit retaliation up until the point when a complaint is administratively filed. *See id*. at 36 (JA42). That would disincentivize shippers from ever discussing emerging disputes with carriers, because they would run the risk of a carrier immediately cutting off any service contracts and any renewal negotiations. *See* ALJ Decision at 42 (JA424); FMC Order at 35 (JA41).

The Commission did compare OJC's demand letters to engaging the agency's Consumer Affairs and Dispute Resolution Services (CADRS), since both provide non-public notice to a specific counterparty of alleged Shipping Act violations with an opportunity to cure before a public dispute arises. *See* FMC Order at 35 (JA35). But while HSDG argues (Br. at 50) that OJC's demand letter did not bring anything to the Commission's attention, neither does confidential CADRS mediation, since

the confidential discussions are not shared with the wider Commission. *See* 46 C.F.R. § 502.405(a). OJC's letter demanding that HSDG maintain files necessary for litigation before the Commission is conduct closely related to actually bringing a complaint to the Commission, and, as the ALJ explained, it is reasonable for the catchall phrase "any other reason" to extend to this closely-related conduct without leading to an unlimited expansion of the statute. ALJ Decision at 41-42 (JA423-24).

### 2. HSDG Retaliated Against OJC by Refusing to Provide Available Space for OJC's Cargo

The record supports the Commission's conclusion that HSDG retaliated against OJC by refusing cargo space accommodations when available, as the retaliation provision in the statute provides. *See* 46 U.S.C. § 41104(a)(3); HSDG Br. at 51-52. HSDG's unsupported assertion (Br. at 52) that refusing a service contract does not constitute refusing "cargo space accommodations when available" should be rejected. A service contract is a reciprocal commitment in which a shipper agrees to provide a minimum volume of cargo, and a carrier agrees to provide the required space at set rates. *See* FMC Order at 27 (JA33); 46 U.S.C. § 40102(21). HSDG argues (Br. at 52) that the Commission could not find that it had refused space without first finding evidence that it had space available. However, the undisputed record shows that during the period of the 2020-2021 Contract, HSDG employees found cargo space accommodations for OJC, and yet did not offer them to OJC. *See* FMC Order at 6-7 (JA12-13). And HSDG negotiated for months with OJC to renew

the contract for 2021-2022 to provide cargo space accommodations, prepared a draft renewal, and subsequently began contracts with other shippers covering the space required to ship thousands of containers. *See id*. at 29 (JA35). The Commission's conclusion that HSDG had space available that it refused to sell to OJC after Mr. Pump's executive direction is supported by the record.

### B. The Commission Reasonably Concluded that HSDG Refused to Deal with OJC

At the time the facts of this case took place, the prohibition against unreasonable refusals to deal, 46 U.S.C. § 41104(a)(10), provided as follows:

> A common carrier, either alone or in conjunction with any other person, directly or indirectly, may not . . . (10) unreasonably refuse to deal or negotiate.[3]

The Commission reasonably found that HSDG's conduct in shutting out OJC during the operative 2020-2021 Contract, and refusing to finalize negotiations on a new service contract, constituted refusals to deal. *See* FMC Order at 18-21 (JA24-27). The agency further concluded that HSDG's conduct was not justified by legitimate transportation factors, meaning that its refusals to deal were unreasonable. *See id*. at 21-24 (JA27-30). Those determinations are well-supported by the record, and HSDG's arguments (Br. at 44-49) are not persuasive.

---

[3] The Ocean Shipping Reform Act of 2022 added ", including with respect to vessel space accommodations provided by an ocean common carrier" after the word "negotiate" in section 41104(a)(10).

#### 1. 2020-2021 Refusal

The Commission reasonably concluded that HSDG refused further shipments after OJC's April Demand. *See* FMC Order at 18-19 (JA24-25). HSDG now argues (Br. at 45) that it did ship 20 containers for OJC after the April Demand and before the service contract expired, but this is not accurate. It is undisputed that HSDG had shipped 182 containers by the day after OJC's April Demand and 185 FFE by the service contract's expiration. *See* ALJ Decision at 30 (JA412); FMC Order at 18-19 (JA24-25). Mr. Li confirmed that HSDG had transported 182 FFE the day after OJC's April Demand, and HSDG admitted that it only shipped a total of 185 FFE at the end of the contract. *See* ALJ Decision at 29 (JA411). HSDG did not argue before the Commission that either of those findings by the ALJ were incorrect. *See* HSDG Exceptions at 9-12 (JA459-62). HSDG also did not argue that the record, such as bills of lading, shows that OJC asked for and was granted space to ship the final three containers after the April Demand. *Id*. (JA459-62). It cannot make these arguments now, although even if the Commission did consider them, shipping three additional containers would not appear to be sufficient to counter the weight of the other evidence as to HSDG's conduct.

Moreover, HSDG's refusal is clear from the record. Screenshots from the day after the April Demand show HSDG transporting 11 FFE for OJC in April and projecting 18 FFE for May. *See* FMC Order at 7 (JA13). A screenshot from May 7,

2021, shows HSDG transporting 9 FFE in April and no containers in either May or June. *See id*. Four different HSDG employees either identified space for OJC, including one that identified 18 available FFE, or offered to work with OJC to identify space after the April Demand. *See* ALJ Decision at 15-16 (JA397-98). Yet after Mr. Pump's decision to cut off OJC, HSDG refused OJC any additional space. *See id*. at 17-18 (JA399-400) (Sales had tried to address OJC's space issue, "but were advised that no additional space would be granted for this customer"). HSDG also asserts (Br. at 45) that shipping 185 FFE while the 2020-2021 Contract was in effect cannot be considered a refusal to deal, but the Commission's decision as to this time period is solely based on the remaining 15 FFE covered by the service contract, which the record shows HSDG could have easily transported, but instead refused.

HSDG has not argued that it had shipped more or less than 182 FFE when it cut off OJC, or that it shipped more than 185 total FFE by the contract's expiration, and HSDG does not now offer evidence that those three unaccounted-for containers were booked after it cut off OJC. On the other hand, OJC explained that the three remaining shipments were scheduled prior to the April Demand. *See* FMC Order at 18 (JA24). Based on the clear record of HSDG's executive refusal, the Commission's decision to credit OJC's explanation for those three containers and

decide that HSDG refused to deal after OJC's April Demand is neither arbitrary nor capricious.

### 2. 2021-2022 Refusal

The Commission's conclusion that HSDG refused to deal with OJC, based in part on HSDG's own admission that it refused a contract renewal under any terms, is neither arbitrary nor capricious. *See* FMC Order at 19-21 (JA25-26). The Commission reasonably found that the evidence supports the conclusion that HSDG refused to deal with OJC based on Mr. Pump's direction. Negotiations started in January 2021 towards a renewed service contract, the parties were in active negotiation exchanging proposals in the days before HSDG cut off OJC, HSDG considered expanding the trade lanes for OJC's renewal contract, and HSDG initially internally proposed increasing OJC's MQC after the April Demand. *Id*. at 4-5, 11 (JA10-11, JA17). Yet Mr. Pump's executive direction caused HSDG to refuse all attempts by OJC to deal, even for a pared-down service contract. *See Id.* at 19 (JA25); ALJ Decision at 28-31 (JA410-13).

HSDG admitted that after the April Demand, it unilaterally notified OJC that it was refusing to renew the 2020-2021 service contract "under any terms." ALJ Decision at 17 (JA399). HSDG argues (Br. at 47) that this was not a refusal, just a failure of negotiations. But HSDG's argument ignores evidence showing that Mr. Pump made an "executive decision," communicated to his subordinates, to "not

engage in any renewal discussions" with OJC. ALJ Decision at 15 (JA397). HSDG's characterization of its actions as simply declining the customer's "preferred terms" fails to account for HSDG's own admission that it rejected a "renewal under any terms," evidence showing that HSDG hid the reasons for the refusal, and evidence that OJC's attempts to address HSDG's pretextual reasons for the refusal were met with a continued refusal. *Id*. at 17 (JA399).

HSDG also argues (Br. at 47) that it did not refuse a renewal because it shipped some OJC containers on the spot market after the service contract expired, but the Commission reasonably explained why higher and volatile spot market rates, compared to a predictable, year-long service contract, are qualitatively different products. *See* FMC Order at 20 (JA26). The Commission amply supported its conclusion that HSDG's refusal to enter a service contract, but its willingness to ship for OJC on the more expensive spot market, constitutes a refusal to deal. *See Id*. at 20-21 (JA26-27). Given OJC's business model, the struggle OJC had in obtaining space even with a service contract, the spike in spot market rates during the relevant period, and the 73% drop in shipments OJC suffered without access to a service contract, it is neither arbitrary nor capricious to conclude that HSDG's refusal to renew a service contract for 2021-2022 was a refusal to deal. *See Id.* (JA26-27).

Finally, contrary to HSDG's contentions (Br. at 47), the Commission's fact-specific and limited decision plainly does not make it "mandatory" to enter into a

service contract. Carriers can refuse to contract with a shipper for any number of reasons; the statute only prevents them from doing so for "unreasonable" reasons. 46 U.S.C. § 41104(a)(10) (2021). These are fact-specific determinations.[4] Here, the clear evidence shows that HSDG refused to deal for reasons even its employees knew were prohibited, and then tried to conceal these reasons. *See* FMC Order at 12 (JA18). But Commission precedent "does not guarantee the right to enter into a contract… all that is required is that common carriers… refrain from shutting out any person for reasons having no relation to legitimate transportation-related factors." *New Orleans Stevedoring Co. v. Bd. of Comm'rs of the Port of New Orleans*, Docket No. 00-11, Initial Decision (Doc. 24) at *15 (ALJ June 27, 2001) available at www2.fmc.gov/ReadingRoom/docs/00-11/00-11initialDecision.pdf/, *aff'd*, 2002 WL 33836158 (FMC June 28, 2002), *aff'd sub nom New Orleans Stevedoring Co. v. FMC*, 80 Fed. Appx. 681 (D.C. Cir. 2003).

---

[4] On July 23, 2024, the Commission issued a final rule providing standards for evaluating alleged refusals to deal, as required by the Ocean Shipping Reform Act of 2022, which as noted above had amended the statute after the time period relevant to this case. *See* Definition of Unreasonable Refusal to Deal or Negotiate With Respect to Vessel Space Accommodations Provided by an Ocean Common Carrier, 89 Fed. Reg. 59648. The new rule, found at 46 C.F.R. § 542.1, is currently the subject of a petition for review before this Court. *See World Shipping Council v. FMC*, No. 24-1298 (D.C. Cir. filed Sept. 13, 2024).

## IV. The Commission Did Not Abuse Its Discretion in Calculating Reparations

The Commission developed reasonable estimates, based on record evidence, to calculate the reparations award. HSDG and OJC object that the award was far too high and far too low, respectively, but the agency made a well-supported decision based on the record before it without crediting unrealistic interpretations of that record. The Commission's decision was guided by voluminous evidence about profit OJC made from actual shipments occurring during the relevant period and evidence that HSDG did have the space available and discussed offering it to OJC, but chose instead to cut OJC off.

### A. HSDG Objections

HSDG argues (Br. at 52-59) that OJC's evidence was insufficient for several reasons. However, the Commission's thorough and clearly-explained analysis of the record was sufficient under the deferential standard of review.

#### 1. Evidentiary Standards in an Administrative Proceeding

HSDG contends (Br. at 53) that the Commission's evidentiary decisions fail to meet the standards found in federal district courts. But as the Commission explained in 2016, the standards of evidence in administrative proceedings governed by the APA are more liberal than the Federal Rules of Evidence. *See* 81 Fed. Reg. 93831. In this proceeding, both the ALJ and the Commission concluded that OJC's spreadsheet and the testimony of OJC witnesses were "relevant, material, reliable

and probative," so the evidence was appropriately admitted and considered. 46 C.F.R. § 502.204.

### 2. The Spreadsheet

HSDG alleges (Br. at 52-55) that Commission incorrectly relied on a spreadsheet produced by OJC, arguing it is not a "business record." But the Commission reasonably concluded that the spreadsheet was sufficiently authentic and reliable given "the great detail of data OJC provided, the lack of specific challenge to any of the 238 data points representing HSDG [A/S] and Maersk shipments, the lack of challenge by HSDG [A/S] to who created the spreadsheet or its data, Mr. Weiss's declaration that the copy of the spreadsheet submitted is 'true and correct,' Mr. Weiss's statement that OJC created the spreadsheet,…[and] Mr. Berning's statement that the data comes directly from OJC's computers," and the ALJ's statement that OJC "provided" the spreadsheet. FMC Order at 40-41 (JA46-47). HSDG says (Br. at 54) that both it and the Commission identified "specific problems" with OJC's spreadsheet. But HSDG admits (*id.*) that the problems were not with the data, but with the "assumptions" underlying the spreadsheet's calculations. As the Commission explained, if the data is reliable and probative, the Commission can, and did in this case, produce its own calculations to evaluate OJC's harm. *See* FMC Order at 52 (JA58). HSDG has yet to find fault with any of the specific data. Moreover, the Commission concluded that some of the ways OJC used

the data to calculate damages were unsupported, and that is why the FMC made changes even when HSDG itself missed these issues. *See id*. at 50-54 (JA56-60).

HSDG's reliance (Br. at 53) on Commission precedent is misplaced. In the two cases it cites in which reparations were not awarded, the claimants relied on "speculative" projections based in one case on a company president's "estimates of the amounts and types of cargoes he could have generated if given access" to certain contracts, *Cal. Shipping Line, Inc. v. Yangming Marine Transp. Corp.*, FMC Docket No. 88-15, 1990 WL 427466, at *24 (FMC Oct. 19, 1990), and in the other on an agent's assumptions about what a competitor "must have earned" leading to a record that was "far too vague" and "completely lacking in details," *Waterman v. Stockholms Rederiaktiebolag Svea*, 3 F.M.B. 248, 249, 250, 253 (1950). Those situations are nothing like the highly detailed data on specific shipments that is present here.

Finally, HSDG argues (Br. at 54) that it has been "handicapped" in its ability to mount an attack against OJC's data. Yet it shipped 238 of the 737 containers in OJC's spreadsheet, providing HSDG an easy way to use its own proprietary information to evaluate OJC's data. *See* FMC Order at 39-40 (JA45-46). OJC provided twelve points of data for every container's contents and twelve points for every product's sales history. *See* ALJ Decision at 49 (JA431). HSDG did not

identify a single error. The Commission fully considered the arguments HSDG made, and reasonably found them inconsistent with the record.

### 3. 400 Container Minimum Quantity Commitment

Finally, HSDG contends (Br. at 55-58) that the Commission did not cite any evidence to support the 400 FFE MQC it used to calculate reparations. Clearly, the figure is an estimate; the Commission is forced to estimate such a number due to HSDG's illegal conduct, which resulted in there not being an actual service contract to assess. *See Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 263-66 (1946) (a reasonable estimate of damages is sufficient where a respondent's wrongful acts prevent more precise proof).

HSDG asserts (Br. at 56) that "there is no evidence" it would have agreed to a higher volume than the prior year, but Ms. Casanova twice emailed internally a higher volume and entered a draft into HSDG's system. *See* ALJ Decision at 14-15 (JA396-97). HSDG further argues (Br. at 56) that there is no evidence OJC demanded 400 FFE or would have been able to fulfill that volume, but OJC shipped 542 containers the prior year and was actively seeking extra space. *See* FMC Order at 56 (JA62).

HSDG also contends (Br. at 57) that OJC did earn profits from 143 containers shipped during the proposed renewal term, and these profits must be subtracted from OJC's reparations. Yet several factors point in the opposite direction: OJC was able

to ship 542 FFE the prior year; it was trying to consolidate all shipping with HSDG; it continually sought extra space; it projected increased demand; and its shipments across the renewal period were more profitable. *See* FMC Order at 55-56 (JA61-62); ALJ Decision at 56-57 (JA437-38). In light of this, the Commission reasonably decided that OJC likely would have supplemented a 400 FFE service contract with 143 FFE of additional shipments given the prior year's shipment of 542 FFE. Finally, HSDG's argument that the shipments it actually carried for OJC during 2021-2022 should be subtracted from the reparations award is not supported. Instead, the agency found that OJC would have made these shipments *in addition to* service contract shipments, not instead of them. *See* FMC Order at 56 (62); ALJ Decision at 56-57 (JA438-39).

**B. OJC Objections**

On the other hand, OJC contends that the evidence it submitted justifies a much higher reparations award. These contentions are also without merit.

**1. 4,700 Container Minimum Quantity Commitment**

OJC insists (Br. at 23-26) that it would have agreed to a 4,700 container minimum quantity commitment with HSDG, and that reparations should be calculated based on that figure. The Commission rightly rejected these arguments as unsupported by the record. *See* FMC Order at 57-60 (JA63-66); ALJ Decision at 53-54 (JA435-36). OJC now contends (Br. at 30) that HSDG's inaction after Ms.

Casanova shared OJC's projections shows it "operationally embraced" these very high volume figures. Yet the record shows that HSDG simply ignored these numbers because they were untethered from reality. *See* FMC Order at 58 (JA64).

#### 2. Space Constraints

OJC also objects (Br. at 33-34) to the Commission's determination to accept HSDG's claims of "space constraints" when calculating reparations, even while the agency rejected HSDG's claims that it lacked space when assessing liability. The Commission's decision was guided by the record in both instances. HSDG had space for OJC, as evidenced by Ms. Casanova's discussions with OJC about a renewal contract and her internal proposal to double the MQC for the renewal contract. *See* FMC Order at 4-5 (JA10-11). At the same time, like every ocean common carrier, HSDG did not have *unlimited* space. *See id*. at 56-60 (JA62-66). The Commission's commonsense decision that HSDG did not have essentially unlimited space is neither arbitrary nor capricious.

### C. The FMC's Decision to Award Additional Amounts of Reparations Was Supported by the Record

As noted above, supra at 14, the Commission determined that HSDG's activity violated both section 41104(a)(3)'s prohibition against retaliation and section 41104(a)(10)'s prohibition against unreasonable refusals to deal. The retaliation provision of the statute was, at the time relevant to this case, covered by 46 U.S.C. § 41305(c), which authorizes the agency to award additional amounts in

reparations, up to a limit of "twice the amount of the actual injury." Because the statute does not include explicit standards for when an award including additional amounts is appropriate, the agency relied on statutory provisions that set forth when illegal conduct under the Shipping Act is "knowing and willful." *See* FMC Order at 45-47 (JA51-53) (addressing in detail each HSDG objection to the additional amounts); ALJ Decision at 61-64 (JA443-46).

HSDG now contests (Br. at 58-59) various points about the determination to award additional amounts, but these objections are not persuasive. HSDG argues that it has no history of prior offenses, yet a cursory search of the Commission's docket shows cases involving Maersk, which owned HSDG at all relevant points. *See* FMC Docket, available at https://www2.fmc.gov/readingroom/. HSDG alleges that the Commission ignored that this case contained novel legal issues, but the Commission addressed that argument, explaining that Mr. Gast twice highlighted that HSDG was likely to lose a lawsuit and not just for contractual damages; Mr. Pump acknowledged he knew his actions were prohibited; HSDG's compliance program confirmed as much; and Ms. Casanova would not admit the real reason HSDG cut off OJC. *See* FMC Order at 11-12, 47 (JA17-18, JA53). The issues here were sufficiently clear that Mr. Gast and Ms. Casanova, two non-lawyers, had no difficulty immediately recognizing HSDG's potential liability. Finally, HSDG again argues (Br. at 59) that it continued to ship for OJC, and that fact should reduce

culpability. But HSDG did not continue to ship *in a reasonable manner* for OJC, as the agency's conclusions about its unlawful conduct make clear. As soon as Mr. Pump issued his direction, HSDG wrongfully cut off OJC from access to the existing service contract and negotiations towards a renewal. *See* FMC Order at 18-21(JA24-27).

Were there not two discoverable emails recording HSDG's actual reasons for cutting off OJC, namely to punish the shipper for considering filing a complaint with the Commission, HSDG may well have gotten away with this unlawful conduct. OJC, on the other hand, lost access to predictable shipping services integral to its business model, and it ended up with access to only 25% of the shipment level it had had in the prior year. In these circumstances, the awarding of a statutorily-authorized additional amount in reparations was well-justified.

## V. The FMC's Denial of OJC's Request for Reconsideration of the Reparations Award Was Supported by the Record

After the Commission's Final Decision was issued, OJC requested reconsideration under 46 C.F.R. § 502.261, contending that the agency had underestimated the reparations it was due. *See* OJC's Recon. Petition (JA590). The Commission properly denied reconsideration. *See* FMC Recon. Order (JA71). OJC now seeks review of that decision, but its claims miss the mark.

OJC argues (Br. at 41-46) that the Commission erred in calculating reparations because it used the increase in volume Ms. Casanova entered into the

draft renewal contract for 2021-2022, but did not use the prior year's shipping rates. *See* OJC's Recon. Petition at 6-8 (JA76-78). OJC's arguments are unavailing. Ms. Casanova created a draft contract and explained that it "contained the same rates as 2020-2021 because those were the rates in the system for the prior contract." FMC Recon. Order at 9 (JA79). Ms. Casanova explained that the "trade team" would set new rates, and she sent them an email explaining that she had changed the volume but left in place the trade lanes, rates, and conditions of the existing contract. *See id*. at 7-8 (JA78-79). In the same email, she described conditions and fees that needed to be updated, indicating that she did not change aspects of the contract that she knew still needed to be updated. *See id*. (JA78-79). She sent a follow up 22 minutes later that added detail about OJC and reiterated the proposal to increase the MQC but did not mention maintaining the same rates or conditions. *See id*. (JA78-79). Ms. Casanova declared under oath that she was not internally proposing to maintain the same rates. *See id*. (JA78-79).

In any event, even if Ms. Casanova was proposing to maintain the same rates, the record does not support the conjecture that HSDG would have made that offer to OJC. *See* FMC Recon. Order at 8 (JA78). As noted, Ms. Casanova was not part of the team that decided rates. *See id*. at 7 (JA77). On the other hand, Mr. Li took special issue with the idea that OJC expected to maintain the same rates, but showed no similar aversion when OJC mentioned a potential substantial increase in volume.

Mr. Pump explained that he did not remember any customers maintaining the same rates, and that such an expectation was detached from the realities of the market. *See id*. at 8 (JA78). Mr. Pump noted that from 2019 to 2021, contract rates doubled or more, and spot rates tripled. *See* ALJ Decision at 19 (JA401). Spot rates provided by OJC itself for the relevant period highlight how unlikely it is that HSDG would have offered to maintain existing shipping rates. *See* FMC Order at 20-21 (JA26-27) (noting spot rates of around $2,000 at the start of the 2020-2021 service contract climbing to $5,742 by the end). The Commission adequately explained why the record did not support basing the reparations amount on shipping rates from the prior year, and that conclusion was neither arbitrary nor capricious.

## VI. The Commission's Determination That HSDG Violated the Shipping Act Was Consistent with the Seventh Amendment Because Congress Permissibly Directed the Agency to Resolve These Claims Under Its Plenary Power to Regulate Foreign Maritime Commerce

HSDG devotes much of its brief (Br. at 24-38) to a claim that this Commission proceeding deprived it of a right to a jury trial under the Seventh Amendment, relying mainly on *Jarkesy*, 603 U.S. 109. But HSDG forfeited that claim by failing to raise it before the agency. Even if that were not so, the Seventh Amendment is not implicated here because there are no common law analogs to the unique Shipping Act claims at issue. And in any event, the agency's resolution of those claims would fall within the public rights exception, because it reflects Congress's plenary power to regulate foreign maritime commerce. Finally, section 41309 of the Shipping Act

provides a mechanism for a jury trial in district court after the conclusion of the administrative proceedings, in the event there are any remaining Seventh Amendment concerns.

### A. HSDG Has Forfeited Any Seventh Amendment Claim Because It Failed to Raise the Issue Before the Commission

As a preliminary matter, the Court need not consider HSDG's Seventh Amendment claim, because HSDG failed to exhaust administrative remedies by not raising the issue with the Commission in this matter, which began in 2021. The administrative record reflects no such argument, even though as the discussion in *Jarkesy* made clear, comparable Seventh Amendment claims have been made, and considered by the Supreme Court, for decades. *See* 603 U.S. at 132-40.

HSDG failed even to bring *Jarkesy* to the Commission's attention, although it could have done so. *Jarkesy* was issued on June 27, 2024. At that point briefing to the Commission in this matter was complete, but the Commission's final decision was not issued until two months later, on August 27, 2024. *See* FMC Order at 1 (JA7). And after that, HSDG still had 30 days under FMC rules to request reconsideration. *See* 46 C.F.R. § 502.261(a). HSDG failed to exercise that option, even though its potential availability was made especially clear by OJC's filing of

just such a petition.[5] *See* OJC's Recon. Petition (JA590). HSDG's omission deprived the Commission of the opportunity to address the issue, and accordingly, HSDG has forfeited its claim. *See MSC*, 141 F.4th at 235-38 (finding that a carrier forfeited a claim by not raising the issue before the Commission); *Weinberger*, 422 U.S. at 765 (the administrative exhaustion rule enables agencies to function efficiently and correct errors).[6]

HSDG argues (Br. at 24-26) that its claim may still be considered because courts will review constitutional issues in some circumstances even in the absence of exhaustion. But the right to a trial by jury in a civil case can be waived, *see Schor*, 478 U.S. at 848-49, and HSDG points to no case in which a court excused a failure to exhaust administrative remedies as to a Seventh Amendment claim like HSDG makes here. In addition, HSDG's failure to raise the claim until now has caused substantial prejudice to the Commission and OJC, which undertook an administrative adjudication spanning over three and a half years that included

---

[5] In fact, the specific issues raised in *Jarkesy* were publicly known and could have been raised with the Commission years earlier, as reflected in the Fifth Circuit's decision from 2022. *See Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022).

[6] The Commission did recently address Seventh Amendment issues in a different case where, unlike here, the respondent submitted *Jarkesy* as supplemental authority. *See MSC Mediterranean Shipping Co. S.A. – Possible Violations of the Shipping Act, 46 U.S.C. 41102(c), 40501, 41104(a)(4)(A)*, FMC Docket No. 23-08, 2026 WL 92421, at *27-35 (FMC Jan. 6, 2026).

extensive discovery and motions practice. *See* FMC Docket No. 21-11. In the circumstances of this case, HSDG has failed to preserve its claim.

### B. The Seventh Amendment and *Jarkesy*

The Seventh Amendment provides that "the right of trial by jury shall be preserved" for "[s]uits at common law, where the value in controversy shall exceed twenty dollars." U.S. Const. amend. VII. The Amendment preserves that right "as it existed in 1791," and it also applies to "actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts" when the United States was founded. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41-42 (1989).

In *Jarkesy*, a securities fraud action, the Supreme Court determined that when federal agencies initiate enforcement proceedings in certain contexts, respondents are entitled to choose a jury trial under the Seventh Amendment, and that requires that cases be brought in an Article III court, rather than before agency ALJs. *See* 603 U.S. at 120-36. The Court laid out a two-part analysis to determine if a particular proceeding must be brought in court on that basis.

First, *Jarkesy* stated, a court must ask whether the specific claims at issue "replicate" common law claims; if so, the Seventh Amendment is implicated and there is generally a right to a jury trial. 603 U.S. at 120. The Seventh Amendment guarantees the right of trial by jury for "[s]uits at common law," which the Court

distinguished from those brought in "equity, and admiralty, and maritime jurisprudence." *Id*. at 122 (cleaned up). To determine when a suit was one at common law, the Court asked whether it was "legal in nature," with the remedy sought being the more important consideration. *Id*. at 122-23. The Court found that the SEC was seeking civil penalties, a remedy that was punitive rather than compensatory, and so it would traditionally be available only in courts of law. *See id*. at 123-25. The Court stated that this "effectively decides" this first part of the analysis, but to confirm that conclusion, it still went on to examine the relation between the securities fraud at issue in *Jarkesy* and common law fraud. *Id*. at 125; *see id*. at 125-26. The Court found the actions analogous, and so the Seventh Amendment applied. *Id*. at 125-26.

Second, even if the Seventh Amendment was implicated, *Jarkesy* recognized that the right to a jury trial is not available if the agency's action is subject to the "public rights" exception. *See* 603 U.S. at 120. That exception applies if the case falls "within any of the distinctive areas involving governmental prerogatives where the Court has concluded that a matter may be resolved outside of an Article III court, without a jury." *Id*. The Court explained that the exception had been extended to a variety of areas, including *the regulation of foreign commerce*, as well as the assessment of tariffs on foreign goods. *See id*. at 128-31.

The *Jarkesy* Court then resolved the public rights issue at hand by determining that the case had more in common with *Granfinanciera* than it did with *Atlas Roofing*

*Co. v. Occupational Safety and Health Review Commission*, 430 U.S. 442 (1977). *See Jarkesy*, 603 U.S. at 132-40. In *Granfinanciera* the Court had found that Congress, in assigning a fraudulent conveyance action by a bankruptcy trustee to a bankruptcy court, had "simply reclassified a pre-existing, common-law cause of action," a "purely taxonomic change," rather than creating anything new. 492 U.S. at 60-61 (cleaned up). The *Jarkesy* Court found this similar to the securities fraud situation it was evaluating. *See* 603 U.S. at 132-34. The Court then distinguished *Atlas Roofing*, which had found that certain Occupational Safety and Health Act violations could be administratively adjudicated, because the statute involved there "did not borrow its cause of action from the common law," nor did it "reiterate common law terms of art"; instead, it created a new set of standards that "resembled a detailed building code." *Jarkesy*, 603 U.S. at 136, 137; *see id*. at 138-40.

### C. The Seventh Amendment Does Not Apply Here Because the Shipping Act Claims at Issue Do Not Replicate Common Law Claims

The Shipping Act claims in this case do not implicate the Seventh Amendment because they are not analogous to common law claims. *Jarkesy* made clear that the right to a jury trial was available only where a claim replicated one that existed at common law, and that is plainly not the case here. *See* 603 U.S. at 120-26.

First, the basic reparations remedy sought for the claims OJC brought in this private-party action are compensatory in nature, not punitive like those *Jarkesy*

found required that a jury trial right be available. *See* 46 U.S.C. § 41305; 603 U.S. at 123-25. The Court noted that the remedy sought was critical to the inquiry, and it emphasized that the fact that the SEC was seeking civil *penalties* "effectively decide[d]" the first part of its analysis, as such remedies were available only in courts of law. 603 U.S. at 125. But here, rather than an agency seeking penalties in an enforcement action, the private party complainant OJC is seeking a compensatory remedy, and so the matter is easily distinguished from *Jarkesy* on that basis.[7] HSDG seems to argue broadly (Br. at 26-29) that any award of money damages requires a jury, but that greatly distorts what *Jarkesy* actually said, and HSDG cites no post-*Jarkesy* case finding a Seventh Amendment jury trial right in a private party's action seeking a compensatory remedy like this one.

Although the remedy sought was critical to this analysis, *Jarkesy* did go on to evaluate whether the claims under review had common law analogs, and in the current case that analysis confirms that the Seventh Amendment is not implicated. First of all, the very structure of the Shipping Act's regulation of conduct involving service contracts underlines Congress's careful effort to craft regulation that does *not* replicate common law claims. As discussed above, in 46 U.S.C. § 40502(f)

---

[7] It is true that the Commission awarded OJC additional reparations here, as authorized by 46 U.S.C. § 41305(c), but even if that additional amount is viewed as more than compensatory in nature, the remaining principles set out in *Jarkesy* still demonstrate that the Seventh Amendment does not preclude the agency's adjudication of these claims, as discussed in detail below.

Congress expressly reserved traditional common law claims for breach of a service contract to "an action in an appropriate court." *See* supra pp. 5. To a significant extent, the analysis as to whether a claim before the Commission raises issues "peculiar to the Shipping Act," even though it relates to a contract, answers both the question whether the agency has jurisdiction and the Seventh Amendment question of whether the action simply replicates a common law claim. *MSC*, 141 F.4th at 233 (quoting *Cargo One*, 2000 WL 1648961, at *14). Thus, if a claim concerns matters that fall under the Shipping Act, it is both within the FMC's jurisdiction and likely outside of the kind of suit covered by the Seventh Amendment. Moreover, the Supreme Court has confirmed that an agency does not violate the Seventh Amendment simply because it adjudicates a dispute between private parties that may share facts with a common law claim. *See CFTC v. Schor,* 478 U.S. 833, 854 (1986).

To any extent the above analysis does not end the inquiry as to whether the specific claims here have the required common law analogs, an examination of those claims in the context of the Shipping Act's evolution shows there are no such analogs. OJC's retaliation and refusal-to-deal claims certainly do not replicate claims that "existed in 1791" or were traditionally decided "in English law courts" when the U.S. was founded. *Granfinanciera*, 492 U.S. at 41-42.

The development of the current Shipping Act, starting with the Shipping Act of 1916 (1916 Act), demonstrates that Congress created a new, comprehensive

system of regulation for ocean-borne foreign commerce. The 1916 Act included a prohibition against retaliation by carriers like HSDG, and a statutory prohibition on refusals to deal was added in the comprehensive 1984 revision of the statute. *See* Shipping Act of 1916, Pub. L. No. 64-25, 39 Stat. 728, § 14 (1916); Shipping Act of 1984, Pub. L. 98-237, 98 Stat. 67, § 10(b)(12) (1984) (1984 Act).

The United States faced significant challenges in foreign commerce in the time leading up to the First World War. *See* Robert B. Jack, *Self-Policing of Ocean Shipping Conferences*, 20 Stan. L. Rev. 724 (1968). To address these challenges, Congress embarked on a study of the advantages and disadvantages of steamship conferences, *i.e.*, arrangements that allowed ocean common carriers to cooperate beyond what would ordinarily be permissible under antitrust law. *See* Daniel Marx, *International Shipping Cartels* 45-67, 127 (1953) (discussing the early investigations into shipping conferences that led to the 1916 Act and evaluating its regulatory implementation). This resulted in the Report of the Committee of the Merchant Marine and Fisheries on Steamship Agreements and Affiliations in the American Foreign and Domestic Trade Under H. Res. 587 (1914) (Alexander Report). The Alexander Report demonstrated that regulation of this sector of international commerce would not be easily accommodated within traditional legal structures. *See* Alexander Report at 304 (in ocean shipping, the monopoly of conference lines had not been subject to any legal control); Jack, 20 Stan. L. Rev. at

724 (due to the international character of ocean shipping, ocean liners had evaded comprehensive government regulation). And although the Report recommended vesting the Interstate Commerce Commission (ICC) with new authority, given the ICC's experience in regulating railroads, Congress subsequently recognized that the regulation of a domestic common carrier like a railroad or ferry was wholly different from regulating international trade. *See* Alexander Report at 309-311, 419, 423. The unique nature of ocean shipping called for unique regulation.

Congress's solution was two-fold. First, Congress subsidized the creation of a U.S. merchant marine, and second, it comprehensively regulated foreign shipping cartels to eliminate the worst monopolistic behavior. *See* 1916 Act. The 1916 Act established a set of prohibitions, including against retaliation, as well as a way to investigate and adjudicate complaints of violations. To implement these measures, Congress created an expert agency called the United States Shipping Board, the Commission's predecessor. The Board was exclusively empowered to regulate international ocean shipping by adjudicating disputes between shippers and steamship companies, ordering reparations and curbing abuses, and issuing reports of investigations. *See* 1916 Act §§ 14-24; Alexander Report at 308. The 1916 Act did not attempt to address breach of contract disputes. *See* 1916 Act. Instead, it aimed to prevent specific actions Congress thought could destabilize a vital international market dominated by foreign ocean carriers. *See* Alexander Report at 309-311, 313.

This regulatory framework was unlike anything that existed at common law. *See* Note, *The American Shipping Industry and the Conference System*, 11 Stan. L. Rev. 136, 142 (1958) (the 1916 Act subjected conferences to significant degree of new federal control).

The specific claims in this case – that an ocean common carrier engaged in retaliation and refused to deal – reflect Congress's concerns about the threats posed by the evolving ocean shipping market. *See Jarkesy* 603 U.S. at 122. As to retaliation, the Alexander Report expressed a concern that shippers would not bring their disputes to a new agency if they feared retaliation by powerful carriers, and the 1916 Act addressed that concern. *See* Alexander Report at 5, 306; 1916 Act § 14. HSDG cites no common law claim prohibiting retaliation by ocean carriers for invoking an agency's jurisdiction, and even the Interstate Commerce Act, from which the Alexander Report drew inspiration, included no retaliation prohibition. Pub. L. 49-104, 24 Stat. 379 (1887).

The later prohibition against refusal to deal derives from similar concerns. In the Shipping Act of 1984, Congress strengthened prohibitions against foreign carriers using the transition from public tariffs to individualized service contracts to exert undue power over U.S. shippers. *See* Malgorzata Anna Nesterowicz, *The Mid-Atlantic View of the Antitrust Regulations of Ocean Shipping*, 17 U.S.F. Mar. L.J. 45, 58-59 (2005). The refusal-to-deal prohibition was one result. *See* 1984 Act §

10(b)(12); Conference Report for the Shipping Act of 1984, H.R. Rep. No. 98-600 (Feb. 22, 1984), at 14. The new provision reflected Congress's growing concern over carriers' power to boycott or punish U.S. shippers and non-vessel-operating common carriers, and the resulting damage to the larger system of foreign commerce regulation, and it is unlike common-law common carriage rules, which were generally aimed at small-scale domestic interactions, such as individuals seeking ferry rides or other domestic transport. S. Rep. No. 97-414, at 40 (1982).

Certainly, as HSDG argues (Br. at 27-28), elements of the Shipping Act incorporate some concepts from the law of common carriage, even calling steamship companies "common carriers." 46 U.S.C. § 40102(7). But the Shipping Act applies only to carriage by water to or from a "*foreign* country," 46 U.S.C. § 40102(7)(A) (emphasis added), specifically excluding domestic carriage, and it creates rules that are distinct from the common law. HSDG appears to cite (Br. at 28) only three cases involving the carriage of goods by water, and only one involves foreign commerce. One concerned liability for the loss of money carried on a steamboat running between two towns in Massachusetts, *see Citizens' Bank v. Nantucket Steamboat Co.*, 5 F. Cas. 719, 724-25 (C.C.D. Mass. 1811), and another involved liability for the loss of bales of cotton shipped from Mississippi to Massachusetts, *see York Co. v. Cent. R.R.,* 70 U.S. 107, 107-108 (1865). The final case, though it did involve steamship service between England and New York, was about liability for the

negligent loss of cargo when a steamship ran aground, *see The Montana*, 22 F. 715, 727 (C.C.E.D.N.Y 1884). The principles involved in those cases are a far cry from the statutory prohibitions in the current case, which reflect Congress's exercise of its "plenary power" over foreign commerce to create comprehensive new regulation of the ocean shipping industry. *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 46 (1974); *see Jarkesy* 603 U.S. at 125-126. The prohibitions at issue here were novel statutory creations with no common law analogs, and the Seventh Amendment does not apply.

### D. Even if the Seventh Amendment Were Implicated by the Claims at Issue Here, They Would Fall Within the Public Rights Exception

Even if the Seventh Amendment did apply to OJC's claims of retaliation and refusal to deal, such claims would not be subject to a jury-trial requirement because they fall within the public rights exception recognized in *Jarkesy*. Indeed, those statutory requirements are quintessential examples of "public rights." As discussed above, they are part of a unique structure of foreign maritime commercial regulation, first established by Congress in the early 20th century to serve the sovereign interests of the nation, and they reflect Congress's plenary power over foreign commerce.

#### 1. The Public Nature of Foreign Maritime Commerce Regulation

The Shipping Act is one of the "distinctive areas involving governmental prerogatives" where matters may be resolved outside of an Article III court, without a jury. *Jarkesy*, 603 U.S. at 120; *see id.* at 128-31. The Act regulates "the foreign

commerce of the United States" in order to promote an efficient, competitive, and economical ocean transportation system. 46 U.S.C. § 40101 (Purposes). Indeed, the phrase "foreign commerce of the United States" would have no meaning in the context of common law claims "ordinarily decided in English law courts" at the time the United States was founded. *Granfinanciera*, 492 U.S. at 41-42.

*Jarkesy* explicitly recognized the public nature of foreign maritime commerce regulation in its discussion of the public rights exception. The Court carefully distinguished Congress's plenary power to regulate foreign commerce, including ocean commerce, from the domestic fraud context the case addressed. *See Jarkesy*, 603 U.S. at 129-30 & n.1. In doing so, the Court discussed *Ocean Steam Navigation Co. v. Stranahan*, 214 U.S. 320 (1909), a challenge to a monetary penalty imposed on a steamship company, emphasizing that that case "expressly confines its analysis to the exercise of Congress's power over foreign commerce," which is "so total" that no party has a vested right to import anything, and which includes the "plenary power in respect to the exclusion of merchandise brought from foreign countries." *Id*. (last quote from *Oceanic Steam*, 214 U.S. at 334, in turn quoting *Buttfield v. Stranahan*, 192 U.S. 470, 492 (1904); emphases in *Jarkesy*); *see Buttfield*, 192 U.S. at 492-93 (discussing the scope of the "complete power of Congress over foreign commerce," which includes the power to enact embargoes, tariffs, exclusions, and import standards for various goods).

The Constitution itself makes clear that the Framers sought national uniformity in the future regulation of maritime commerce — for example in the Port Preference Clause — underlining that such uniformity was not a well-recognized feature of the pre-existing common law. *See* U.S. Const. Art. I, Sec. 9, Clause 6 (barring preferences between ports because of their location in different states); The Federalist Papers (C. Rossiter ed. 1961), No. 22 (Hamilton) at 144 (the lack of national authority over commerce had harmed efforts to gain favorable foreign commercial relations and would "continue to do so as long as the same obstacles to a uniformity of measures continue to exist"); *S.C. State Ports*, 535 U.S. at 767-68 ("the Federal Government undoubtedly possesses an important interest in regulating maritime commerce").

The Commission's longstanding role as the exclusive forum for resolving Shipping Act claims serves these vital public interests. *See Government of Guam v. American President Lines*, 28 F.3d 142, 146 (D.C. Cir. 1994) (contrasting the Shipping Act to the Interstate Commerce Act, which does provide a district court cause of action as an alternative to administrative proceedings). The Supreme Court has long recognized that the agency is "the expert body established by Congress for safeguarding this specialized aspect of the national interest." *California v. United States*, 320 U.S. 577, 584 (1944) (referring to the U.S. Maritime Commission, a predecessor of the Commission); *S.C. State Ports*, 535 U.S. at 767-68 (to serve the

national interest in regulating maritime commerce, the FMC can initiate enforcement proceedings "to investigate alleged violations of the Shipping Act").

### 2. The Retaliation and Refusal-to-Deal Claims at Issue Here Fall Within the Public Rights Exception

In light of that larger context, the specific prohibitions at issue here plainly qualify for the public rights exception under the analytical framework in *Jarkesy*. In particular, the current claims resemble those in *Atlas Roofing*. *See Jarkesy*, 603 U.S. at 132-40. In *Atlas Roofing*, the relevant occupational safety and health statute "did not borrow its cause of action from the common law," but instead embodied specific, modern public safety rules. *Jarkesy*, 603 U.S. at 136, 137. Here, there is likewise no common law claim that an ocean carrier retaliated against or refused to deal with a shipper; instead, those rules reflect relatively recent policy concerns. Indeed, it was in part the lack of an adequate common law remedy that forced Congress to create safeguards to protect the shipping public against abuses by the "completely domina[nt]" ocean carriers. Alexander Report at 306; *see Atlas Roofing*, 430 U.S. at 444-45 (Congress determined that existing common law and statutory remedies were inadequate). As explained above, the retaliation provision was an integral part of the 1916 Act, and the refusal-to-deal prohibition was an important part of the comprehensive revision of the statute in the 1984 Act. *See* Alexander Report at 307; 1984 Act § 10(b)(12). Those provisions require carriers to deal with the public in

specific ways that support the functioning of the comprehensive federal regulatory structure.

The claims at issue in this case are easily distinguished from those that *Jarkesy* and *Granfinanciera* found did not qualify for the public rights exception. The prohibitions here do not "target the same basic conduct," "employ the same terms of art," or "operate pursuant to similar legal principles" as any common law claim, unlike the fraud claims in *Jarkesy*. 603 U.S. at 134. Nor do they amount to the simple "reclassif[ying]" of a "pre-existing, common-law" claim or a "purely taxonomic change," as with the fraudulent conveyance claim in *Granfinanciera*. 492 U.S. at 60-61. HSDG tries (Br. at 29-32) to collapse the claims at issue with breach of contract claims, but they are distinct, as explained above, *see* supra pp. 21-26, and the statute itself carefully preserves this distinction, 46 U.S.C. § 40502(f).

The role of the Commission itself in adjudicating the claims at issue is another important factor underlining the public nature of the rights here. Private parties like OJC have never been authorized to bring these Shipping Act claims directly in court, nor could the Commission itself do so; the type of administrative adjudication involved in this case under 46 U.S.C. §§ 41301-41310 is the only option. A recent Fifth Circuit decision relied in part on this factor in finding regulatory provisions qualified for the public rights exception. *See Ortega v. Off. of the Comptroller of the Currency*, 155 F.4th 394 (5th Cir. 2025), *pet. for reh'g en banc filed*, No. 23-60617

(Oct. 21, 2025). In *Ortega*, the court rejected claims that civil penalties awarded by an ALJ in an action by the Office of the Comptroller of the Currency to enforce provisions of federal banking statutes violated the Seventh Amendment. *See id*. at 402-09. The court noted that there were no "regulatory causes of action against such banks in the 18th century such that the Seventh Amendment could 'preserve' such suits," but later "Congress saw the inadequacy of court adjudication[,] created new remedies[,] and assigned their adjudication to an administrative agency." *Id*. at 406, 408. And the court emphasized that Congress assigned jurisdiction to the "executive branch, with no involvement from Article III courts." *Id*. at 406. The court distinguished the situation in *Jarkesy*, where the SEC only received an elective option to pursue "in-house" agency enforcement in 2010. *Id*. at 403-04. Here, as in *Ortega*, there has never been an option to pursue the claims at issue in court. *See Government of Guam*, 28 F.3d at 146 (contrasting the Interstate Commerce Act's provision for district court actions with the 1916 Act's lack of such an option).

Two recent Third Circuit decisions provide a contrast that, like the one *Jarkesy* identified in *Atlas Roofing* and *Granfinanciera*, strongly supports the application of the public rights exception here. In *Axalta Coating Systems v. FAA*, 144 F.4th 467 (3d Cir. 2025), the court evaluated an enforcement action the FAA had brought against a company for failing to package a can of flammable paint in accord with the agency's hazardous materials regulations. *See id*. at 471-72. The

*Axalta* court found that the FAA action was more akin to *Atlas Roofing* than *Jarkesy* because the rules were "technical prescriptions for engaging in the regulated activity," rather than a replication of common law claims. 144 F.4th at 476; *see id*. at 473-76. The presence of common law terms that Congress "necessarily drew upon when defining" the prohibitions did not render the entire regulatory scheme akin to common law negligence. *Id.* at 477. Likewise in this case, the presence of some common carriage terms in the Shipping Act does not convert the retaliation or refusal-to-deal claims at issue into common law claims.

By contrast, in *Sun Valley Orchards, LLC v. United States Department of Labor*, 148 F.4th 121 (3d Cir. 2025), on which HSDG relies (Br. at 29-30), a different panel found that the Seventh Amendment precluded the Department of Labor from administratively imposing civil penalties for violations of labor standards under a nonimmigrant visa program that had been embodied in a "work contract." *Id*. at 124. The court found that to be effectively enforcing contract obligations, and on the public rights point, the role of immigration was insufficient to make the action a public one because it was really about domestic labor standards. *See Sun Valley*, 148 F.4th at 128-31. But the claims at issue here focus closely on Congress's concerns about foreign maritime commerce, not the type of domestic affairs reflected in traditional common law actions.

HSDG's other arguments as to public rights are unpersuasive and inconsistent with the full analysis *Jarkesy* conducted. First, contrary to HSDG's claims (Br. at 31-32), the involvement of two private parties here does not foreclose application of the public rights exception. In fact, HSDG cites no cases determining that the Seventh Amendment did require a jury trial option for a private-complaint-based adjudication like this one; all the major cases discussed above involved enforcement by a government agency. HSDG tries (Br. at 30 n.3) to distinguish *Schor*, but there the Supreme Court did not find that the Seventh Amendment precluded an agency from adjudicating a dispute, despite the presence of two private parties. *See* 478 U.S. at 837. HSDG also tries (Br. at 31-32) to distinguish *Stern v. Marshall*, 564 U.S. 462 (2011), but there the Court "rejected the limitation of the public rights exception to actions involving the government as a party." 564 U.S. at 490. Instead, the Court explained that the exception can apply where, as here, a claim derives from "a federal regulatory scheme" or its resolution by "an expert Government agency is deemed essential to a limited regulatory objective." *Id*.

In addition, contrary to HSDG's claims (Br. at 33-36), the Commission's award of additional reparations here under section 41305(c) does not prevent application of the public rights exception. Even if that portion of the award were viewed as punitive, that would relate only to the first part of the *Jarkesy* analysis, not the later inquiry as to public rights. Of course, punitive remedies have been

present in cases that found the public rights exception operated to permit agency adjudication despite application of the Seventh Amendment. *See Atlas Roofing,* 430 U.S. at 445; *Ortega,* 155 F.4th at 408; *Axalta,*144 F.4th at 475. Thus, the presence of a punitive remedy does not preclude operation of that exception.

Finally, HSDG's apparent argument (Br. at 36-38) that the Article III analysis in this context is distinct from the Seventh Amendment analysis is incorrect. If the public rights exception applies, and "Congress may assign the adjudication of a statutory cause of action to a non-Article III tribunal, then the Seventh Amendment poses no independent bar to the adjudication of that action." *Granfinanciera*, 492 U.S. at 53-54; *Axalta*, 144 F.4th at 477 n.3. In other words, if the Court concludes that the public rights exception applies to the Commission's adjudication of these claims, it has decided the issue under both the Seventh Amendment and Article III.

### E. Even if HSDG Had a Right to a Jury Trial Here, an Enforcement Provision of the Shipping Act Would Provide That Option

Even if the Seventh Amendment applied to the claims at issue and the public rights exception did not, this adjudication would still not violate the Constitution because a provision of the Shipping Act does offer a jury trial option to a respondent like HSDG. Section 41309 provides that when a person does not comply with a reparations order, the person to whom the reparations were awarded may seek enforcement in a federal district court. 46 U.S.C. § 41309. Section 41309(c) provides that in such an action, "the findings and order of the Commission are prima facie

evidence of the facts stated in the findings and order." In such an action, an administrative respondent like HSDG could seek a jury trial, and that option is sufficient to preserve the Seventh Amendment right. *See Meeker v. Lehigh Valley R. Co.*, 236 U.S. 412, 417-22, 430 (1915) (a statute under which the Interstate Commerce Commission awarded damages to railroad shippers, who could then recover in a civil suit where the agency's findings were prima facie evidence but not conclusive, "does not abridge the right of trial by jury").

Recently, this Court concluded that a provision in the Federal Communications Act available to respondents that have been assessed a monetary forfeiture penalty addresses any Seventh Amendment concerns. *See Sprint Corp. v. FCC*, 151 F.4th 347, 353-54, 359, 361 (D.C. Cir. 2025). Under that procedure, a company may contest liability, but if the FCC affirms it, the company has the option to pay, appeal under the Hobbs Act, or "do nothing at all until it is served with a complaint." *Sprint*, 151 F.4th at 354. Thus, a company could obtain a jury trial in district court, *see id.*; 47 U.S.C. § 504(a), and an FMC respondent like HSDG could follow a similar course of action under 46 U.S.C. § 41309. *See also Consolo*, 383 U.S. at 614-18 (discussing the operation of a predecessor to section 41309).

## CONCLUSION

Because HSDG and OJC have failed to show that the Commission's Final Decision and Denial of Reconsideration were unlawful under the APA or violated the Seventh Amendment, their petitions should be denied.

April 3, 2026

Respectfully submitted,

*/s/ Daniel P. Bassett*

Phillip "Chris" Hughey
*General Counsel*
Harry J. Summers
Daniel P. Bassett
*Attorney-Advisors*
FEDERAL MARITIME COMMISSION
800 North Capitol Street, N.W.
Washington, D.C. 20573
Phone: (202) 523-5802
phughey@fmc.gov
hsummers@fmc.gov
dbassett@fmc.gov

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation and type-style requirements of Fed. R. App. P. 32(a)(7)(B) and D.C. Cir. R. 32(e)(2)(B), because the Court has allowed the Commission 17,000 words for this brief, which contains 16,337 words, excluding the parts of the brief that are exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

The brief also complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it was prepared using Microsoft Word in 14-point Times New Roman font.

*/s/ Daniel P. Bassett*
Daniel P. Bassett
*Attorney-Advisor*
FEDERAL MARITIME COMMISSION
800 North Capitol Street, N.W.
Washington, D.C. 20573
Phone: (202) 523-5802

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of April, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, which will send a notification of such filing to all counsel of record.

*/s/ Daniel P. Bassett*_________
Daniel P. Bassett
*Attorney-Advisor*
FEDERAL MARITIME COMMISSION
800 North Capitol Street, N.W.
Washington, D.C. 20573
Phone: (202) 523-5802

# ADDENDUM

# FEDERAL MARITIME COMMISSION

**Statement of the Commission**
*On Retaliation*

Docket No. 21-15

Issued December 28, 2021

To enforce the prohibitions in Title 46, Subtitle IV, of the United States Code, the Commission relies on shippers and others to inform the Commission about potential unlawful conduct and provide evidence in the form of documents and testimony (both written and oral). Shippers play a similar role when filing complaints and commenting on rulemakings. By filing private party actions, shippers not only serve their own interest by seeking reparations (damages), but they also alert the Commission to potential violations, help the Commission clarify the line between lawful and unlawful conduct, facilitate the development of Commission precedent, and deter unfair and unreasonable conduct. Shippers and other industry participants may also bring disputes to the Commission's Office of Consumer Affairs and Dispute Resolution Services (CADRS) to take advantage of the Commission's alternative dispute resolution procedures.[1]

For this system to function effectively, shippers and other industry participants must be able to raise claims with and provide information to the Commission without fear of retaliation for having done so. The Commission has, and will continue, to take seriously and investigate thoroughly allegations of carrier retaliation. Additionally, the Commission issues this Policy Statement to clarify that it will interpret 46 U.S.C. § 41104(a)(3) – the anti-retaliation provision – broadly to effectuate Congress's intent that shippers feel free to air their grievances to the Commission, and to address new shipping practices and new forms of retaliation.[2]

To that end, the Commission confirms that: (1) although § 41104(a)(3) protects "shippers," that term includes more than just cargo owners; (2) protected activity includes not only filing a complaint with the Commission but also participating in Commission investigatory or enforcement efforts, commenting on a rulemaking, or using CADRS' dispute resolution procedures; and (3) to establish a violation of § 41104(a)(3), a complainant alleging retaliation or other unfair or unjustly discriminatory conduct based on the above grievance-related activity (filing complaints, etc.) does not need to prove that the carrier's conduct was designed to stifle competition of other carriers or that the shipper at issue sought the services of a carrier other than the respondent – cases suggesting otherwise are inapplicable.

---

[1] *See* https://www.fmc.gov/databases-services/consumer-affairs-dispute-resolution-services/.

[2] 46 U.S.C. § 41104(a)(3) provides that "[a] common carrier, either alone or in conjunction with any other person, directly or indirectly, may not . . . retaliate against a shipper by refusing, or threatening to refuse, cargo space accommodations when available, or resort to other unfair or unjustly discriminatory methods because the shipper has patronized another carrier, or has filed a complaint, or for any other reason."

## I. History of Prohibition on Retaliation and Related Conduct

Congressional concern with carrier retaliation predates the Shipping Acts. In 1914, Representative Joshua W. Alexander, the Chairman of the House Committee on the Merchant Marine and Fisheries, presented a report on the Committee's investigation of foreign and domestic shipping lines.[3] The preface to the Alexander Report noted that "[w]hile numerous individual shippers voluntarily presented their grievances to the Committee, under promise of confidential treatment, very few were willing (fearing retaliation) to testify openly against the steamship line or lines upon which they were dependent for the movement of their freight."[4] The report later noted the relationship between carrier market power and shipper fears of retaliation: "Conference lines, through their monopolistic powers, so completely dominate the shippers with whom they deal that these shippers can not afford, for fear of retaliation, to place themselves in a position of active antagonism to the lines by openly giving particulars of their grievances."[5] Committee witnesses and commenters advocated the creation of an authority to review conference and rate agreements, in part to give shippers a venue for filing complaints.[6] They also proposed that Congress prohibit carriers from "refusing accommodations to any shipper by way of retaliation because he may have shipped by an independent line, or may have filed a complaint charging unfair treatment, or for other unjust reasons."[7]

The Committee accepted those proposals, and recommended, among other things, that Congress: (1) empower the Interstate Commerce Commission to "[a]dopt whatever measures it may deem necessary to protect the complainant against retaliation," and (2) prohibit carriers from "retaliating against any shipper by refusing space accommodations when such are available, or by resorting to other unfair methods of discrimination, because such shipper has patronized an independent line, *or has filed a complaint charging unfair treatment*, or for any other reason."[8]

The Shipping Act of 1916[9] drew heavily on the recommendations of the Alexander Report.[10] Section 14 of the 1916 Act prohibited deferred rebates, fighting ships, making

[3] Report of the Committee on the Merchant Marine and Fisheries on Steamship Agreements and Affiliations in the American Foreign and Domestic Trade Under H. Res. 587 (1914) (Alexander Report).

[4] Alexander Report at 5.

[5] Alexander Report at 306; *see also id.* ("The various lines, constituting a conference, have the same interests and their organization is effective. Shippers, on the contrary, live far apart, and because of their different and frequently antagonistic interest can only combine for mutual protection with the greatest difficulty.").

[6] Alexander Report at 307 ("Conference and rate agreements, and pooling arrangements, should be made with the full knowledge of some legally constituted authority in order (1) to safeguard the interests of shippers and (2) to make it possible for shippers to file complaints without fear of retaliation.").

[7] Alexander Report at 313.

[8] Alexander Report at 421 (emphasis added).

[9] Shipping Act, 1916, Pub. L. No. 64-260.

[10] *See Fed. Mar. Bd. v. Isbrandtsen Co.*, 356 U.S. 481, 490 (1958) ("In passing the Shipping Act of 1916 . . . Congress followed the basic recommendations of the Alexander Committee."); H.R. Rep. No. 65-659 at 27 (1916).

discriminatory shipping contracts and "retaliat[ing] against any shipper by refusing, or threatening to refuse, space accommodations when such are available, or resort to other discriminating or unfair methods, because such shipper has patronized any other carrier or has filed a complaint charging unfair treatment, or for any other reason."[11] This language was carried forward with little change as section 10(b)(5) in the Shipping Act of 1984 and its codification as 46 U.S.C. § 41104(a)(3).[12]

The Commission has infrequently discussed retaliation aimed at shipper complaints but has condemned the practice. In *Pacific American Fisheries Inc. v. American-Hawaiian Steamship Co.*, carriers eliminated a pier used by a shipper from the carrier's terminal rate.[13] The United States Maritime Commission, a predecessor of the Federal Maritime Commission, found that the carrier's conduct was unjust and unreasonable under section 18 of the 1916 Act and unduly prejudicial under section 16 of the Act.[14] The Commission also noted, however, that there was evidence that the chairman of the carriers' conference had previously threatened to eliminate the pier from the terminal rate application unless the shipper withdrew a complaint in a related matter. The Commission stressed that "[a]part from the force of such evidence as possible added proof of unreasonableness and undue prejudice, it shows an attitude toward and treatment of shippers by these respondents which is to be condemned, in view of the provision of section 14 (Third) of the Shipping Act, 1916, prohibiting resort by a subject carrier to a discriminating or unfair method because a shipper has filed a complaint."[15]

Most of the caselaw on § 41104(a)(3) and its predecessors, however, is unrelated to shipper grievances and instead concerns conduct such as dual-rate contract systems that impact competition between carriers.[16] The leading case about this type of conduct is *Federal Maritime*

---

[11] Shipping Act, 1916, Pub. L. No. 64-260, § 14.

[12] Shipping Act of 1984, Pub. L. No. 98-237, § 10(b)(5), 98 Stat. 67, 78 ("No common carrier, either alone or in conjunction with any other person, directly or indirectly, may . . . retaliate against any shipper by refusing, or threatening to refuse, cargo space accommodations when available, or resort to other unfair or unjustly discriminatory methods because the shipper has patronized another carrier, or has filed a complaint, or for any other reason."). Although the 1984 Act lacks a comma after "methods" that was present in the 1916 Act, it does not appear that the change was meaningful. Section 14 Third of the 1916 Act was copied "virtually verbatim into the 1984 Act as section 10(b)(5)," *Int'l Ass'n of NVOCCs v. Atl. Container Line*, Docket No. 81-5, 1990 FMC LEXIS 5, at *88 (ALJ Jan. 25, 1990), and the legislative history of the 1984 Act indicates only that section 10(b)(5) was derived from section 14 Third, *Cal. Shipping Line, Inc. v. Yangming Marine Transp. Corp.*, Docket No. 88-15, 1990 FMC LEXIS 25, at *41 (FMC Oct. 19, 1990). The codification of section 10(b)(5) did not result in meaningful changes.

[13] 2 U.S.M.C. 270, 275-279 (U.S.M.C. 1940).

[14] *Pac. Am. Fisheries*, 2 U.S.M.C. at 279.

[15] *Pac. Am. Fisheries*, 2 U.S.M.C. at 277.

[16] See *Isbrandtsen.*, 356 U.S. at 482-83 (finding unlawful under section 14 Third of 1916 Act dual rate contract system); *Pac. Coast/Hawaii & Atlantic-Gulf/Hawaii General Increase in Rates*, 7 F.M.C. 260, 280 (finding sugar freighting agreement requiring party to offer cargo to carrier before using party's own vessel or chartering a vessel did not violate section 14 Third of the 1916 Act because agreement left shipper free to use any other common carrier in the trade); *Isbrandtsen Co. v. States Marine Corp. of Del.*, 6 F.M.B. 422 (Fed. Mar. Bd. 1961) (finding dual rate contract system did not violate section 14 Third of the 1916 Act).

*Board v. Isbrandtsen Co.*[17] There, a non-conference (or "independent") carrier undercut the relevant conference[18] rates. In response, the conference proposed, and filed with the Federal Maritime Board, a dual rate contract system where a shipper who signed an exclusive patronage contract with the conference would receive a lower freight rate than the conference's noncontract rates.[19] The Board approved the system, but the United States Court of Appeals for the D.C. Circuit set aside the order, finding the dual rate system violated section 14 Third of the Shipping Act of 1916.[20]

The Supreme Court affirmed. In interpreting section 14 Third, the Court noted that section 14 of the 1916 Act specifically prohibited three types of conduct that stifles competition between conference and independent carriers: deferred rebates (section 14 First), fighting ships (section 14 Second), and retaliating against shippers by refusing space accommodations because the shipper patronized another carrier, filed a complaint, or for any other reason.[21] The Court pointed out, however, that section 14 included a fourth category of prohibited conduct: "resort to other discriminating or unfair methods."[22] The Court ruled that the practices "outlawed by the 'resort to' clause of § 14 Third take their gloss from the abuses specifically proscribed by the section" and thus "other discriminating or unfair methods" are "confined to practices designed to stifle outside competition."[23]

The Court reasoned that this was consistent with the "revealed congressional purpose in § 14 Third" – "to outlaw practices in addition to those specifically prohibited elsewhere in the section when such practices are used to stifle outside competition of independent carriers."[24] Applying this approach, the Court held that the dual rate contract system at issue was unlawful because the conference implemented it to offset competition from independent carriers.[25]

---

[17] *Isbrandtsen*, 356 U.S. at 482.

[18] A conference is an association of ocean common carriers who engage in concerted activity and use a common tariff. 46 U.S.C. § 40102(8).

[19] *Isbrandtsen*, 356 U.S. at 483; *see also States Marine*, 6 F.M.B. at 439-40 (noting that under a dual rate contract system, "shippers are required to sign a contract in advance and to confine all their shipments to conference lines," and in return, shippers "either receive a discount on freight rates or else lower rates of freight than non-contractors").

[20] *Isbrandtsen*, 356 U.S. at 483.

[21] *Isbrandtsen*, 356 U.S. at 491.

[22] *Isbrandtsen*, 356 U.S. at 492.

[23] *Isbrandtsen*, 356 U.S. at 495; *see also id.* at 493 ("Ties to shippers not designed to have the effect of stifling outside competition are not made unlawful. Whether a particular tie is designed to have the effect of stifling outside competition is a question for the Board in the first instance to determine."); *id* at 499 (holding that "§ 14 Third strikes down dual-rate systems only where they are employed as predatory devices").

[24] *Isbrandtsen*, 356 U.S. at 495.

[25] *Isbrandtsen*, 356 U.S. at 493. Following *Isbrandtsen*, Congress enacted legislation to suspend the case's holding regarding dual rate contract systems until Congress could investigate its ramifications. *See* Pub. L. No. 85-626, 72 Stat. 574, 574 (1958); Pub. L. No. 86-542, 74 Stat. 253, 253 (1960); Pub. L. No. 87-75, 75 Stat. 195, 195 (1961). In

The Commission relied on *Isbrandtsen* to further interpret § 41104(a)(3) through the lens of competition among carriers. In *International Association of NVOCCs v. Atlantic Container Line*, although the Commission's Administrative Law Judge (ALJ) denied a motion to dismiss a claim based on section 10(b)(5) of the Shipping Act of 1984 (the predecessor of § 41104(a)(3)), the ALJ agreed with the respondent ocean carriers that: (1) the law was intended to prohibit predatory practices designed to stifle "outside competition"; and (2) a finding of unlawful discrimination under another section of the law is not sufficient to establish a violation of § 41104(a)(3); rather, a complainant must show that the carrier-respondent had a secondary objective, namely, to stifle outside competition. Otherwise, the ALJ noted, the other prohibitions in the act become surplusage.[26]

Similarly, the Commission in *California Shipping Line, Inc. v. Yangming Marine Transport Corp.* held that section 10(b)(5) "applies solely to retaliatory acts of a carrier against a shipper who has sought the services of another carrier, including retaliatory practices designed to stifle outside competition."[27] There, the complainant, a non-vessel-operating common carrier (NVOCC), alleged that an ocean carrier failed on three occasions to make available to it the essential terms of three service contracts the carrier had with nonparty shippers. The complainant alleged that not only did the carrier violate then-existing law requiring carriers to provide essential terms of service contracts to similarly situated shippers, but that the carrier also violated section 10(b)(5). The ALJ found that the carrier violated the latter prohibition because of the carrier's "discriminatory" denial of access to the service contracts.[28]

The Commission reversed. The Commission cited *Isbrandtsen* and reasoned that if section 10(b)(5) applied to *any* act of discriminatory conduct, it would render other prohibitions superfluous.[29] Consequently, the Commission held that a violation requires retaliatory conduct and evidence that the shipper sought the services of another carrier. Additionally, the Commission rejected a complainant-related retaliation theory, which was premised on complainant having filed a complaint against a different carrier. According to the Commission,

---

1961, Congress amended section 14 the Shipping Act of 1916 to authorize ocean common carriers and conferences to enter into "effective and fair dual rate contracts with shippers and consignees." Pub. L. No. 87-346, 75 Stat. 762, 762 (1961).

[26] *Int'l Ass'n of NVOCCs v. Atl. Container Line*, Docket No. 81-5, 1990 FMC LEXIS 5, at *8-9, *87-97 (ALJ Jan. 25, 1990). There, non-vessel-operating common carriers sued ocean carriers alleging that the ocean carriers refused to make containers, chassis, and other equipment for consolidation and loading of cargo available to NVOCCs at the NVOCCs own premises while at the same time supplying such equipment to other shippers. According to the complainants, the refusal to provide equipment prevented NVOCCs from competing with the ocean carriers for less-than-container-load shippers. *Ariel Mar. Grp. v. N.Y. Shipping Ass'n*, Complaint ¶¶ 1-10 (Dec. 23, 1988). Among other things, the complainants alleged that this amounted to refusing cargo space accommodations when available in violation of section 10(b)(5) of the 1984 Act. *Id.* The ocean carriers moved for dismissal of the claim, arguing that their conduct did not result in the type of predatory conduct covered by the anti-retaliation provision. *Int'l Ass'n of NVOCCs*, 1990 FMC LEXIS 5 at *87-93. The ALJ denied the motion because dismissal at a relatively early stage of the proceedings was inappropriate. *Id.* at *97.

[27] Docket No. 88-15, 1990 FMC LEXIS 25, at *44-45 (FMC Oct. 19, 1990).

[28] 1990 FMC LEXIS 25 at *3-9.

[29] 1990 FMC LEXIS 25 at *44.

"[a]lthough section 10(b)(5) does prohibit retaliation against a shipper because the shipper has filed a complaint, we believe that this provision is limited to situations where the shipper has filed a complaint against the carrier who is allegedly retaliating against it."[30] Subsequent cases cited *International Association of NVOCCs* and *California Shipping Line* as limiting the scope of § 41104(a)(3).[31]

## II. Commission Current Interpretation

Section 41104(a)(3) provides that "[a] common carrier, either alone or in conjunction with any other person, directly or indirectly, may not . . . retaliate against a shipper by refusing, or threatening to refuse, cargo space accommodations when available, or resort to other unfair or unjustly discriminatory methods because the shipper has patronized another carrier, or has filed a complaint, or for any other reason."

Put differently, the provision prohibits a common carrier from:

1. Retaliating against a shipper by refusing, or threatening to refuse, cargo space accommodations when available *because*

    a. the shipper has patronized another carrier,
    b. the shipper has filed a complaint, or
    c. for any other reason; [32]

    or

2. Resorting to other unfair or unjustly discriminatory methods *because*

    a. the shipper has patronized another carrier,
    b. the shipper has filed a complaint, or
    c. for any other reason.

---

[30] 1990 FMC LEXIS 25 at *45-46.

[31] In *MAVL Capital, Inc. v. Marine Transport Logistics*, Docket No. 16-16, 2017 FMC LEXIS 4, at *61 (ALJ Jan. 17, 2017), the ALJ relied on *Int'l Ass'n of NVOCCs* in holding that the complainants' § 41104(a)(3) claims failed because the complainants had not explained how the respondents' conduct was designed to stifle outside competition. The Commission affirmed the ALJ's dismissal of these claims because the complainants did not challenge the dismissal in their exceptions. MAVL, 2 F.M.C.2d 198, 207 (FMC 2020). *See also Edaf Antillas, Inc. v. Crowley Caribbean Logistics*, LLC, Docket No. 14-04, 2014 FMC LEXIS 29, at *29 (ALJ Nov. 6, 2014),(dismissing § 41104(a)(3) claim because the complainant did not show that retaliation due to patronizing another carrier, citing *California Shipping Lines*); *W. Overseas Trade & Dev. Corp. v. Asia N. Am. Eastbound Rate Agreement*, Docket No. 92-06, 1993 FMC LEXIS 61, at *57 (ALJ Aug. 16, 1993) (noting that the Commission in *California Shipping Lines* "established strict standards" for § 41104(a)(3) claims and stating that a shipper using another carrier was a necessary element of the claim).

[32] Although the comma usage in § 41104(a)(3) could be read otherwise, there is reason to believe that the list of protected activity in the provision (i.e., patronizing another carrier, filing a complaint) modifies both the "retaliation" clause and the "resort to" clause. The Court in *Isbrandtsen* indicated that the list of protected activity in the 1916 Act modifies the "retaliation" clause. 356 U.S. at 491. As noted above, it does not appear that subsequent minor amendments to section 14 Third of the 1916 Act, such as deleting the comma after "methods" were intended to change the meaning of the provision.

Although the Alexander Report in 1914 made clear that the Shipping Acts were intended to encourage shippers to bring their grievances against carriers to the government's attention without fear of retaliation, this purpose has largely been ignored in the caselaw, which has focused almost entirely on predatory practices that inhibit competition among carriers. The language used in this precedent, appropriate in the context in which it developed, runs the risk of unduly narrowing the scope of § 41104(a)(3).

The Commission therefore emphasizes the following.

A. "Shipper" Defined Broadly

Unless amended by Congress, § 41104(a)(3) applies only to prohibited conduct directed at a "shipper." But this term protects entities other than just the cargo owner. The term "shipper" means a cargo owner, the person for whose account the ocean transportation of cargo is provided, the person to whom delivery is to be made, a shippers' association,[33] or a non-vessel-operating common carrier that accepts responsibility for payment of all charges applicable under the tariff or service contract.[34] In contrast, passengers on a vessel, unless they otherwise fall within the definition of shipper, are not protected entities under § 41104(a)(3).[35]

B. Protected Activity Extends Beyond Filing a Complaint

Section 41104(a)(3) contains two types of shipper activity that are specifically protected: patronizing another carrier and filing a complaint. Filing a complaint refers to filing a sworn complaint alleging a violation under 46 U.S.C. § 41301(a). The statute also, however, protects shippers from being retaliated against "for any other reason." The Commission interprets "any other reason" to mean that protected activity under § 41104(a)(3) includes other ways that shippers may bring allegations of unlawful activity to the Commission, such as participating in Commission investigatory or enforcement efforts, commenting on a rulemaking, or using CADRS' dispute resolution procedures. This interpretation is consistent with congressional intent as set forth in the Alexander Report and with the important role shippers serve in assisting the Commission with its mission. Further, providing information to Commission investigators and enforcement attorneys, seeking assistance from CADRS, and commenting on Commission rules and notices fall within same class of conduct as filing a complaint.[36]

---

[33] A "shippers' association" is "a group of shippers that consolidates or distributes freight on a nonprofit basis for the members of the group to obtain carload, truckload, or other volume rates or service contracts." 46 U.S.C. § 40102(24).

[34] 46 U.S.C. § 40102(23). Although the protected entities under § 41104(a)(3) are shippers, this does not mean one must necessarily be a shipper to file a complaint alleging a violation. Any person may file a complaint alleging a violation of Title 46, Subtitle IV, Part A. *See* 46 U.S.C. § 41301(a); Federal Maritime Commission Statement on Representative Complaints, Docket No. 21-13 (FMC Dec. 28, 2021).

[35] *Hepner v. The Peninsular & Oriental Steam Navigation Co.*, 27 F.M.C. 563, 565 (FMC 1984) (finding that applying section 14 Third to shippers but not passengers was consistent with the language of the statute and finding that the terms of a negotiated settlement was not prohibited retaliatory conduct).

[36] Under the *ejusdem generis* canon of statutory construction, general words following a list of particular classes of things are construed as applying only to things of the same class as those listed. *Cal. Shipping Line*, 1990 FMC LEXIS 25 at *40 n.19.

C. Section 41104(a)(3) Claims Alleging Complaint-Related Retaliation Do Not Require Proof About Carrier Competition

In addition to setting forth a protected entity and protected activities, § 41104(a)(3) lists two types of prohibited carrier conduct. First, a carrier cannot retaliate against a shipper by refusing, or threatening to refuse, cargo space accommodations because the shipper has engaged in protected activity. Second, a carrier cannot resort to other unfair or unjustly discriminatory methods because a shipper has engaged in protected activity.

The "other unfair or unjustly discriminatory" language is a "catchall clause by which Congress meant to prohibit other devices not specifically enumerated but similar in purpose and effect to those barred by § 14 First, Second, and the 'retaliate' clause of § 14 Third."[37] The Court in *Isbrandtsen* held that only conduct "designed to stifle outside competition" fell within this catchall.[38] But it is not hard to envision situations where a carrier might engage in retaliatory conduct that has nothing to do with competition with other carriers. A carrier might engage in conduct detrimental to a shipper (e.g., refusing to enter into, renew, or amend a service contract) to "get even" with or deter that shipper and other shippers from complaining to the Commission. Under a broad reading of *Isbrandtsen*, this type of carrier conduct would not violate § 41104(a)(3) because it would not involve conduct designed to stifle outside competition.

While the Commission is bound by *Isbrandtsen*, the Commission does not believe it requires such a result and interprets it as not applying where a retaliation claim is based on complaint-related activity (filing a complaint, participating in Commission investigatory or enforcement efforts, commenting on a rulemaking, or bringing a dispute to CADRS). *Isbrandtsen* did not involve allegations that a carrier retaliated against a shipper because it "filed a complaint charging unfair treatment."[39] Rather, at issue was a dual rate contract system designed to protect a conference from an independent carrier.[40] Consequently, the Court had no reason to address, and did not purport to address, the language in the statute that protects shippers who file a complaint. Further, the Court deemed the purpose of section 14 Third was to outlaw practices used to stifle the competition of independent carriers but did not discuss the portions of the Alexander Report that referred to protecting complaining shippers.

Similarly, the Commission finds *International Association of NVOCCs* and *California Shipping Line* inapplicable to claims of complaint-related retaliation. In other words, the Commission will not apply their competition-focused language to future complaint-related claims.[41] The former did not involve allegations of complaint-related retaliation and the ALJ did

---

[37] *Isbrandtsen*, 356 U.S. at 492.

[38] *Isbrandtsen*, 356 U.S. at 495.

[39] Shipping Act, 1916, Pub. L. No. 64-260, § 14.

[40] Although conferences were once a significant force in ocean transportation, there is only one active conference on file with the Commission, and it is only for the carriage of U.S. government cargoes in the Trans-Pacific trade.

[41] The Commission will also not apply similar limiting language in cases relying on *International Association of NVOCCs* and *California Shipping Lines*, such as that in *MAVL Capital, Inc.*, 2017 FMC LEXIS 4 at *61; *Edaf Antillas*, 2014 FMC LEXIS 29 at *29; *W. Overseas Trade & Dev. Corp.*, 1993 FMC LEXIS 61 at *57.

not address that aspect of § 41104(a)(3)'s language. Nor did the ALJ explain why a complainant who alleged carrier retaliation based on filing a complaint would also need to show that the carrier had a "secondary objective" to stifle outside competition. It is enough that a complainant can show that a carrier engaged in unfair or unjustly discriminatory conduct *because* a shipper filed a complaint-related activity.

*California Shipping Line* was primarily a me-too service contract access case. Requiring a complainant alleging complaint-related retaliation to prove that the shipper "sought the services of another carrier" is inconsistent with the plain language of § 41104(a)(3), which contains no such element, and is inconsistent with Congress's purpose to combat shipper reticence about bringing complaints to the government. Moreover, this extra step simply does not make sense when the allegation is that a carrier engaged in unfair conduct because a shipper filed a complaint.[42]

That said, the Commission's interpretation in this section of the Policy Statement is only that the statements in the above cases – which limit "unfair or unjustly discriminatory conduct" to conduct implicating carrier competition – do not apply to claims alleging prohibited conduct based on complaint-related activity by shippers. In contrast, the holdings are applicable in the factual contexts in which they arose, e.g., where the alleged unlawful conduct involves "ties" between shippers and carriers.[43]

The Commission also acknowledges that § 41104(a)(3) should not be read so expansively that it renders other prohibitions in Chapter 411 of Title 46 superfluous. Section 41104 of Title 46, for instance, only prohibits specific types of unfair or unjustly discriminatory conduct.[44] Section 41104(a)(3) prohibits a common carrier from "resort[ing] to other unfair or unjustly discriminatory methods . . . for any other reason." The latter does not swallow the other prohibitions, however, because it is not a flat prohibition on all unfair or unjustly discriminatory conduct. A complainant must show that a carrier engaged in prohibited conduct (refusing cargo space accommodations or other unfair or unjustly discriminatory methods), with respect to a protected entity (shipper), because the protected entity engaged in protected activity (patronizing other carriers, filing a complaint, or other activities of the same class).

*By the Commission.*

William Cody
Secretary

---

[42] As noted above, the Commission in *California Shipping Line* dismissed a complaint-related retaliation claim because the carrier accused of retaliation was not the carrier against whom the complainant had previously filed a complaint. While the Commission takes no position on that aspect of *California Shipping Line* here, there could be circumstances where a carrier might be motivated to retaliate against a shipper who filed a complaint against another carrier.

[43] *Isbrandtsen*, 356 U.S. at 493 ("Ties to shippers not designed to have the effect of stifling outside competition are not made unlawful.").

[44] *See* 46 U.S.C. § 41104(a)(4), (5),